UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE BOARD OF MANAGERS OF TRUMP TOWER AT CITY CENTER CONDOMINIUM, by its President, Alan Neiditch,<br><br>                    Plaintiff,<br><br>          v.<br><br>FRANK PALAZZOLO, MARY PALAZZOLO, STEPHEN TOBIA, STEPHEN REITANO, JOSEPH SANTANGELO, LORRAINE DISTEFANO, GINA THOMAS, LORI OVERTON, F & M FUNDING LLC, RLA HOLDINGS, LLC, PREMIUM STAFFING LLC, PREMIUM PARKING, LLC, ANTOINETTE CITY CENTER, LLC, RIDGEVIEW HOLDINGS LLC, B.A.B. GROUP I, LLC, B.A.B. GROUP, II, LLC, FIRST RESOURCE FUNDING LLC, and REDA, ROMANO & COMPANY, L.L.P.<br><br>                    Defendants. | Docket No.: 16-cv-9188<br><br><br><br>**<u>COMPLAINT</u>**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

Summary of Action ............................................................................................................ 1

The Parties ...................................................................................................................... 3

Jurisdiction and Venue ..................................................................................................... 9

Facts Common to All Causes of Action .......................................................................... 10

   *The Illegal Scheme and the Palazzolo Enterprise* ................................................... 10

   *Palazzolo Sets Up a Complex Web of Accounts Designed to Siphon the Condominium's Funds Without Detection* ............................................................ 15

   *The First Sham Transfer: The 2010 RLA Loan* ..................................................... 18

   *Unit Owners Demand Reversal of the Loan* .......................................................... 21

   *The Palazzolo Enterprise Covers Its Tracks at Chase* ........................................... 22

   *Additional Unauthorized Transfers* ...................................................................... 23

   *Continuing Investment in Ridgeview* .................................................................... 27

   *Cremac Commercial Finance LLC* ....................................................................... 28

   *Palazzolo's Theft of Insurance Proceeds* .............................................................. 29

   *The Operating Account is Depleted* ...................................................................... 32

   *FloTV* ................................................................................................................... 34

   *Misrepresentations in Financial Statements and the Alteration of Bank Documents* ............... 35

   *Reda Romano is Hired to Perform Audit Services* ................................................. 38

   *The Board Adopts an Ethics Policy* ...................................................................... 39

   *The Final Sham Transfer: Palazzolo "Borrows" $1.2 million more for RLA* ......................... 40

   *The Forensic Investigation Reveals Additional Sham Relationships* ....................... 42

   *Premium Staffing and Premium Parking* ............................................................... 43

   *Diversion of Utility Payments by the Palazzolo Enterprise* ................................... 49

CLAIMS FOR RELIEF ................................................................................................... 50

Plaintiff Board of Managers (the "Board") of Trump Tower at City Center Condominium of White Plains (the "Condominium"), by its attorneys, Meister Seelig & Fein LLP, as and for its Complaint against defendants hereby alleges as follows:

## Summary of Action

1.      This is an action brought under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*. and state law for treble, actual, and punitive damages.

2.      The Condominium is a 35-story, 212-unit condominium in White Plains, New York.  The building opened in 2005 and, at all times, is governed by the seven-member Board, Plaintiff in this action.

3.      From his election as the Condominium's Treasurer in 2007 until his removal in 2015, defendant Frank Palazzolo ("Palazzolo") and his co-defendants conspired to finance their own private and personal business investments by stealing the Condominium's money.

4.      Without authorization, Palazzolo and other members of the Palazzolo Enterprise transferred over $8,751,528.26 of the Condominium's funds to himself, to unauthorized and unknown third parties, and to many of the defendants named herein.  Palazzolo "borrowed" whatever he needed from the Condominium's reserve and other accounts as if they were his own piggy bank, but often failed to return what he had taken.  In total, Palazzolo and other members of the Palazzolo Enterprise failed to replace $1,340,814.33 of the Condominium's money that he had stolen for the benefit of his criminal enterprise.

5.      Palazzolo, together with his wife, defendant Mary Palazzolo ("Mary Palazzolo"), his business associates Stephen Tobia ("Tobia"), Stephen Reitano ("Reitano"), Joseph Santangelo ("Santangelo"), Lorraine DiStefano ("DiStefano"), Lori Overton ("Overton"), and

Gina Thomas ("Thomas"), and the business organizations named herein, defendants F & M Funding, LLC ("F & M"), RLA Holdings, LLC ("RLA"), Premium Staffing, LLC ("Premium"), Premium Parking, LLC ("Premium Parking"), Antoinette City Center, LLC ("ACC"), Ridgeview Holdings, LLC ("Ridgeview LLC"), B.A.B. Group I, LLC ("BAB I"), B.A.B. Group II, LLC ("BAB II"), First Resource Funding LLC ("First Resource"), and Reda, Romano & Company, L.L.P. ("Reda Romano") compose an association-in-fact (the "Palazzolo Enterprise") funded by defendants' countless acts of racketeering in the course of their shameless looting of the Condominium.

6.     As the Condominium's Treasurer, Palazzolo was entrusted with significant responsibility, as well as with direct and sole control over the Condominium's cash reserves. Instead of faithfully carrying out his duties, Palazzolo used his position of authority and his sole control over the Condominium's purse strings to illegally finance the Palazzolo Enterprise. Palazzolo committed repeated and continuing acts of deception, fraud, and outright theft from the Condominium's reserve and other accounts to falsely inflate the balance sheets of the defendant business organizations named herein with millions of dollars belonging to the Condominium.  Palazzolo kept stealing from the Condominium until his enterprise, his lies, and his thefts were uncovered during a forensic examination conducted by the Board following his removal in 2015.

7.     Defendants' conduct violates the Racketeer Influenced and Corrupt Organizations Act, 28 U.S.C. § 1961 *et seq.* ("RICO"), with predicate acts of wire fraud, mail fraud, bank fraud, and violations of the National Stolen Property Act.  In addition, defendants' conduct gives rise to liability under numerous causes of action under New York law, including but not limited to common law fraud, unjust enrichment, conversion, and breaches of fiduciary duty.

8.      As described herein, defendants systematically and continuously conducted a corrupt enterprise through a pattern of racketeering acts in violation of RICO undertaken for their own benefit and for the wrongful purpose of harming and intentionally defrauding the Condominium, its residential unit owners, its bankers and lending partners, and all those who would rely on the banking records and financial statements of the Condominium.

9.      Through this Complaint, the Board seeks to recover the funds stolen by Palazzolo and to recover damages from him and the other members of the Palazzolo Enterprise to the fullest extent permitted by civil RICO laws.  This civil RICO action seeks treble, actual, and punitive damages, together with interest, costs, and fees; and all other relief that this Court deems just and proper.

The Parties

10.     Plaintiff Board is an unincorporated association and the legal entity responsible for the control and operation of all common areas and public spaces of the Condominium.  The Board maintains its office and principal place of business care of the Trump Corporation ("Trump Corp."), 725 Fifth Avenue, New York, New York 10022.

11.     Defendant Frank Palazzolo is an individual residing at 10 City Place, Unit PH-5D, White Plains, New York 10601.  Palazzolo served as Treasurer of the Condominium from 2007 until he was removed from that office by the Board in 2015.  Palazzolo remains a member of the Board as the nominated representative of the commercial spaces in the Condominium.  Palazzolo is also a real estate investor and businessman who, together with defendants, conspired to fund his own business activities and the business activities of the Palazzolo Enterprise with money stolen from the Condominium.  Palazzolo was the leader of the Palazzolo Enterprise, an association-in-fact comprising Palazzolo's friends, business associates, and the defendant

3

business organizations under their control.  Palazzolo used the money stolen from the Condominium to commit predicate acts of racketeering in furtherance of the Palazzolo Enterprise.  Palazzolo owns a commercial building at 800 Central Park Avenue in Scarsdale, New York that is both publicly advertised and well-known as "Palazzolo Plaza."  Palazzolo Plaza is the address used by many of the business organizations composing the Palazzolo Enterprise, including F & M, RLA, First Resource Funding, Premium, Premium Parking, and Ridgeview LLC.  At all relevant times, Palazzolo controlled or was otherwise a member or managing member of defendants F & M, RLA, Premium, Premium Parking, BAB I, and BAB II.

12.     Defendant Mary Palazzolo is an individual residing at 10 City Place, Unit PH-5D, White Plains, New York 10601.  On information and belief, Mary Palazzolo is the wife of Defendant Frank Palazzolo.  At all relevant times, Mary Palazzolo controlled or was otherwise a member or managing member of defendants F & M and Ridgeview LLC

13.     Defendant Stephen Tobia is an individual residing at 17 Spruce Hill Court, Pleasantville, New York 10570.  Tobia is a long-time business associate of Palazzolo, and is a member of the Palazzolo Enterprise.  Tobia is a real estate investor and businessman who, together with defendants, conspired to fund his own business activities and the business activities of the Palazzolo Enterprise with money stolen from the Condominium by Palazzolo.  Tobia used that money to commit predicate acts of racketeering in furtherance of the Palazzolo Enterprise. At all relevant times, Tobia controlled or was otherwise a member or managing member of defendants RLA, ACC, First Resource, and, on information and belief, defendant Ridgeview LLC.  Tobia also served on the Board between October 2006 and 2015, when he was removed by vote of the Condominium.  Mr. Tobia also served as the Condominium's Vice President between June 2011 and December 2015.

14.     Defendant Stephen Reitano is an individual residing at 108 E. 38th Street, #1503, New York, New York 10016.  Reitano is a former business associate of Palazzolo, a former resident of the Condominium, and a member of the Palazzolo Enterprise.  Reitano is a real estate investor and businessman who, together with defendants, conspired to fund his business activities and the business activities of the Palazzolo Enterprise with money stolen from the Condominium by Palazzolo.  Reitano used that money to commit predicate acts of racketeering in furtherance of the Palazzolo Enterprise.  At all relevant times, Reitano controlled and/or was a member or managing member of Ridgeview LLC and was also a member of the Board between April 2006 and February 2013.

15.     Defendant Joseph Santangelo is an individual residing at 7 Jacobs Lane, Bethel Connecticut 06801.  Santangelo is a long-time business associate of Palazzolo and member of the Palazzolo Enterprise.  Santangelo conspired with defendants to fund his business activities and the business activities of the Palazzolo Enterprise with money stolen from the Condominium by Palazzolo.  Santangelo used that money to commit predicate acts of racketeering in furtherance of the Palazzolo Enterprise.  At all relevant times, Santangelo controlled and/or was a member or managing member of defendants Premium, Premium Parking, and, on information and belief, defendant Ridgeview LLC.

16.     Defendant Lorraine DiStefano is an individual residing at 3371 Sunny Court, Mohegan Lake, NY 10547.  DiStefano is a long-time business associate of Palazzolo and member of the Palazzolo Enterprise.  DiStefano conspired with defendants to fund her business activities and the business activities of the Palazzolo Enterprise with money stolen from the Condominium by Palazzolo.  DiStefano used that money to commit predicate acts of racketeering in furtherance of the Palazzolo Enterprise.  At all relevant times, DiStefano

controlled and/or was a member or managing member of defendants Premium and Premium Parking.

17. Defendant Gina Thomas is an individual residing at 59 Pearce Place, Mahopac, New York 10541. Thomas is an employee of defendant F & M and member of the Palazzolo Enterprise. Thomas conspired with defendants to enrich herself and fund the business activities of the Palazzolo Enterprise with money stolen from the Condominium by Palazzolo.

18. Defendant Lori Overton is an individual residing at 456 S. 8th Avenue, Mount Vernon, New York 10550-4327. At all relevant times, Overton was an employee of JPMorgan Chase Bank, N.A. and a member of the Palazzolo Enterprise. Overton conspired with defendants to enrich herself and fund the business activities of the Palazzolo Enterprise with money stolen from the Condominium by Palazzolo.

19. Defendant F & M Funding LLC ("F & M") is a New York limited liability company with a place of business at Palazzolo Plaza, c/o Mary Palazzolo, 800 Central Park Avenue, Suite 201, Scarsdale, New York, 10583. F & M is a member of the Palazzolo Enterprise. F & M received monies—and facilitated the receipt of monies by other members of the Palazzolo Enterprise—that were stolen from the Condominium by Palazzolo. F & M used those funds to commit predicate acts of racketeering in furtherance of the Palazzolo Enterprise. At all relevant times, defendants Palazzolo and Mary Palazzolo controlled and/or were members or managing members of F & M.

20. Defendant RLA Holdings, LLC ("RLA") is a New York limited liability company with a place of business at Palazzolo Plaza, 800 Central Park Avenue, Suite 201, Scarsdale, New York 10583. RLA is a member of the Palazzolo Enterprise. RLA received monies—and facilitated the receipt of monies by other members of the Palazzolo Enterprise—that were stolen

6

from the Condominium by Palazzolo.  RLA used those funds to commit predicate acts of racketeering in furtherance of the Palazzolo Enterprise.  At all relevant times, defendant Tobia controlled and/or was a member or managing member of RLA.

21.     Defendant Premium Staffing LLC ("Premium") is a New York limited liability company that purported to dissolve on or about August 22, 2016 and which, on information and belief, is winding down its business operations.  Premium maintains a place of business at Palazzolo Plaza, 800 Central Park Avenue, Suite 201, Scarsdale, New York, 10583.  Premium is a member of the Palazzolo Enterprise.  Premium received monies—and facilitated the receipt of monies by others—that were stolen from the Condominium by Palazzolo.  Premium used those funds to commit predicate acts of racketeering in furtherance of the Palazzolo Enterprise.  At all relevant times, defendants Palazzolo, Santangelo, and DiStefano controlled and/or were members or managing members are members of Premium Staffing.

22.     Defendant Premium Parking, LLC ("Premium Parking") is a business organization that, on information and belief, was never properly formed in the State of New York, with a place of business at Palazzolo Plaza, 800 Central Park Avenue, Scarsdale, New York 10583.  Premium Parking is a member of the Palazzolo Enterprise.  Premium Parking received monies—and facilitated the receipt of monies by others—that were stolen from the Condominium by Palazzolo.  Premium Parking used those funds to commit predicate acts of racketeering in furtherance of the Palazzolo Enterprise.  At all relevant times, defendants Palazzolo, Santangelo, and DiStefano controlled and/or were members or managing members of Premium Parking.

23.     Defendant Antoinette City Center, LLC ("ACC") is a New York limited liability company with a place of business at 10 City Place, White Plains, New York 10601.  ACC is a

member of the Palazzolo Enterprise.  ACC received monies—and facilitated the receipt of monies by others—that were stolen from the Condominium by Palazzolo.  ACC used those funds to commit predicate acts of racketeering in furtherance of the Palazzolo Enterprise.  At all relevant times, defendants Tobia and Palazzolo controlled and/or were members or managing members of ACC.

24.     Defendant Ridgeview Holdings LLC ("Ridgeview LLC") is a New York limited liability company with a place of business at Palazzolo Plaza, c/o Mary Palazzolo, 800 Central Park Avenue, Scarsdale, New York 10583.  Ridgeview LLC is a member of the Palazzolo Enterprise.  Ridgeview LLC received monies—and facilitated the receipt of monies by others—that was stolen from the Condominium by Palazzolo.  Ridgeview LLC used those funds to commit predicate acts of racketeering in furtherance of the Palazzolo Enterprise.  At all relevant times, defendants Palazzolo and Mary Palazzolo controlled and/or were members or managing members of Ridgeview LLC.

25.     Defendant B.A.B. Group I, LLC ("BAB I") is a New York limited liability company with a place of business at Palazzolo Plaza, 800 Central Park Avenue, Suite 201, Scarsdale, New York, 10583.  BAB I is a member of the Palazzolo Enterprise.  BAB I received monies stolen from the Condominium by Palazzolo and used those funds to commit predicate acts of racketeering in furtherance of the Palazzolo Enterprise.  At all relevant times, Palazzolo controlled and/or was a member or managing member of BAB I.

26.     Defendant B.A.B. Group II, LLC ("BAB II") is a New York limited liability company with a place of business at Palazzolo Plaza, 800 Central Park Avenue, Suite 201, Scarsdale, New York, 10583.  BAB II is a member of the Palazzolo Enterprise.  BAB II received monies stolen from the Condominium by Palazzolo and used those funds to commit predicate

acts of racketeering in furtherance of the Palazzolo Enterprise.  At all relevant times, Palazzolo controlled and/or was a member or managing member of BAB II.

27.     Defendant First Resource Funding LLC ("First Resource") is a New York limited liability company with a place of business at Palazzolo Plaza, Suite 201, 800 Central Park Avenue, Scarsdale, New York, 10583.  First Resource is a member of the Palazzolo Enterprise. First Resource received monies stolen from the Condominium by Palazzolo and used those funds to commit predicate acts of racketeering in furtherance of the Palazzolo Enterprise.  At all relevant times, Tobia controlled and/or was a member or managing member of First Resource.

28.     Defendant Reda, Romano & Company, L.L.P. ("Reda Romano") is a New York registered limited liability partnership with a place of business at 800 Westchester Avenue, N405, Rye Brook, New York 10573, where it also maintains its principal executive offices. Reda Romano is a member of the Palazzolo Enterprise.  Reda Romano facilitated the receipt of monies by others that were stolen from the Condominium by Palazzolo.  Those funds, in turn, were used by defendants to commit predicate acts of racketeering in furtherance of the Palazzolo Enterprise.

<u>Jurisdiction and Venue</u>

29.     This Court has subject matter jurisdiction over the claims described herein under 28 U.S.C. §§ 1331 and under 18 U.S.C. § 1964(c).  This Court also has supplemental jurisdiction over state law claims described herein under 28 U.S.C. § 1367.

30.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1) and (2) as well as under 18 U.S.C. § 1965.

Facts Common to All Causes of Action

*The Illegal Scheme and the Palazzolo Enterprise*

31.     Trump Tower at City Center is a 35-story, 215-unit condominium with 212 residential units and 3 commercial units in White Plains, New York.  The building was developed by non-defendant Louis Cappelli ("Cappelli") who, during construction, entered into a licensing and management agreement with Trump Corp.  The building opened in 2005 and almost immediately encountered financial difficulties.  In 2007, condominium resident Frank Palazzolo, who had recently moved his business operations to Westchester, became the Treasurer of the Condominium.

32.     During his first few years on the Board, Palazzolo used his financial acumen, business skills, and charm to ingratiate himself and become a seemingly indispensable member of the Board.  Palazzolo negotiated for payments from Cappelli to boost the Condominium's reserve account, and engineered the Condominium's purchase of the garage and recreation deck from Cappelli.  Palazzolo was credited with helping to set the Condominium on sound financial footing.

33.     Palazzolo began to use his influence to dominate all aspects of the Condominium's Board.  For many years, Palazzolo and defendant Tobia, a Board member, had been business partners.  Palazzolo soon entered into real estate investments with defendant Reitano, who was also on the Board at the time.  He loaned Board member (and non-defendant) John Durante $500,000 to rescue and turn around Durante's then-failing business.  He loaned substantial sums of money to Board member (and non-defendant) Fred Mastroianni.  These business relationships assured Palazzolo of the unwavering loyalty of five of the seven Board members, guaranteeing to support his control of every significant aspect of the Condominium's

10

finances.  The Board members depended on Palazzolo to run the Condominium, and praised him to unit owners as a financial wizard.

34.     With his control of the Board established, Palazzolo marginalized the role of Trump Corp., which had been acting as the Condominium's managing agent.  He instructed Trump Corp. not to attend Board meetings and, for a handsome $100,000 annual fee, gave them responsibility for management of the Condominium's operating account—principally, this involved the collection of common charges and the payment of bills.  This gave Palazzolo total, absolute, and unfettered complete control of the Condominium's reserve account.  Only Palazzolo was a signatory to the Condominium's reserve accounts, and he soon directed that all account statements be delivered to him at his private business—in Palazzolo Plaza, in Scarsdale, New York.

35.     The Condominium's reserve funds became Palazzolo's private piggy bank.  He linked the Condominium's accounts with his own personal and business accounts, giving him the ability to move money back and forth with from any location he was in, and at any time—with no more than an internet connection.  Over six years, he moved millions of dollars in and out of the accounts, used the Condominium's money to finance the Palazzolo Enterprise's investment in Cappelli's other real estate developments, used the Condominium's money to buy three foreclosed units in the building for himself, and brazenly stole hundreds of thousands of dollars from the Condominium to line his own pockets and the pockets of other members of the Palazzolo Enterprise.  Palazzolo kept it up until his removal by the Board in 2015.

36.     To hide his thefts from the Condominium, the Board, Trump Corp., and the Condominium's lawyers and auditors, Palazzolo and other members of the Palazzolo Enterprise created fraudulent bank confirmations and bank statements that fooled everyone.  Palazzolo's

lies caused the Condominium to issue—unwittingly—four consecutive years of bogus audited financial statements.  For example, in 2013, Palazzolo submitted fabricated bank statements purporting to show that the Condominium had $940,472 in its reserve accounts when, in actuality, Palazzolo had long emptied the accounts, leaving the Condominium with only $5,372.  The bank records that Palazzolo fraudulently created were relied upon by the Condominium and by its many residents, exposing them to the risk of catastrophic liability.  Palazzolo himself used the bogus financial statements he had created to negotiate with the Condominium's lenders at Banco Popular in connection with financing the Condominium's garage.

37.     Palazzolo also removed the Trump Corp.-hired companies providing security, lifeguard, and parking services to the Condominium and replaced them with members of the Palazzolo Enterprise under his control: defendants Premium and Premium Parking.  Although Palazzolo claimed not to have any financial interest in these two businesses, they were nominally run by members of the Palazzolo Enterprise, including defendants DiStefano and Santangelo, and operated out of his personal office in Palazzolo Plaza.  Those two entities were used by Palazzolo to improperly divert hundreds of thousands of dollars of Condominium revenue to his own personal accounts, and to the accounts of the other members of the Palazzolo Enterprise.  When Palazzolo was finally voted off of the Board in December 2015, the shocking extent of Palazzolo's thefts was discovered: hundreds of thousands had been outright stolen from the Condominium's Garage account, in addition to the hundreds of thousands of dollars that both Premium and Premium Parking over-paid themselves for the services they claimed to be providing to the Condominium.  Since replacing Premium in 2016, the Condominium has saved over $500,000 in staffing costs alone.

38.     Palazzolo disguised the bad acts of Premium and Premium Parking by insisting that the Condominium use his personal accountants—defendant Reda Romano—to perform the annual audits for the Condominium.  At Palazzolo's direction, Reda Romano ignored manifest signs of fraud that a diligent accountant should have perceived, and accepted his assurance that there was no need to review the backup documentation which, he explained, would verify his statements regarding the books and records of the accounts of Premium and Premium Parking. In so doing, Reda Romano remained ignorant of the unauthorized transfers of the Condominium's money that were being conducted through the accounts of Premium and Premium Parking.

39.     Palazzolo's defalcations ran the gamut as he took advantage of every opportunity that came his way to steal the Condominium's money.  Over $400,000 in insurance proceeds relating to damage caused by Superstorm Sandy were immediately diverted into his accounts and the accounts of other members of the Palazzolo Enterprise.  On another occasion, a $143,714 check made payable to the Condominium from Qualcomm, issued from its account in California, was diverted from the Condominium's accounts to the garage account, and then quickly to Palazzolo and his Enterprise.  During Palazzolo's time as Treasurer, Palazzolo and Tobia collected over $200,000 in utility payments from tenants at the commercial spaces RLA and ACC owned in the Condominium, but instead of turning those payments over to the Condominium, they stole them, leaving the Condominium and its residents to pick up the tab for their tenants' electrical bills.

40.     Defendants are the family, business partners, and friends of Frank Palazzolo. Together, they comprise the Palazzolo Enterprise, an association-in-fact of individuals and

businesses funded by Palazzolo's thefts of the Condominium's money from its reserve and other accounts.

41. All of the Defendants are members of, or associated with, the Palazzolo Enterprise. Each of the members of the Palazzolo Enterprise conspired with each other to conduct, finance, and acquire ownership interests in the Enterprise's and its business affairs through a pattern of racketeering activity. As described herein, the Members of the Palazzolo Enterprise knowingly and improperly used the Condominium's money to fund their own business activities. Specifically, they used the Condominium's money to take advantage of business, investment, and real estate opportunities, to falsely inflate the value of their own businesses to qualify for financing from unwitting lending institutions, and to line their own pockets. In so doing, they left the Condominium in a precarious financial position—unable to pay for basic services and exposed to significant litigation risk for the intentional misstatements the defendants made to the Condominium and its business partners, including the numerous lenders to its hundreds of residents.

42. All told, including thefts from the reserve account, the garage account, insurance payments, vendor checks and electricity payments not made, Palazzolo "borrowed" (*i.e.*, removed without authorization) at least $8,751,528.26 from the Condominium for the benefit of the defendant members of the Palazzolo Enterprise. Of that amount, Palazzolo failed to return at least $1,340,814.33, which was simply stolen from the Condominium for the benefit of the Palazzolo Enterprise. It is expected that discovery in this case will reveal that this is merely the tip of the iceberg.

*Palazzolo Sets Up a Complex Web of Accounts*
*Designed to Siphon the Condominium's Funds Without Detection*

43.     When Palazzolo was first elected as the Condominium's Treasurer in 2007, the Condominium's reserve and operating accounts were maintained together in a single account overseen by the Condominium's management company, Trump Corp.

44.     Over the course of his tenure as Treasurer, however, Palazzolo opened and closed seven different accounts at four different financial institutions.  Each of these accounts was in the name of the Condominium, but under the sole control of Palazzolo.  Many of the acts of racketeering described in this Complaint were, in some way, enabled or disguised by these accounts and by the rapid and frequent transfers Palazzolo directed between them.  Palazzolo's smoke and mirrors made it difficult for the Board to learn about Palazzolo's improper transfers to the various individuals and entities comprising the Palazzolo Enterprise, and made it nearly impossible to determine accurately the amount of money that the Condominium actually held in reserve.

45.     The opening of multiple accounts was not, by itself, illegal.  Nonetheless, it was critical to the Palazzolo Enterprise's illegal activity because it was one of the first steps taken to further, and to disguise the racketeering of, the Palazzolo Enterprise.  By scattering his improper withdrawals of the Condominium's reserve funds across the different accounts he had created, Palazzolo was able to evade detection for many years.

46.     The activity in these accounts was staggering.  During Palazzolo's tenure as the Condominium's Treasurer, only five transfers of funds out of the Condominium's reserve accounts were explicitly authorized by the Board.  The Board's forensic examination revealed hundreds of withdrawals with no relationship to the business of the running the Condominium.

15

47.     The first bank account Palazzolo set up to hold the Condominium's reserve funds was at Key Bank in June 2008 (the "Key 158 Account").  It remained open for slightly more than two years.  During that time, Palazzolo directed the unauthorized transfer of $550,000 of the Condominium's reserve funds to F & M from that account.  Palazzolo closed that account in September 2010 and transferred the remaining balance to a new account he had set up at JPMorganChase & Co. ("Chase") (the "Chase 7595 Account", discussed below at ¶49).

48.     Before he closed the Key 158 Account, Palazzolo also opened an account at Hudson Valley Bank in June 2010 (the "Hudson 9741 Account").  That account was funded with a $400,000 transfer from the Key 158 Account on June 21, 2010.  Palazzolo closed that account later that year in December 2010 when those same funds were transferred to another new account Palazzolo had opened at Chase (the "Chase 7742 Account").

49.     In September 2010, only three months after opening the Hudson 9741 Account, Palazzolo opened two accounts at a local branch of JPMorgan Chase & Co. ("Chase") located at 860 Central Park Avenue, Scarsdale, New York, 10583 (the Chase 7742 Account and a second, the "Chase 7595 Account").  Those accounts were funded with the previously-described $400,000 transfer from the Hudson 9741 Account and a $30,478.30 transfer of the balance remaining in the Key 158 Account.  The Chase 7595 Account was open for two years.  During that time, Palazzolo directed the unauthorized transfer of $75,000 to F & M from that account.  The Chase 7595 Account was closed on September 28, 2012, when Palazzolo directed the transfer of the remaining balance to the Chase 7742 Account.

50.     The Chase 7742 Account remains open.  During his time as Treasurer, Palazzolo directed the unauthorized transfer of $4,768,644.99 to F & M, the unauthorized transfer of $255,000 to non-defendant Cremac Commercial Finance, LLC ("Cremac"), the unauthorized

transfer of $500,000 to Ridgeview LLC, $500,000 to Palazzolo's lawyer, non-defendant Lawrence Gottlieb, and the unauthorized transfer of $1,300,000 to other as-yet-unidentified third parties from the Chase 7742 Account.

51.     In June 2014, Palazzolo opened a second account at Hudson Valley Bank (the "Hudson 3641 Account") with a transfer of $500,000 from the Chase 7742 Account.  That account was closed in July 2015 when the remaining balance was transferred to a new account at Popular Community Bank (the "Popular 5767 Account").

52.     In January 2015, Palazzolo opened a third account at Chase (the "Chase 9221 Account").  The Chase 9221 Account was closed in July 2015 and the remaining balance was transferred to the Popular 5767 Account.  During his time as Treasurer, Palazzolo directed the unauthorized transfer of $120,340.27 to F & M from this Account.

53.     Finally, in June 2015, Palazzolo opened the Popular 5767 Account with two transfers totaling $894,314.20 identified as proceeds from a "garage loan."  The Popular 5767 Account remains open.  During his time as Treasurer, Palazzolo directed the unauthorized transfer of $1,222,275.83 to F & M from this Account.

54.     By using these multiple accounts, Palazzolo was able to evade detection and could provide funding to the Palazzolo Enterprise at any time, and on demand.  His methods were straightforward: he simply stole from the Condominium's reserve accounts whatever the Palazzolo Enterprise needed.  When Palazzolo's thefts were discovered in July 2015, these transfers—never previously presented to or authorized by the Board—were discovered.  It is now clear that the Condominium's money was illegally used to fund the business activities of the Palazzolo Enterprise.

*The First Sham Transfer: The 2010 RLA Loan*

55.     Following his election as Treasurer, Palazzolo began using the Condominium's reserve funds to further the interests and investments of the individuals and business organizations that comprise the Palazzolo Enterprise.

56.     Many of Palazzolo's friends and former business partners lived in the Condominium and, in fact, many served on the Board with him, including Tobia, Reitano, and non-defendants Fred Mastroianni, and John Durante—two individuals who owed Palazzolo hundreds of thousands of dollars from prior business ventures.  With his friends and co-conspirators firmly entrenched in positions on the Board, Palazzolo effectively eliminated any meaningful resistance to the Palazzolo Enterprise's illegal use of the Condominium's financial resources to prop up the various business schemes of the Palazzolo Enterprise.

57.     In April of 2010, Palazzolo came to the Board with a proposal.  Palazzolo explained that it would be in the Condominium's best interest to loan $400,000 to a company called RLA, which would, in turn, agree to pay that amount back plus interest calculated at 6% *per annum* (the "2010 RLA Loan").  Palazzolo left omitted disclosure of the fact that RLA was a business organization owned by Palazzolo's good friend, neighbor, and fellow Board member, defendant Stephen Tobia.  Tobia was also a member of the Palazzolo Enterprise.

58.     Tobia was the sole managing member of RLA.  In 2010, when Palazzolo proposed the 2010 RLA Loan, Tobia was a member of the Board.  Palazzolo insisted, at the time, that he had no ownership interest in RLA.  But this was misleading: RLA was an entity that was deeply intertwined with the Palazzolo Enterprise.  For example, RLA's business address was at Palazzolo Plaza, in the same suite as defendants F & M, First Resource Funding, Premium, Premium Parking, and Ridgeview LLC.  RLA was also the owner of two of the three commercial

units in the Condominium that it had purchased with Palazzolo's help in June 2008.  And, of course, RLA was owned and managed by Tobia.

59.    Palazzolo represented to the Board that RLA would repay the loan at 6% interest, far outstripping the interest the Condominium was then earning from its bank account.  Palazzolo also agreed to provide a personal guaranty for the repayment of the funds.

60.    These promises were easy for Palazzolo to make because he never intended to keep them.  Thus, although he promised to act as personal guarantor on the 2010 RLA Loan, Palazzolo never provided a memorialization of that promise.  In fact, Palazzolo never provided any written documentation of the 2010 RLA Loan whatsoever.  Ominously, when presenting the 2010 RLA Loan to the Board for approval, Tobia—the purported owner of RLA—did not recuse himself from the vote to approve such an obviously self-interested transaction, but Palazzolo did. As it turned out, there was a good reason for Palazzolo's unexpected recusal: the money was going to F & M, *i.e.*, to Palazzolo's company, and not to Tobia's.

61.    Palazzolo and Tobia thus conspired to present the 2010 RLA Loan as a good investment that was secure—given RLA's promise to repay and Palazzolo's personal guaranty of its repayment—and was to be made to an entity in which Palazzolo had no personal interest.  In fact, however, none of these things were true: the money was not securely backed by RLA's promise to repay, because RLA was not being loaned any money.  Palazzolo and Tobia were instead conspiring to disguise their transfer of the Condominium's reserve funds to F & M.

62.    The 2010 RLA Loan was quickly approved by a Board primarily—and by a majority—composed of members of the Palazzolo Enterprise (Palazzolo, Reitano, and Tobia) and Palazzolo's past business associates (non-defendants Durante and Mastroianni).  At no time did Palazzolo or Tobia inform the Board that, in fact, the money was going to F & M, or that

19

Palazzolo would never actually provide the promised personal guaranty.  Thus, the Board

approved the 2010 RLA Loan without ever knowing its true purpose, or the true risk of the

transaction.

63.     On April 13, 2010, the purported loan was consummated when Palazzolo

transferred $400,000 from the Key 158 Account to F & M, the Company he ran together with his

wife, defendant Mary Palazzolo.  This was not the 2010 RLA Loan that was proposed to the

Board; it was not a transfer authorized by the Board.  Palazzolo had stolen $400,000 for his own

business purposes, and for the benefit of the Palazzolo Enterprise.  Palazzolo could now pretend

to the world that his company, F & M, had $400,000 more than it actually had—and by that

pretension to those funds, F & M could attract commensurate investment and financing

opportunities.  The 2010 RLA Loan was a sham to benefit the Palazzolo Enterprise at the

expense of the Condominium Palazzolo served as Treasurer.

64.     The Board subsequently learned that F & M used the 2010 RLA Loan to qualify

for financing in connection with a real estate investment that members of the Palazzolo

Enterprise wished to make in a development called "Ridgeview."

65.     Ridgeview was a real estate project in Elmsford, New York in which one of

Palazzolo's former business associates, non-defendant Louis Cappelli, was involved.  Members

of the Palazzolo Enterprise—specifically, Palazzolo, Reitano, Santangelo, and Tobia—created

Ridgeview Holdings, LLC ("Ridgeview LLC") to manage the enterprise's investment in

Ridgeview.  On information and belief, Ridgeview LLC was managed by those same members

of the Palazzolo Enterprise: Palazzolo, Reitano, Santangelo, and Tobia.  It maintained an office

at the same location as defendants F & M, RLA, ACC, First Resource Funding, Premium,

Premium Parking, and Ridgeview LLC: Palazzolo Plaza, 800 Central Park Avenue in Scarsdale,

New York. Mary Palazzolo was designated as the person able to accept service on behalf of Ridgeview in the entity's registration with the New York Secretary of State.

66. Because the Palazzolo Enterprise did not have sufficient funds to qualify for financing in connection with the Ridgeview investment, Palazzolo stole that money from the Condominium. By diverting the $400,000 from the sham 2010 RLA Loan to F & M (which the Board had agreed to lend to RLA), F & M falsely inflated its balance sheet to show lenders and business partners that it had $400,000 more than it actually had at the time.

*Unit Owners Demand Reversal of the Loan*

67. Soon after the transfer of the proceeds of the sham 2010 RLA Loan to F & M, the minutes of the Board meeting at which that loan was approved were made available to all of the Condominium's unit owners. The disclosure caused an uproar and demand for immediate resolution.

68. Unit owners quickly and angrily voiced complaints about what they believed to be the purpose of the 2010 RLA Loan—the use of Condominium reserve funds to an outside business. Their complaints were understandable but misdirected: what unit owners did not know was that the funds had never even been transferred to RLA—they had been diverted to F & M by Palazzolo in order to facilitate the Palazzolo Enterprise's investment in Ridgeview.

69. Soon after the unit owners' outcry, Palazzolo agreed to return the funds. On May 28, 2010, F & M transferred $404,117 back to the Key 158 Account. Although it was never explained explicitly, the additional funds appeared to correspond to a calculated interest rate of approximately 1%. In fact, however, there was no interest rate, because there was no loan agreement. Nor was there a guarantee. Nor did the money go to RLA as approved by the Board. What happened was what would soon become *de rigueur* racketeering for the Palazzolo

Enterprise: money was simply stolen from the Condominium and was used to finance the Enterprise's various outside business investments. Further, as discussed below, the return of the funds was another promise that Palazzolo never intended to keep.

*The Palazzolo Enterprise Covers Its Tracks at Chase*

70.     Now that his efforts had been stymied (at least in part) by the Condominium's residential unit owners, Palazzolo knew he needed to come up with a more sophisticated means of diverting Condominium funds to his Enterprise.

71.     For the next five years, until his removal from the Board in 2015, Palazzolo redoubled his efforts to disguise his numerous defalcations of the Condominium's reserve funds. Principally, Palazzolo's efforts were to stop doing the one thing that had gotten him caught in the 2010 RLA Loan: he stopped notifying the Board, or seeking its approval in any way.

72.     In addition, Palazzolo disguised his thefts by constantly shifting the Condominium's reserve funds from one account to another without a legitimate business reason to do so. During the events described herein, Palazzolo was able to steal millions of dollars from the Condominium to bolster the business activities of the Palazzolo Enterprise. Along the way, he kept hundreds of thousands of dollars for himself.

73.     In or about 2010, Palazzolo enlisted the assistance of Lori Overton, an employee of a local Chase branch and member of the Palazzolo Enterprise. Overton's cooperation and participation was critical in furthering—and shielding from discovery—Palazzolo's acts of racketeering. At Palazzolo's direction, the Condominium opened multiple Chase accounts for its reserve funds at the local branch office just down the street from where Palazzolo (and RLA and F & M and Ridgeview LLC) had their offices. On information and belief, Palazzolo masked his theft of the Condominium's reserve funds by linking his personal accounts to the three accounts

he had opened for the Condominium (the Chase 7742, 9221, and 7595 Accounts), making it easier for him to effect transfers without the Board's knowledge. Later, with Overton's help, Palazzolo altered the Condominium's account statements and confirmations to make it appear that the Condominium had more money than it actually had (¶¶115–22).

74.     Linking the accounts gave Palazzolo the ability to move money out of the Condominium's reserve funds quickly, by use of a personal computer, and without any check on his power to do so. As described in greater detail herein, Palazzolo used this ability to transfer additional millions of dollars belonging to the Condominium to the accounts of the individuals and business organizations comprising the Palazzolo Enterprise. Because these accounts were, in fact, unrelated, Palazzolo's linking of these accounts constituted a fraud upon a banking institution.

*Additional Unauthorized Transfers*

75.     Disappointed that he was forced to give back the sham 2010 RLA Loan when unit owners objected to the use of Condominium funds to prop up his outside business interests, Palazzolo refined his approach. His solution was brutish: he simply stole the money a few months later in December 2010, this time without bothering to notify the Board, or to seek its approval in any way.

76.     Correspondingly, on December 1, 2010, Palazzolo did precisely what unit owners had recently insisted he not do: he transferred $400,000 from the Chase 7742 Account to F & M. By this time, his personal accounts were linked to the reserve accounts, and he had the ability (an ability that he soon took advantage of) to falsify bank records. In other words, Palazzolo had hidden his theft from the Board and the Condominium.

77.     The Board was never notified of this transfer, nor did it approve the transaction. So long as those funds were reflected on F & M's books and records, the Palazzolo Enterprise was deceiving its business partners, including its lenders and other investors.  Nine days later, Palazzolo returned the funds, apparently having, by that time, falsely convinced others that the Palazzolo Enterprise had $400,000 that, in fact, it merely had stolen from the Condominium. This time, Palazzolo did not bother to pretend that F & M owed any interest on the transaction.

78.     On December 29, 2010, Palazzolo wired $500,000 from the Chase 7742 Account to his lawyer, Lawrence Gottlieb.  The Board was never notified of this transfer, nor did it approve of the transfer.

79.     While many other individual acts of theft and fraud were (and likely remain) hidden from view, Palazzolo's efforts to hide those thefts ultimately proved much more difficult to hide.  Those efforts were, themselves, predicate acts of bank fraud, wire fraud, and mail fraud under RICO.

80.     For example, the Board's investigation has revealed that at year end 2010, Palazzolo delivered a materially false and misleading accounting ledger to Trump Corp., and to the Condominium's auditors, who were preparing the Condominium's year-end financial statements.  The materials and information Palazzolo passed along stated that the Condominium's numerous reserve accounts held a total of $542,618.78.  In fact, however, at the time Palazzolo made those representations, the Condominium's reserve funds were only $43,155.  While many acts of racketeering have been discovered and are described herein, on information and belief, additional acts of racketeering similar or identical to those alleged herein are likely to be revealed through discovery, and will, it is hoped, explain what, precisely, happened to every penny of the Condominium's funds.

24

81.     For the next five years, Palazzolo regularly stole funds from the Condominium to support the activities of the Palazzolo Enterprise, and then altered documents to hide his thefts. Notably, Palazzolo's thefts were not always partnered with a subsequent and equivalent return of the Condominium's funds.  As described in greater detail in Appendix A hereto, between February 28, 2011 and June 12, 2015, Palazzolo made 22 additional unauthorized transfers from the Condominium's reserve funds held in the Chase 7742 Account to F & M totaling $2,893,369.16.

82.     Palazzolo was able to accomplish these repeated acts without authorization because of the misrepresentations he had previously made to Chase (on information and belief, with Overton's assistance) allowing him to improperly link his personal accounts to the accounts of the Condominium, and because he arranged (again, on information and belief, with Overton's assistance) to have all communications regarding the Condominium's reserve accounts at Chase sent to his office, and not to the Condominium or to Trump Corp.

83.     Palazzolo's thefts were not limited to the Condominium's reserve funds held in the Chase 7742 Account.  Using the web of accounts he had opened at different banks, Palazzolo was able to conduct his shell game for years, pretending on numerous occasions that the business organizations of the Palazzolo Enterprise had millions of dollars that, in fact, belonged to the Condominium.

84.     For example, on July 19, 2011, August 5, 2011, and November 10, 2011, Palazzolo transferred a combined total of $79,481.69 from the Condominium's reserve funds in the Chase 7595 Account—an account that was open for only two years—to F & M.  There is no indication in the books and records of the Condominium regarding the purpose of these transfers. Indeed, the Board was never made aware of these transfers, much less did they approve of them.

25

These transfers, too, had the effect of falsely inflating the amounts in F & M's bank accounts with funds stolen from the Condominium's reserve fund.

85.     Palazzolo also used the Chase 9221 Account—an account he opened and then closed six months later—to transfer $120,340.27 to F & M in three transactions between March and July 2015.  Specifically, and as described in Appendix A hereto, Palazzolo directed the transfer of $20,000 to F & M from that account on March 6, 2015, $50,000 on June 2, 2015, and $50,340.27 on July 21, 2015.  The final transfer—on July 21, 2015—was perhaps the Palazzolo Enterprise's most desperate: Palazzolo transferred those funds only a day after the Board adopted a resolution prohibiting Palazzolo from making any transfers of reserve funds without Board approval.  This transfer of over $50,000 was unrelated to the sham loans described herein—the 2010 and 2015 RLA Loans—and like the other transfers from the Chase 9221 Account, was never otherwise documented, explained, or even disclosed to the Board.  It was little more than a brazen theft.

86.     All told, Palazzolo transferred $8,078,985.26 away from the Condominium's reserve accounts without proper authorization, and failed to return $668,271.33 of it.  Each of these transfers, together with all transfers identified in Appendix A hereto, constituted an independent act of fraud upon the Condominium.  By virtue of these fraudulent acts, misrepresentations, and omissions, the Palazzolo Enterprise received millions of dollars from the reserve accounts of the Condominium that, upon information and belief, defendants transported or caused to be transported to other states and/or foreign jurisdictions, or otherwise utilized in connection with interstate commerce.

*Continuing Investment in Ridgeview*

87.     As discussed above, in 2010, the Palazzolo Enterprise illegally—and without authorization—tried to use the Condominium's reserve funds to enable its investment in Ridgeview by the 2010 RLA Loan.  Although the Enterprise was forced to return the funds following the angry complaints of unit owners, Palazzolo and his conspirators did not give up their efforts.  As previously alleged, Palazzolo simply did the same thing without asking permission—or mentioning the transfers to the Board at all.  (¶¶75–77).

88.     On February 28, 2011, apparently in need of additional funds to secure the Palazzolo Enterprise's investment in Ridgeview, an additional $400,000 was transferred from the Chase 7742 Account to F & M.  Once again, this was only a few months after the Condominium's unit owners had demanded F & M send back the proceeds of the purported 2010 RLA Loan for precisely the same amount, and after the subsequent and unauthorized transfer of those funds on December 1.  On March 10, 2011, Palazzolo transferred another $100,000 from the Chase 7742 Account to an unknown recipient.  On April 8, 2011, Ridgeview LLC wired $500,000 into the Chase 7742 Account, and three days later, on April 11, 2011, Palazzolo caused the transfer of $500,000 back to Ridgeview LLC from the Chase 7742 Account.  Finally, on June 6, 2011, $500,000 was returned to the Chase 7742 Account from an unidentified source.

89.     These unauthorized, undisclosed, and illegal round trip transfers back and forth of the Condominium's funds to Ridgeview and other entities within the Palazzolo Enterprise, constitute repeated and continuous acts of racketeering.  Critically, Palazzolo did not always return all of the money that the Palazzolo Enterprise used in this fashion.  For many years, these transfers were well-disguised in the tangled web of multiple reserve accounts Palazzolo had

created and that he continued to create.  The Board's investigation has revealed that a great deal

of its money had been stolen—and never returned—by the Palazzolo Enterprise.

90.     In total, these shadowy transfers to and from unauthorized persons reflect

Palazzolo's attempt to use over $1,500,000 of the Condominium's reserve funds to bolster and

finance the Palazzolo Enterprise.  On information and belief, these transfers were effected in

furtherance of the Enterprise's attempts to qualify for financing in connection with its

contemplated investment in Ridgeview.  Of the $1,500,000 "borrowed" in this fashion, it is

possible—but by no means known for certain—that Palazzolo returned as much as $1,000,000.

The missing funds, of course, have not been returned.

*Cremac Commercial Finance LLC*

91.     The Board's investigation also reviewed transfers from the Chase 7742 Account

to an entity called Cremac Commercial Finance LLC ("Cremac").  Neither the Board nor the

Condominium has ever had any relationship with Cremac, a business run by Joseph and John

Cafiero, two individuals who are also unknown to the Board.  Yet despite this, Palazzolo caused

the transfer of $255,000 from the Chase 7742 Account by wire to Cremac on July 8, 2011.

92.     Three days later, on July 11, 2011, F & M attempted to make a $255,000 deposit

to the Chase 7742 Account.  However, that deposit was returned for insufficient funds on July

13, 2011.  No further attempt was ever made to replace those funds.  Whatever the Cremac

investment was, one thing is certain: it is yet another example of the Palazzolo Enterprise's

unauthorized and illegal use of the Condominium's reserve funds to create a false impression of

the value and worth of F & M and the other business organizations operated by the Enterprise.

*Palazzolo's Theft of Insurance Proceeds*

93.     In 2012, the Condominium suffered property damage (largely related to Superstorm Sandy) that was covered by a policy written by Citizens Insurance Company of America.  The Condominium's claims were settled and four separate checks were sent to the Condominium by Hanover Insurance from its office in Worcester, Massachusetts between November 2012 and June 2013.

94.     The Condominium never received the funds in those checks, however, because Palazzolo diverted them to the Palazzolo Enterprise.  On each of four occasions, within days of the arrival of a check from the Condominium's insurer, Palazzolo would transfer the same amount—or a larger amount—from the Chase 7742 Account to F & M:

| Date of Deposit of Insurance Funds | Amount | Date of Transfer to F & M | Amount |
|---|---|---|---|
| 11.29.12 | $151,938.00 | 12.5.12 | $151,938.00 |
| 2.11.13 | 66,627.68 | 2.12.13 | 77,401.70 |
| 4.22.13 | 50,000.00 | 4.24.13 | 50,000.00 |
| 5.9.13 | 209,529.46 | 5.14.13 | 214,529.46 |

95.     By transferring those insurance funds to F & M, the Palazzolo Enterprise appeared to have received a significant cash infusion, when in reality, Palazzolo was simply stealing that cash from the Condominium.  In all, Palazzolo diverted $478,095.14 in insurance proceeds that should have been received by the Condominium to F & M—the company he ran with his wife.

96.     In fact, Palazzolo "over-diverted" small amounts of money.  The trivial size of these particular thefts speaks more by their existence than by their dollar value.  Palazzolo not only diverted to the Palazzolo Enterprise all of the insurance funds that should have gone to the Condominium, but he also used the fact of those payments to disguise the theft of an <u>additional</u>

29

$15,774.02 from the Condominium's reserve funds.  To wit: the Condominium received four checks from its insurer totaling $478,095.14, but the four transfers Palazzolo made to F & M totaled $493,869.16.

97.     Palazzolo also used this time period to systematically make direct (and unauthorized) transfers from the Chase 7742 to F & M.  Between November 19, 2012 and March 21, 2014, in addition to the diversion of insurance proceeds described herein, Palazzolo directed an additional six transfers to F & M totaling $70,000.  Those transactions are set forth in greater detail in Appendix A hereto.  Together with the diverted insurance funds, in that short period, Palazzolo had stolen at least $563,869.16 for the Palazzolo Enterprise from the Condominium's reserve funds.

*Palazzolo Uses Condominium Funds to Acquire Three Units for Himself*

98.     In April 2012, Ridgewood Savings Bank foreclosed on three units in the Condominium that were owned by Palazzolo, or by related persons or entities under his control. Following foreclosure, title for the three units was held by Ridgewood Savings Bank's subsidiary, Ridge Forest Realty Corp. ("Ridgewood").  Ridgewood turned to the Condominium, and offered it the opportunity to purchase those three units for approximately $900,000.

99.     One of the three foreclosed apartments had been previously owned by non-defendant Lillian Mangi ("Mangi"), the sister of Mary Palazzolo, who lived in the unit adjacent to the unit in which Palazzolo and Mary Palazzolo lived.  When Mangi ran into financial difficulties, Palazzolo and Mary Palazzolo offered to take possession of her apartment (and responsibility for her mortgage) and physically annexed that unit onto their own.  This annexation complicated the foreclosure proceeding and drove down the sale price of that apartment.

30

100.    After initiating foreclosure proceedings, Ridgewood offered the three units to the Condominium for a total price of $900,000.  Although the Board considered the offer, the asking price would have virtually depleted the amount that the Condominium believed it had in its reserve accounts.  Correspondingly, the Board prepared to decline the offer.

101.    Palazzolo, however, insisted that the Condominium act as his proxy and purchase the units on his behalf.  Ridgewood's offer was attractive to Palazzolo because it could legitimize the annexation of his sister-in-law's apartment, and allow him to acquire valuable real estate at fire-sale prices.  But perhaps the most critical effect was that Palazzolo's purchase would disguise his past thefts of the Condominium's reserve funds.  Palazzolo must have been concerned that if the Condominium had chosen to pursue the opportunity on its own, it might have discovered that only approximately $6,337.56 remained in its reserve accounts as of April 1, 2012 (despite Palazzolo's representations that the accounts—and the Condominium— were adequately funded).

102.    Correspondingly, Palazzolo offered to advance the down payment for the purchase of the units to the Condominium if it would accept the offer on his behalf, and then assign the contract of sale to him.  The Board, composed at the time of members of the Palazzolo Enterprise and other individuals with business relationships with Palazzolo, agreed with his proposal.  Palazzolo negotiated directly with Ridgewood and the parties agreed to the sale of the three units for $875,000.  Palazzolo transferred $87,500 to the Condominium's lawyers, representing the down payment for the purchase.  With Ridgewood's consent, the Condominium entered into the contract to purchase the three units, and then assigned its rights under that contract to Palazzolo.  On information and belief, the closing was scheduled, at that time, to take place on October 22, 2012.

31

103.    As for the balance of the purchase price, Palazzolo planned on paying for it the same way he paid for most things: with the Condominium's money.  Since no one had noticed his failed attempt at returning the $255,000 he had given to Cremac on July 11, 2011, Palazzolo apparently determined that he was safe to continue stealing the Condominium's reserve funds. Over the course of the next year, and as set forth more completely in Appendix A hereto, Palazzolo transferred hundreds of thousands of dollars without authorization to F & M.  By September 28, 2012, only a few weeks before the scheduled closing of the foreclosed units, Palazzolo had stolen an incredible $725,000 (including the returned $255,000 from the Cremac theft described at ¶¶91–92, above) by making regular and unauthorized transfers of the Condominium's reserve funds to F & M.

104.    With this cushion in place at F & M, on September 28, 2012, Palazzolo was able to transfer $800,000 back to the Chase 7742 Account that purported to be the balance of the purchase price for the foreclosed units.  In fact, for the most part, this was an ironic return of the Condominium's own finances: as noted, $725,000 had been systematically stolen from the reserve account since July 11, 2011.  On October 22, 2012, when the sale of the three foreclosed units took place, Palazzolo transferred the $800,000 in the Condominium's Chase 7742 Account to F & M, which used those funds to acquire the units.  At the time, it appeared as if Palazzolo was merely using the funds he had deposited a month earlier to purchase the three foreclosed units.  In fact, as described herein, most of the money Palazzolo used to acquire the foreclosed units belonged to Condominium.

*The Operating Account is Depleted*

105.    By March 2014, the Condominium's reserve accounts had dwindled to an unsustainable amount.  While Palazzolo (with Overton's help) had been successfully disguising

this fact since at least 2010 by submitting altered bank confirmations to the Board, to the Trump Corp., and to the Condominium's auditors (see below, ¶¶115–22), the Condominium was starting to have liquidity problems.  The Condominium was surprised to discover that it could not afford necessary repair work, for which the reserve funds had been set aside.  Having no other option, the Board directed the use of funds from the Condominium's operating account to pay for certain long term maintenance projects.

106.    This, in turn, had the effect of depleting the Condominium's operating account. Soon, the Board was hearing complaints from the Condominium's Building Manager, who reported that it was impossible to perform routine maintenance on the Condominium because there were insufficient funds.  This also meant that the Condominium did not have enough in its operating accounts to pay for basic needs and services, including taxes, payroll, and security.

107.    On a number of occasions, Palazzolo used a series of confusing, chaotic, and unauthorized transfers to hide the fact that he was transferring funds from the reserve account to cover gross deficiencies in the operating account.  None of these transfers were presented to the Board for approval nor, of course, were they ever approved.  On February 28, 2014, following the receipt of $5,000 from the Operating Account, the Chase 7742 Account had a balance of only $10,673.03.  Palazzolo caused F & M to transfer $945,000 into the Chase 7742 on March 21, 2014 that falsely made it appear that the Condominium had $955,673.03 in its reserve account, when in fact, nearly all of those funds belonged to F & M.  Over the course of the next six months, Palazzolo transferred hundreds of thousands of dollars back and forth between F & M, the Chase 7742 Account, the (then) newly-opened HVB 3461 Account, and the Condominium's reserve accounts.  These rapid movements created—and were intended to create—the false

impression that the Condominium had money that, in fact, Palazzolo had long since stolen and distributed to the Palazzolo Enterprise.

108.    These transfers, too, were acts taken in furtherance of the acts of racketeering described herein.  Palazzolo was playing a shell game with the Condominium's finances to disguise the fact that, as of 2014, over $500,000 had been diverted from the Chase 7742 Account alone to the balance sheet of F & M without being repaid, often hidden in a flurry of unnecessary, chaotic, and unauthorized transactions in and out of all of the many accounts Palazzolo had opened for the Condominium's reserve funds.  Once the funds were on F & M's books, the Palazzolo Enterprise could do with it whatever it saw fit.

*FloTV*

109.    In 2014, Palazzolo stole $143,000 that the Board received from Qualcomm and distributed that amount to the Palazzolo Enterprise.

110.    Those funds were the result of a rooftop antenna easement the Condominium had granted to a business called FloTV.  In 2010, FloTV negotiated with the Condominium to obtain an easement permitting FloTV to install an antenna on the Condominium building's rooftop. The deal required that each month, FloTV would pay the Condominium approximately $4,200 for the use of its rooftop space.

111.    FloTV, however, was an unsuccessful business, and in 2014, its parent company, Qualcomm wound down its operations.  Palazzolo volunteered to conduct negotiations with Qualcomm for the remaining payments owed under the easement and for the cost of removal of the rooftop antenna—which FloTV had agreed to remove at its expense in the original agreement with the Condominium.

34

112.     In 2014, Palazzolo negotiated successfully with Qualcomm and achieved an agreement pursuant to which Qualcomm would pay the Condominium $143,000, representing the FloTV's remaining obligations under the roof easement ($43,000) and compensation for the cost of removing its equipment from the rooftop ($100,000).

113.     Palazzolo could not have been more pleased with himself.  On or about July 15, 2014, Palazzolo attended a Board meeting and proudly displayed the check he had just received—made out to the Condominium—for $143,000.  His efforts were celebrated.  That meeting was the closest the Condominium would ever come to its money.

114.     Instead of depositing the check with the Condominium, on July 16, 2014, Palazzolo deposited it in the account of defendant Premium: a Company which Palazzolo had long claimed to be unaffiliated with, but that was under his control.  As described in greater detail below (¶¶141–59), these funds were transferred from the garage account to members of the Palazzolo Enterprise, and were never returned to the Condominium.

*Misrepresentations in Financial Statements and the Alteration of Bank Documents*

115.     Palazzolo had been hiding his unauthorized thefts and the Palazzolo Enterprise's misuse of the Condominium's reserve funds by altering—or creating false—account information since 2010.  The understatements were significant.

116.     Since 2008, Palazzolo and Reitano directed the Condominium's annual audit work to O'Connor Davies LLP ("O'Connor Davies").  Beginning in 2010, Palazzolo and Overton took steps to hide the thefts of the Condominium's reserve funds in the Chase 7742 Account by altering account documents generated by the bank.  On December 29 of 2010, Palazzolo caused the Condominium to transfer $500,000 to an unknown recipient from the Chase 7742 Account by check.  This transfer was neither presented to the Board for approval, nor

authorized by any other means.  Following that transfer (and a $208.49 deposit of interest made on December 31), the actual balance of the Condominium's reserve funds in the Chase 7442 Account was $42,827.27.  Overton and Palazzolo altered—and Overton signed—the requested confirmation to reflect the balance on December 28, 2010—$542,618.78 (*i.e.*, prior to the $500,000 withdrawal)—as the year-end balance.  Palazzolo provided the misleading information resulting from the alteration of the confirmation to Trump Corp. and O'Connor Davies without, of course, informing them that their sleight of hand had disguised the theft of $500,000 by the Palazzolo Enterprise.  This act, like the other similar acts described herein, constitutes a predicate act of bank fraud undertaken in connection with the interstate commercial activities of the Palazzolo Enterprise.

117.    As of December 31, 2011, although the Condominium's reserve accounts had only $15,152.40, Palazzolo and Overton created false documentation delivered to Trump Corp., the Condominium's management company, and the Condominium's auditors, O'Connor Davies stating that there was $723,580.69 in those accounts.  Once again, Palazzolo and Overton altered and delivered altered documents purporting to be genuine Chase account statements to Trump Corp. and to O'Connor Davies.  The altered documents themselves reflect many attempts to re-create the appearance of the true documents—including Palazzolo and Overton's attempt to re-create bar codes appearing on Chase account statements.

118.    As of December 31, 2012, the Condominium's reserve balances had fallen to only $9,064.00, but Palazzolo reported a balance of $829,264 in the financial statements he submitted to the Condominium's auditors at O'Connor Davies and Trump Corp.

119.    As of December 31, 2013, after the reserve balances dwindled to $5,372, Palazzolo reported in the Condominium's financial statements that the reserve accounts were

well stocked with $940,472.  For those balances—provided at year end 2013—Palazzolo and Overton again attempted to fabricate account documents to disguise the defalcations of the Palazzolo Enterprise.  On June 2, 2014, Palazzolo provided auditors with a purported confirmation of the Chase 7742 Account that showed a balance on December 31, 2013 of $940,472.58.  The confirmation purports to show that it was returned to the requesting party in a single day (typically, Chase takes many weeks to complete similar confirmation requests).  Further, and of course, most importantly, the balance of the Chase 7742 on December 31, 2013 was not $940,472.58; it was, in fact, only $5,372.48.

120.    Each of these alterations constitute numerous, repeated, and continuous examples of the predicate acts of racketeering, including but not limited to mail fraud, wire fraud, and bank fraud, described in 18 U.S.C. § 1961(1).

121.    By supplying false information to the Condominium, to Trump Corp., and to its auditors, Palazzolo caused—and knew or should have known that he was causing—the creation of grossly misleading financial statements that would be distributed to and relied upon by unit owners, their bankers, and the financial institutions holding mortgages on their homes.  The disregard that Palazzolo, the Condominium's Treasurer, showed to the far-reaching impact of these acts makes the broad scope of permissible damages in this civil RICO action both reasonable and appropriate.

122.    Palazzolo was aware, for example, that the Condominium was using his fraudulently altered financial information in connection with its application for financing its ownership of the parking garage located in the Condominium.  Specifically, in 2013, the Condominium's audited financial statements—reflecting Palazzolo's exaggerations of the amounts in its reserve funds—were used in connection with the Condominium's successful

application for a $5.1 million mortgage on the Condominium's parking garage from Banco Popular.  The loan was ultimately issued from Banco Popular's address in Miami Lakes, Florida. Palazzolo knew that the Condominium was submitting financial information he had falsely inflated to Banco Popular, yet he did nothing.  Palazzolo's cover-up has, correspondingly, left the Condominium exposed to significant liability to Banco Popular in the event of a lawsuit for damages incurred as a result of relying on that false information.

*Reda Romano is Hired to Perform Audit Services*

123.    In 2014, Palazzolo insisted that the Board replace O'Connor Davies and retain defendant Reda Romano to perform the annual audit of the Condominium's finances.  Reda Romano was a member of the Palazzolo Enterprise and Palazzolo's long-time personal accountants.  Palazzolo falsely claimed that O'Connor Davies had threatened to double their fees and conveniently explained that Reda Romano would perform the audit for the same fee the Condominium had paid O'Connor Davies the year before.  On April 25, 2014, the Condominium executed an engagement letter with Reda Romano, pursuant to which Reda Romano agreed to perform an audit of the Condominium's financial statements for 2013.

124.    What the Condominium did not know at the time, but has subsequently learned, was that Reda Romano was a complicit member of the Palazzolo Enterprise.  During the Condominium's engagement of Reda Romano, the firm either intentionally or negligently failed to notice signs of mismanagement and fraud, allowing the Palazzolo Enterprise to continue to steal at will from the Condominium.

125.    For example, as described above, Palazzolo provided Reda Romano with a bank confirmation of the Condominium's reserve account balance purportedly executed on the same day it was requested.  (¶119).  This dramatic departure from practice—in which banks are often

hounded for weeks if not months to provide similar confirmation—should have raised a red flag that the confirmation was not genuine. Instead, Reda Romano—either willfully or intentionally—ignored this departure from ordinary practice, and failed to bring the same-day confirmation to the Board's attention.

126. Reda Romano was also aware of the Condominium's contractual relationship with Premium and its purported contractual relationship with Premium Parking. Indeed, for years, the Condominium's income from its parking garage had been recorded on the books of the Condominium. Yet in preparing its audit for the Condominium, Reda Romano relied solely on Palazzolo's assertions, and failed to review the books and records of Premium, or of any other backup materials supporting Palazzolo's assertions. Instead, Reda Romano simply took Palazzolo on his word that they did not need to review those materials, and kept silent. This was a complete derogation of their obligations as accountants and auditors to the Condominium, and was a shocking revelation to the auditors who were hired to replace Reda Romano in 2015.

127. Reda Romano's silence kept the Condominium from discovering the extent to which the Palazzolo Enterprise was stealing its money. Instead of performing their contractual obligations to the Condominium as they had promised to do, Reda Romano aided and abetted Palazzolo and his Enterprise in disguising the theft of hundreds of thousands of dollars from the Condominium's reserve and garage accounts.

*The Board Adopts an Ethics Policy*

128. Throughout the beginning of 2015, unit owners began raising concerns over what was seen as an uncomfortable relationship between Palazzolo and the entities under his control and the Condominium's finances. At the urging of residents, the Board drafted and approved an Ethics Policy and Code of Conduct on May 12, 2015 (the "Ethics Policy").

39

129.    As stated in its preamble, the Ethics Policy was intended to "provide guidance with ethical issues and a mechanism for addressing unethical conduct."  Among other things, the Ethics Policy prohibited precisely the type of self-dealing described herein, and explicitly forbade any Board member from seeking preferential treatment for themselves or their relatives, or from using association property or business for their own gain or benefit.  Without hesitation, Palazzolo and Tobia signed the Ethics Policy, and thereby pledged to act in accordance with its terms.  In fact, as they quickly affirmed through their conduct, they had no intention of doing so.

*The Final Sham Transfer: Palazzolo "Borrows" $1.2 million more for RLA*

130.    On June 29, 2015, the Condominium refinanced its debt on the parking garage with a loan from Banco Popular North America.  Palazzolo deposited the net loan proceeds— $931,250—into the Chase 7742 Account.  On July 1, 2015, without mentioning anything to the Board on which he served as Treasurer, Palazzolo simply took that money—and a little extra— for himself.  On that day, Palazzolo transferred $1.2 million from the Chase 7742 Account to RLA, and thereby, to the Palazzolo Enterprise (the "2015 RLA Loan").

131.    Shortly thereafter, in early July, an employee at the Trump Corp. noticed in a reserve fund summary prepared by Tobia that the reserve fund included a notation that read "RLA Note $1,200,000" and informed the Condominium's attorney of this unauthorized transaction.

132.    The Board was immediately suspicious of the transfer for a number of reasons: it was for a large amount of money; it had never been discussed (much less authorized); and the transfer was made to a RLA, the owner of two commercial units in the Condominium, and the entity involved in the controversial 2010 RLA Loan.  At the time of the 2015 RLA Loan,

Defendant Tobia was still a member of the Board and, as previously noted, was the managing member of RLA.

133.    By July 2015, Palazzolo's total control and domination of the Board had begun to crumble.  Reitano and Mastroianni had sold their condominium units (in Mastroianni's case, to RLA) and as a consequence, were no longer on the Board.  Durante, when confronted with the brazenness of the 2015 RLA Loan and the conflict due to his $500,000 indebtedness to Palazzolo, resigned from the Board.  Newly-elected Board members were, for the first time, able to wrest control of the Board from the Palazzolo Enterprise, although not without a furious battle from Palazzolo and Tobia.

134.    When the Board confronted Palazzolo about the 2015 RLA Loan, he was quick to explain.  Palazzolo stated that in exchange for the funds, Tobia had executed a note for the $1.2 million in which he agreed to pay interest at 6% and had assigned his interest in the lease on one of the commercial units owned by RLA.  Palazzolo also presented an affidavit of confession of judgment, signed by Tobia, for the amount of the 2015 RLA Loan together with interests and costs, and a notice of a lien he had purportedly filed permitting the Condominium to collect its debt from any unpaid common charges owed on the same commercial space.  (Notably, the tenant, Demirjian Holdings, Ltd., did not owe any past common charges at the time.)

135.    The Board had, of course, never had an opportunity to review these documents prior to the transfer of funds.  They had, once again, been used as a piggy bank by the Palazzolo Enterprise.  Palazzolo's after-the-fact purported justification for the 2015 RLA Loan was the straw that broke the camel's back.  The Board and unit owners, outraged by his conduct once again, demanded that Palazzolo undo the transaction.

41

136.   After initially protesting, on July 20, 2015, Palazzolo directed the return of the funds to the Chase 7742 Account.  As in 2010, although Palazzolo had purported to loan the funds to RLA, the funds were returned to the Condominium from F & M.  This fluidity confirms the interconnected structure of the Palazzolo Enterprise and Palazzolo's role as its financier of sorts: his thefts financed the entirety of the Palazzolo Enterprise.

137.   Even after the reversal of the 2015 RLA Loan, Palazzolo's shenanigans were not quite over.  Two days later, on July 22, 2015, Palazzolo directed the transfer of $1,222,275.83 out of the Chase 7742 Account to F & M again.  Later that same day, that amount was returned to the Condominium when it was deposited in the Popular 5767 Account.  While the purpose of these bizarre round trips remains unknown at this time, it is apparent that even on his way out the door, Palazzolo continued to use the resources of the Condominium to falsely inflate the value of F & M Holdings in order to bolster the business activities of the Palazzolo Enterprise.

138.   After the July 2015 Board minutes were published and distributed to unit owners, unit owners were (once again) outraged out Palazzolo's conduct.  In December 2015, unit owners submitted a petition demanding that the Board hold a special meeting to vote on the removal of Palazzolo and Tobia from the Board.  That vote took place on December 16, 2015, and Palazzolo and Tobia were voted off of the Board.  Shortly thereafter, RLA and ACC, the owners of the Condominium's three commercial units, appointed Palazzolo to the Board as their representative.

*The Forensic Investigation Reveals Additional Sham Relationships*

139.   Following the revelation of the 2015 RLA Loan, the Board hired forensic accountants to perform a thorough forensic investigation of the Condominium's reserve and operating accounts under Palazzolo's tenure as Treasurer between 2007 and 2015.  Those efforts

revealed that the transactions described herein resulted in a total deficit to the Condominium's reserve accounts of $668,271.33.

140. But the investigation also revealed a number of additional machinations of the Palazzolo Enterprise, each of which are further examples of racketeering and which give rise to certain of the claims asserted herein.

*Premium Staffing and Premium Parking*

141. The Board's investigation revealed that Palazzolo, together with DiStefano and Santangelo, stole hundreds of thousands of dollars for the Palazzolo Enterprise through the operation of the Condominium's garage.

142. In 2008, the Board voted for the Condominium to purchase the parking garage in the building from Cappelli, the Condominium's developer. After assuming control of the garage in March, the Board soon replaced an existing vendor with Supreme Parking, Inc. ("Supreme"), which charged $32,000 each month to provide valet services to the Condominium.

143. On December 27, 2007, DiStefano opened a bank account at a Scarsdale branch of Commerce Bank in the name of "Premium Staffing, LLC TTCC Garage" (the "Garage Account"). She made herself (and not a Board Member) the sole signatory of the Garage Account even though, as described above (¶¶109–14), the Garage Account had previously accepted deposits written to the Condominium, such as the check from Qualcomm. Without bothering to mention his plan to the Board or otherwise seek its approval, Palazzolo directed all garage income to the Garage Account, where DiStefano and Santangelo would then began to issue the monthly payments to Supreme. For that service, Premium also paid itself a monthly fee.

144.    Palazzolo falsely claimed that he was unaffiliated with Premium when, in fact, Premium, together with its members DiStefano and Santangelo, were members of the Palazzolo Enterprise.  Premium, and Premium Parking, the unregistered business entity Palazzolo later claimed was the true "manager" of the garage, maintained service addresses at Palazzolo Plaza, in precisely the same suite as defendants RLA, F & M, and First Resource Funding, LLC.

145.    The Palazzolo Enterprise had their sights set on the funds flowing to the garage from the outset.  The miraculously-timed opening of the Garage Account—months prior to the formalization of any relationship between the Condominium and Premium, months prior to the engagement of Supreme to provide valet services, and months prior even to the Condominium's acquisition of the garage—was an ominous sign of things to come.

146.    Beginning in 2008, Premium collected virtually all the revenues generated by the operation of the Garage and was, correspondingly, responsible for the payment of most of the Garage's expenses, including payments relating to the financing associated with the acquisition of the garage.

147.    That Premium was collecting anything was bizarre.  No one on the Board had hired Premium to do the job it was purportedly doing in the first place, nor had there even been a discussion of a job that needed doing.  Somehow, at the direction of Palazzolo, the Condominium had simply started paying Premium thousands of dollars a year to manage the Garage Account.

148.    Palazzolo then transferred responsibility for paying off the Condominium's mortgage on the garage to the operating account maintained by Trump Corp., thus removing one of the garage's most significant expense from its balance sheet.  While this should have resulted in a more profitable garage (at least on the books), in fact, the opposite proved true.

149.    Premium started off charging the Condominium a $3,000 monthly fee for managing the Garage Account.  Palazzolo, DiStefano, and Santangelo soon decided that was not enough.  Premium gradually increased its fee: first to $4,000 in 2008; then $4,500 in 2009; then $5,000 in 2010.

150.    In October 2010, Premium began to disguise its fees by reimbursing both itself and Supreme in single transfers from the Garage Account, rather than making direct transfers to Supreme for its $32,000 monthly valet fee.  The disguise was effective: Premium was able to raise its monthly payments to $7,800 without raising an eyebrow of suspicion.

151.    In February 2011, Premium increased its monthly fee to $10,800 and in September 2011, it increased its fee again to $11,800 per month.  Starting in February 2012, however, Premium's payments to itself became erratic and unpredictable.  Although the amounts were irregular, and to date, the Board has been able to obtain only partial information, it has nonetheless been learned that between 2011 and 2014, Premium paid itself and Supreme a total of $2,409,475.  Presuming Supreme was charging $32,000 a month for valet services, this means that Premium had—without authorization—paid itself $873,475 in four years for simply handing money from the Condominium to Supreme, its valet parking service provider, paying utilities, and a few other monthly expenses.

152.    In 2014, Palazzolo and DiStefano presented a new "Parking Agreement" to the Condominium on behalf of Premium Parking, in which Premium Parking agreed to provide valet services to the Condominium.  Those valet services were, in fact, performed by Supreme, but it was impossible to determine from the contract how much of that money was being paid to Supreme and how much was being paid to Premium Parking.  This obfuscation had been going on for years; as previously noted, Premium had been collecting Supreme's fee and its own fee

out of the Garage Account in one commingled payment since 2010. More importantly, although it was described as a New York limited liability company in the Parking Agreement, there has never been a New York limited liability company called Premium Parking either organized in, or authorized to do business in, New York. In any event, the Parking Agreement was meaningless to Premium Parking and the Palazzolo Enterprise: Premium Parking paid itself far in excess of the amounts described in the Parking Agreement in 2015 and 2016, before it was terminated by the Board.

153.    The fees paid to Premium Parking had grown to nearly match the total income received each month by the garage: by 2016, nearly all of the revenue from the garage was being diverted to the Palazzolo Enterprise through Premium. Including fees from commercial tenant, residents, and other users, the garage earned between $50,000 and $62,000 each month. In capturing an ever-larger share of this income, Premium's fees grew from just over 60% of the garage's gross income in 2008, to over 93% of the gross income in 2014. The difference in dollars was stark: the same operations that had generated over $225,000 in net profit to the Condominium in 2009 had caused a $35,259 loss to the Condominium in 2014.

154.    As it turned out, however, the hundreds of thousands of dollars in fees that Premium and Premium Parking paid themselves were only a small part of the story. The Board has also learned that when the garage was profitable, Premium never returned the profits to the garage. Instead, when the garage was making money (*i.e.*, between 2008 and 2013), Premium was simply distributing those profits to members of the Palazzolo Enterprise. Palazzolo, DiStefano, and Santangelo were stealing from the Condominium in two ways: first, by diverting enormous unauthorized monthly fees to Premium; and second, by distributing any profits the garage made to the coffers of the members of the Palazzolo Enterprise.

155.     In total, and in addition to the millions of dollars "borrowed" from the reserve accounts (and the hundreds of thousands of dollars simply stolen and never returned to those accounts), Premium transferred an additional $680,964.82 of the Condominium's money from the Garage Account to various members of the Palazzolo Enterprise or to others on their behalf between 2008 and 2015.  Each of those transactions is described in Appendix A hereto, and each constitutes an additional predicate act in furtherance of the Palazzolo Enterprise.  The transfers so far discovered include: ten transfers to F & M totaling $152,944.79; three transfers to RLA totaling $15,000; four transfers to First Resource totaling $23,335.27; three transfers to Palazzolo's BAB I and BAB II totaling $43,167; 29 transfers to DiStefano totaling $167,790; fifteen transfers to Thomas totaling $72,400; a $60,000 transfer to Premium's parking operations at the White Plains Ritz Carlton; and dozens of other transfers to individuals and businesses that had no business relationship with the Condominium's garage, and no entitlement to the funds that had been stolen from the Condominium via the Garage Account.

156.     Premium also grossly overbilled for the services it provided, in some cases by charging the Condominium nearly twice the amount it was paying its employees to provide lifeguarding and security services.  Since replacing Premium in early 2016, the Board has saved nearly $500,000 by entering into contracts with companies that were not a part of the Palazzolo Enterprise.

157.     In at least one instance, Palazzolo acted directly on behalf of Premium to pad the books of the Palazzolo Enterprise with the Condominium's enterprise.  On or about December 1, 2014, Palazzolo presented an "Exclusive Service Agreement" on behalf of Premium Parking to the Condominium's Resident Manager, Mr. Lawrence Gomez.  Mr. Palazzolo was aware (or should have been aware) that the Condominium by-laws did not authorize the Condominium's

Resident Manager to enter into contracts on behalf of the Condominium.  Mr. Gomez balked, knowing he did not have the authority, at which time Mr. Palazzolo threatened to have him fired if he did not sign the agreement.  Seeing no other option, Mr. Gomez purported to execute the agreement on behalf of the Condominium.  The agreement concerned Richard Flynn, a Trump Corp. employee who was working as a porter at the Condominium for an annual salary of approximately $40,000.  The Exclusive Service Agreement purported to guarantee Mr. Flynn payment as a handyman for at least 40 hours of work each week at $95/hour (*i.e.* $187,600 in guaranteed income each year in addition to his salary.  The Exclusive Service Agreement was executed by DiStefano and Mr. Gomez, and both signatures were notarized by Thomas.  Premium then charged the Condominium for his six-figure handyman salary, and paid itself out of the Garage Account.

158.    In fact, however, Mr. Flynn never received the additional $187,600 that Premium "reimbursed" itself.  Instead, he received only approximately an additional $30,000 for doing handyman work at the Condominium.  Premium simply charged the Condominium for all of the money purportedly owed to Mr. Flynn, and kept it for the benefit of the Palazzolo Enterprise.  These acts were fraudulent, and constitute theft, and a waste of the Condominium's limited resources in violation of the fiduciary duties Palazzolo owed to the Condominium.

159.    The Board brought an action in Supreme Court, Westchester County, against Premium Parking, LLC and Premium Staffing, LLC for an accounting on or about May 19, 2016 that aims, in part, to determine the amount of these and other losses and the extent to which those amounts—wrongfully taken from the Condominium—were used to further the economic interests of the Palazzolo Enterprise.  Following the initiation of that litigation, Premium Staffing filed dissolution papers on August 16, 2016.

*Diversion of Utility Payments by the Palazzolo Enterprise*

160.     Each month, the Condominium received a bill for electricity usage by all of the

Condominium's residential units, common areas, and commercial units.  Through the use of

submeters, a third-party service provider, Quadlogic Corp., determined the appropriate charges

for electricity to be allocated to each residential unit owner, the commercial units, and the

amount to be attributed to common areas.  RLA owned two of the commercial units in the

Condominium and, since 2008, has leased them to a hair salon—Demirjian—and a restaurant—

Via Veneto—located on the lobby level of the building.  ACC owned the other commercial unit,

which it has leased to various businesses since 2012.

161.     Unbeknownst to the Board (but known to Palazzolo and Tobia, the managing

member of ACC), Quadlogic wrongfully believed that the commercial sub-meters did not need

to be tracked, because the amounts therein recorded reflected electrical usage by common areas

in the Condominium.  Correspondingly, Quadlogic never generated charges for the commercial

units; those amounts were unwittingly sloughed off onto the Condominium and its unit owners as

if they were shared expenses of the Condominium for its common areas.

162.     After Palazzolo's ouster from the Board, Quadlogic's mistake was discovered,

and the Board confronted the commercial tenants to determine why they were not paying their

share of the electric bill.  Demirjian—Palazzolo's commercial tenant—explained that Palazzolo

had told them he was paying the electric bills on their behalf, and that they should simply pay

him directly.  Demirjian showed the Board a photocopy of a check Palazzolo had given to him,

purportedly paid to the Condominium on May 4, 2012, for $27,694 in unpaid electric charges,

and an executed promissory note Palazzolo had presented in which Demirjian agreed to pay

Palazzolo directly for their electrical usage. (Gina Thomas, once again, notarized Palazzolo's signature).

163.     The catch, of course, was that none of that money was turned over to the Condominium. Neither the $27,694 check Palazzolo claimed to have paid to the Condominium, nor any of the payments the commercial tenants made to Palazzolo ever made their way into the Condominium's accounts. To date, Palazzolo and Tobia's only response has been the false claim that the Board agreed in 2008 that commercial unit owners would not be charged for electricity. The Board minutes, of course, do not reveal such a wild assertion, nor is there any evidence of such an agreement. Palazzolo and Tobia simply kept the Condominium's funds—in excess of $200,000 paid by the commercial tenants for electrical usage—for themselves and the Palazzolo Enterprise, and, once again, left the Condominium and its unit owners to pay for it.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(Violations of RICO, 18 U.S.C. § 1962(a))
(Against Frank Palazzolo)

164.     Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

165.     At all relevant times, Plaintiff was a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(a).

166.     At all relevant times, Palazzolo was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(a).

167.     At all relevant times, the Palazzolo Enterprise: (i) was an ongoing association-in-fact with a decision-making framework or mechanism for controlling the association; and (ii) had associated members with a common purpose that functioned as a continuing unit.

168.     On information and belief, at all relevant times, the Palazzolo Enterprise was engaged in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(a).

169.     At all relevant times, Palazzolo, as alleged herein, received income from a pattern of racketeering activity, and used and invested that income in the operation of the Palazzolo Enterprise.

170.     At all relevant times, Plaintiff was injured by reason of Palazzolo's investment of income from racketeering, principally, the theft of the Condominium's funds to prop up his own business interests and those of the Palazzolo Enterprise.

*The Palazzolo Enterprise*

171.     The defendants are a group of persons and entities associated together in fact as the Palazzolo Enterprise for the common purpose of carrying out an ongoing enterprise, as described in the foregoing paragraphs of this Complaint.  Namely, through years of individual acts of theft and fraud to cover that theft, these defendants stole money from the Condominium.

172.     The Palazzolo Enterprise is a long-standing organization that functions as a continuing unit and that exhibits an informal command structure with the purpose of making business and real estate investments, which constitute business activities affect interstate commerce.  At all times relevant to this Complaint, the defendants engaged in the operation or management of the Palazzolo Enterprise, and Palazzolo acted as the head of the Palazzolo Enterprise.  Further, Palazzolo invested the income received from the acts of racketeering described herein into the Palazzolo Enterprise and through those acts of racketeering, acquired an interest in or established the operation of, the Palazzolo Enterprise and the entities it was composed of.

173.     The predicate acts described herein constitute a pattern of racketeering activity and are part of a common scheme to enrich the Palazzolo Enterprise at the expense of the Condominium through acts constituting: (i) mail fraud, in violation of 18 U.S.C. § 1341; (ii) wire fraud, in violation of 18 U.S.C. § 1343; (iii) bank fraud, in violation of 18 U.S.C. §§ 1344; (iv) and violations of the National Stolen Property Act, 18 U.S.C. §§ 2314–15.

174.     As a direct and proximate result of the violations set forth above, the Condominium has been injured.  Palazzolo's violations of § 1962(a) are the proximate cause of this injury.  Under the provisions of 18 U.S.C. § 1964(c), the Condominium is entitled to bring this action and recover treble damages, the cost of bringing this suit, prejudgment interest, and attorneys' fees.

*Mail Fraud and Wire Fraud (18 U.S.C. §§ 1341, 1343)*

175.     By the acts described herein, the members of the Palazzolo Enterprise knowingly executed and/or intentionally participated in a scheme that defrauded, and that was intended to defraud, the Condominium, and that employed the use of the mails in furtherance thereof.

176.     In furtherance of that scheme, and as described herein, the defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, and also caused matters and things to be placed in a post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier, including, but not limited to the following:

- correspondence incorporating false and misleading statements regarding the balance of the reserve accounts of the Condominium and the transactions further described herein;

- funds transferred by Palazzolo to the defendant members of the Palazzolo Enterprise, with the intent that those funds be used to promote the Palazzolo Enterprise; and

- funds transferred by Premium at the direction of Palazzolo, DiStefano, and Santangelo to the defendant members of the Palazzolo Enterprise, with the intent that those funds be used to promote the Palazzolo Enterprise.

177.    Plaintiffs incorporate Appendix A hereto by reference, which sets forth those transfers reflecting and constituting instances of wire and mail communications in furtherance of the Palazzolo Enterprise that constitute violations of 18 U.S.C. §§ 1341 and 1343, including when the communication was made and how it furthered the fraudulent scheme (*i.e.* to whom it was transferred on behalf of the Palazzolo Enterprise).  Except where otherwise described herein, all transfers are alleged to have been made by, or at the direction of, Palazzolo.

*Bank Fraud (18 U.S.C. § 1344)*

178.    By the acts described herein, the members of the Palazzolo Enterprise knowingly executed and/or intentionally participated in a scheme that defrauded a financial institution.

179.    Further, the members of the Palazzolo Enterprise knowingly executed and/or intentionally participated in a scheme to obtain the monies and assets of the Condominium under the custody and control of a financial institution by means of false pretenses, representations, or promises.

180.    Plaintiff acts included, but are not limited to:

- unauthorized transfers of funds from the Key 158 Account, the Chase 9221 Account, the Chase 7742 Account, and the Chase 7595 Account;

- unauthorized transfers of funds from the Garage Account;

- the creation and/or dissemination of false account confirmations relating to the Chase 7595 and the Chase 7742 Accounts; and

- the dissemination of knowingly false financial statements in connection with the Condominium's application to re-finance its parking garage.

53

181.    Plaintiffs incorporate the Appendix A hereto by reference, which sets forth those transfers reflecting and constituting acts of fraud upon a financial institution in violation of 18 U.S.C. §§ 1344, including which defendant caused each transfer to be made or wired, when each transfer was made, and how each transfer furthered the fraudulent scheme.

*National Stolen Property Act (18 U.S.C. §§ 2314–15)*

182.    By the acts described herein, the members of the Palazzolo Enterprise transmitted, transferred, and received money with a value of more than $5,000, knowingly the same to have been converted and/or taken by fraud.  Upon information and belief, that money was transmitted or transferred in interstate commerce.

183.    Plaintiff acts included, but are not limited to the unauthorized transfers of funds from the Key 158 Account, the Chase 9221 Account, the Chase 7742 Account, the Chase 7595 Account, and the Garage Account.

184.    Plaintiffs incorporate Appendix A hereto by reference, which sets forth those transfers reflecting and constituting acts of fraud upon a financial institution in violation of 18 U.S.C. §§ 1344, including which defendant caused each transfer to be made or wired, when each transfer was made, and how each transfer furthered the fraudulent scheme.

SECOND CLAIM FOR RELIEF
(Violations of RICO, 18 U.S.C. § 1962(b))
(Against Frank Palazzolo)

185.    Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

186.    At all relevant times, Plaintiff was a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(b).

187.    At all relevant times, Palazzolo was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(b).

188.    At all relevant times, the Palazzolo Enterprise: (i) was an ongoing association-in-fact with a decision-making framework or mechanism for controlling the association; and (ii) had associated members with a common purpose that functioned as a continuing unit.

189.    On information and belief, at all relevant times, the Palazzolo Enterprise was engaged in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(b).

190.    At all relevant times, Palazzolo, through the pattern of racketeering activity described above (¶¶171–184), and set forth elsewhere herein and in Appendix A hereto, acquired and/or maintained his interest in and control of the Palazzolo Enterprise.

191.    As a direct and proximate result of the violations set forth above, the Condominium has been injured.  Palazzolo's violations of § 1962(b) are the proximate cause of this injury.  Under the provisions of 18 U.S.C. § 1964(c), the Condominium is entitled to bring this action and recover treble damages, the cost of bringing this suit, prejudgment interest, and attorneys' fees.

THIRD CLAIM FOR RELIEF
(Violations of RICO, 18 U.S.C. § 1962(c))
(Against all Defendants)

192.    Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

193.    At all relevant times, Plaintiff was a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

194.     At all relevant times, each of the defendants named herein was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

195.     At all relevant times, the Palazzolo Enterprise: (i) was an ongoing association-in-fact with a decision-making framework or mechanism for controlling the association; and (ii) had associated members with a common purpose that functioned as a continuing unit.

196.     On information and belief, at all relevant times, the Palazzolo Enterprise was engaged in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

197.     At all relevant times, defendants were employed by or associated with the Palazzolo Enterprise and conducted and participated in the conduct of the Palazzolo Enterprise through the pattern of racketeering activity described above (¶¶171–184), and set forth elsewhere herein and in Appendix A hereto.

198.     As a direct and proximate result of the violations set forth above, the Condominium has been injured.  Defendants' violations of § 1962(c) are the proximate cause of this injury.  Under the provisions of 18 U.S.C. § 1964(c), the Condominium is entitled to bring this action and recover treble damages, the cost of bringing this suit, prejudgment interest, and attorneys' fees.

FOURTH CLAIM FOR RELIEF
(Violations of RICO, 18 U.S.C. § 1962(d))
(Against all Defendants)

199.     Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

200.     At all relevant times, Plaintiff was a person within the meaning of 18 U.S.C.  §§ 1961(3) and 1962(d).

201.    At all relevant times, Palazzolo was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d).

202.    At all relevant times the Palazzolo Enterprise: (i) was an ongoing association-in-fact with a decision-making framework or mechanism for controlling the association; and (ii) had associated members with a common purpose that function as a continuing unit.

203.    The defendants entered into a series of agreements between and among each other to engage in a conspiracy to violate 18 U.S.C. §§1962(a), (b), and (c).  Each defendant entered into at least one agreement with at least one other defendant to join the conspiracy, took acts in the furtherance of the conspiracy, and knowingly participated in the conspiracy.

204.    The defendants agreed and conspired to violate 18 U.S.C. §§ 1962(a), (b), and (c) by participating, directly or indirectly, in the conduct of the affairs of the Palazzolo Enterprise through a pattern of racketeering activity, including an agreement that the conspirators, or one of them, would commit or cause the commission of two or more racketeering acts constituting such a pattern.

205.    By engaging in those acts of racketeering as set forth above (¶¶171–184), and set forth elsewhere herein and in Appendix A hereto, defendants have agreed to conspire and did so conspire in violation of 18 U.S.C. § 1962(d) to engage in illegal predicate acts that formed a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5) and otherwise agreed to violate 18 U.S.C. § 1962(c).

206.    Each defendant is a member of the Palazzolo Enterprise and as co-conspirators, the defendants are liable for all of the actions committed by all of the co-conspirators within the conspiracy and are liable for all of the damages sustained by the Condominium that were caused

by any members of the conspiracy, regardless of whether the defendants were themselves directly involved in a particular aspect of the Palazzolo Enterprise.

207.    As a direct and proximate result of the violations set forth above, the Condominium has been injured.  Defendants' violations of § 1962(d) are the proximate cause of this injury.  Under the provisions of 18 U.S.C. § 1964(c), the Condominium is entitled to bring this action and recover treble damages, the cost of bringing this suit, prejudgment interest, and attorneys' fees.

FIFTH CLAIM FOR RELIEF
(Conversion)
(Against all Defendants)

208.    Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

209.    At all relevant times, Plaintiff had an immediate and superior right of possession to its reserve funds and to certain funds in the Garage Account.

210.    By the wrongful actions described herein, the defendants intentionally stole and converted the Condominium's reserve and other funds to the exclusion of the Condominium's rights.

211.    As a direct and proximate cause of those actions, the Condominium has been damaged and is entitled to compensatory damages in an amount to be determined at trial.

SIXTH CLAIM FOR RELIEF
(Breaches of Fiduciary Duty)
(Against Frank Palazzolo)

212.    Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

213.    At all relevant times, Palazzolo owed a fiduciary duty to the Condominium in his

role as its Treasurer.  As such, Palazzolo was obligated to act at all times in the best interests of

the Condominium.

214.    By the wrongful actions described herein, Palazzolo breached the fiduciary duties

he owed to the Condominium by looting the Condominium's assets to further the business

interests of the Palazzolo Enterprise by, among other conduct: (i) misrepresenting the balance in

the Condominium's reserve accounts; (ii) misrepresenting the proposed use of the 2010 RLA

Loan and the 2015 RLA Loan; (iii) directing the transfers of the Condominium's reserve and

other funds for his own benefit and for the benefit of other members of the Palazzolo Enterprise,

as identified in Appendix A hereto, without authorization.

215.    Palazzolo's conduct was contrary to the interests of the Condominium and was

the direct and proximate cause of damages to the Condominium in an amount to be determined at

trial.

SEVENTH CLAIM FOR RELIEF
(Aiding and Abetting Breaches of Fiduciary Duty)
(against all defendants other than Frank Palazzolo, namely Mary Palazzolo, Stephen Tobia,
Stephen Reitano, Joseph Santangelo, Lorraine DiStefano, Gina Thomas, Lori Overton, F & M
Funding LLC, RLA Holdings, LLC, Premium Staffing LLC, Premium Parking, LLC, Antoinette
City Center, LLC, Ridgeview Holdings LLC, B.A.B. Group I, LLC, B.A.B. Group II, LLC, First
Resource Funding, LLC, and Reda Romano & Co., L.L.P.)

216.    Plaintiff realleges and incorporates herein by reference each and every foregoing

paragraph of this Complaint as if set forth in full.

217.    At all relevant times, Palazzolo owed a fiduciary duty to the Condominium in his

role as its Treasurer.  As such, Palazzolo was obligated to act at all times in the best interests of

the Condominium.

218.    All defendants other than Palazzolo knew that Palazzolo was improperly transferring the Condominium's reserve funds to them and to the Palazzolo Enterprise, in violation of fiduciary duties he owed to the Condominium.  By the acts described herein, including but not limited to those identified in Appendix A hereto, all defendants other than Palazzolo gave substantial assistance to Palazzolo in the breach of those fiduciary duties.

219.    The conduct of all defendants other than Palazzolo was a direct and proximate cause of damages to the Condominium in an amount to be determined at trial.

EIGHTH CLAIM FOR RELIEF
(Fraud)
(Against Frank Palazzolo)

220.    Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

221.    As described herein, Palazzolo knowingly and intentionally made numerous misrepresentations and omissions of fact to the Condominium including: (i) misrepresentations regarding the balance in the Condominium's reserve accounts; (ii) misrepresentations regarding the proposed use of the 2010 RLA Loan and the 2015 RLA Loan; and (iii) concealing transfers (or the true nature of transfers) of the Condominium's reserve and other funds for his own benefit and for the benefit of other members of the Palazzolo Enterprise, as identified in Appendix A hereto, without authorization.

222.    Palazzolo made these misrepresentations and omissions of fact with the intent to induce the Condominium's justifiable reliance on his representations.  The Condominium reasonably relied upon Palazzolo's misrepresentations and omissions to its detriment.

223.    Palazzolo's fraudulent misrepresentations and omissions were the direct and proximate cause of damage to the Condominium in an amount to be determined at trial.

## NINTH CLAIM FOR RELIEF
### (Fraudulent Concealment by Fiduciary)
### (Against Frank Palazzolo)

224.    Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

225.    At all relevant times, Palazzolo owed a fiduciary duty to the Condominium in his role as its Treasurer.  As such, Palazzolo was obligated to act at all times in the best interests of the Condominium.

226.    As described herein, Palazzolo concealed the true balances of the accounts containing the Condominium's reserve funds and the facts of the transfers described herein and set forth in Appendix A hereto.

227.    Palazzolo intentionally concealed those facts in order to defraud or mislead the Condominium.  The Condominium reasonably relied upon Palazzolo's misrepresentations and omissions to its detriment.

228.    Palazzolo's fraudulent concealment was the direct and proximate cause of damage to the Condominium in an amount to be determined at trial.

## TENTH CLAIM FOR RELIEF
### (Unjust Enrichment)
### (Against all Defendants)

229.    Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

230.    By their wrongful conduct as described herein, defendants have been unjustly enriched at the Condominium's expense.

231.    It is against equity and good conscience to permit the defendants to retain the benefits of their wrongful conduct.

232.    Defendants' wrongful conduct was the direct and proximate cause of damage to the Condominium in an amount to be determined at trial.

ELEVENTH CLAIM FOR RELIEF
(Money Had and Received)
(Against all Defendants)

233.    Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

234.    As described herein, the defendants benefitted from the receipt of money rightfully belonging to the Condominium.  The defendants have no lawful or equitable right to these funds, having obtained them through fraud or deceit.

235.    Equity and good conscience dictate that defendants may not retain possession or control of those funds, which rightfully belong to the Condominium.  Correspondingly, defendants are obligated to return all such funds to the Condominium.

TWELFTH CLAIM FOR RELIEF
(Professional Malpractice)
(Against Reda Romano & Company, L.L.P.)

236.    Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

237.    On April 25, 2014, the Condominium executed an agreement with Reda Romano in which Reda Romano agreed it would perform an audit of its financial statements as of December 31, 2013.  In that agreement, Reda Romano promised that it would conduct its audit "in accordance with auditing standards generally accepted in the United States of America and will include tests of your accounting records and other procedures we consider necessary to enable us to express such an opinion."

238. In that agreement, Reda Romano also stated that it would "inform the appropriate level of management of any violations of laws or governmental regulations that come to our attention, unless clearly inconsequential."

239. Consistent with the terms of its engagement as described in that agreement, Reda Romano was required to audit the books and records of the Condominium with appropriate skepticism, and owed the Condominium a duty to exercise due professional care by adhering to accepted standards of practice for certified public accountants.

240. As alleged herein, Reda Romano departed from those accepted standards, among other ways, when it failed to review any of the back-up information giving rise to Palazzolo's claims regarding the operation of the Garage Account without bringing that failure to the Board's attention, and when it certified fraudulent account balances without questioning bank confirmations purportedly completed the same day they were requested.

241. Reda Romano's departure from accepted standards constitutes professional malpractice.  But for that malpractice, the unauthorized transfers of the Condominium's funds would have been detected earlier, and in many cases, prevented.

242. Reda Romano's malpractice was the direct and proximate cause of damage to the Condominium in an amount to be determined at trial.

THIRTEENTH CLAIM FOR RELIEF
(Gross Negligence)
(Against Reda Romano & Company, L.L.P.)

243. Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

244. Reda Romano owed Plaintiff a duty to exercise due care in providing accounting services to the Condominium.

245.    Reda Romano breached that duty of due care by, among other things, failing to review any of the back-up information giving rise to Palazzolo's claims regarding the operation of the Garage Account without bringing that failure to the Board's attention, and by certifying fraudulent account balances without questioning bank confirmations purportedly completed the same day they were requested.

246.    These breaches are of such an aggravated character as to constitute gross negligence because they show a reckless disregard for the rights of the Condominium and/or intentional wrongdoing.

247.    But for that gross negligence, the unauthorized transfers of the Condominium's funds would have been detected earlier, and in many cases, prevented.

248.    Reda Romano's gross negligence was the direct and proximate cause of damage to the Condominium in an amount to be determined at trial.  Further, Reda Romano's breaches of its duty of care are of such an egregious nature as to justify an award of punitive damages.

FOURTEENTH CLAIM FOR RELIEF
(Breach of Contract)
(Against Reda Romano & Company, L.L.P.)

249.    Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

250.    On April 25, 2014, the Condominium entered into a valid and binding agreement with Reda Romano in which Reda Romano agreed it would perform an audit of its financial statements as of December 31, 2013.  In that agreement, Reda Romano promised that it would conduct its audit "in accordance with auditing standards generally accepted in the United States of America and will include tests of your accounting records and other procedures we consider necessary to enable us to express such an opinion."

64

251.    In that agreement, Reda Romano also stated that it would "inform the appropriate level of management of any violations of laws or governmental regulations that come to our attention, unless clearly inconsequential."

252.    Reda Romano breached that agreement by failing to fulfill its express and/or implied promise to perform accounting services with due care by, among other things, agreeing to ignore the Garage Account without bringing Palazzolo's request to do so to the Board's attention, and by certifying fraudulent account balances without questioning bank confirmations purportedly completed the same day they were requested.

253.    But for that breach, the unauthorized transfers of the Condominium's funds would have been detected earlier, and in many cases, prevented.

254.    Reda Romano's breach of the agreement to provide a year-end audit of the Condominium's financial books and records was the direct and proximate cause of damage to the Condominium in an amount to be determined at trial.

WHEREFORE, Plaintiff demands the entry of a judgment as follows:

(a) on the First Claim for Relief for violations of RICO, 18 U.S.C. § 1962(a), damages, including interest, against Palazzolo, in the amount of threefold the actual damages this Court finds the Condominium has sustained and the cost of this action, including reasonable attorneys' fees, as described by 18 U.S.C. § 1964(c), and such additional compensatory damages, punitive damages, costs, and other relief as the Court deems just and equitable;

(b) on the Second Claim for Relief for violations of RICO, 18 U.S.C. § 1962(b), damages, including interest, against Palazzolo, in the amount of threefold the actual damages this Court finds the Condominium has sustained and the cost of this action, including reasonable

attorneys' fees, as described by 18 U.S.C. § 1964(c), and such additional compensatory damages, punitive damages, costs, and other relief as the Court deems just and equitable;

(c) on the Third Claim for Relief for violations of RICO, 18 U.S.C. § 1962(c), damages, including interest, against all Defendants, jointly and severally, in the amount of threefold the actual damages this Court finds the Condominium has sustained and the cost of this action, including reasonable attorneys' fees, as described by 18 U.S.C. § 1964(c), and such additional compensatory damages, punitive damages, costs, and other relief as the Court deems just and equitable;

(d) on the Fourth Claim for Relief for violations of RICO, § 1962(d), damages, including interest, against all Defendants, jointly and severally. in the amount of threefold the actual damages this Court finds the Condominium has sustained and the cost of this action, including reasonable attorneys' fees as described by 18 U.S.C. § 1964(c), and such additional compensatory damages, punitive damages, costs, and other relief as the Court deems just and equitable;

(e) on the Fifth Claim for Relief for conversion, compensatory damages with the specific amount to be determined at trial;

(f) on the Sixth Claim for Relief for breaches of fiduciary duty, compensatory, exemplary, and punitive damages in an amount to be determined at trial;

(g) on the Seventh Claim for Relief for fraud, compensatory, exemplary, and punitive damages in an amount to be determined at trial;

(h) on the Eighth Claim for Relief for aiding and abetting breaches of fiduciary duty, compensatory, exemplary, and punitive damages in an amount to be determined at trial;

(i) on the Ninth Claim for Relief for fraudulent concealment by fiduciary, compensatory, exemplary, and punitive damages in an amount to be determined at trial;

(j) on the Tenth Claim for Relief for unjust enrichment, compensatory, exemplary, and punitive damages in an amount to be determined at trial;

(k) on the Eleventh Claim for Relief for money had and received, compensatory, exemplary, and punitive damages in an amount to be determined at trial;

(l) on the Twelfth Claim for Relief for professional malpractice, compensatory, exemplary, and punitive damages in an amount to be determined at trial;

(m) on the Thirteenth Claim for Relief for gross negligence, compensatory, exemplary, and punitive damages in an amount to be determined at trial;

(n) on the Fourteenth Claim for Relief for breach of contract, compensatory, exemplary, and punitive damages in an amount to be determined at trial.

(o) an order that defendants indemnify and hold harmless Plaintiff from any and all causes of action arising from the misstatements and omissions of Palazzolo and/or the Palazzolo Enterprise in the books and records of the Condominium.

(p) on all claims for relief, under federal common law and N.Y. CPLR 5001 and 5004, awarding the Condominium prejudgment interest from the date on which the acts complained of herein occurred;

(q) on all claims for relief, establishment of a constructive trust over the transfers received by the Palazzolo Enterprise or otherwise received by virtue of any claim for relief described herein, for the benefit of the Condominium;

(r) on all claims for relief, awarding the Condominium all applicable interest, costs, and disbursements incurred in connection with this action; and

(s) on all claims for relief, granting the Condominium such other, further, and different

relief as this Court deems just, proper, and equitable.


Dated: New York, New York
      November 28, 2016

**MEISTER SEELIG & FEIN LLP**

By:
      Adam B. Oppenheim, Esq.
      Jeffrey A. Kimmel, Esq.

125 Park Avenue
7th Floor
New York, NY 10017
Tel: 212.655.3500

*Attorneys for Plaintiff*