UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE BOARD OF MANAGERS OF TRUMP
TOWER AT CITY CENTER
CONDOMINIUM, by its President, Alan
Neiditch,

                        Plaintiff,

    -v-

FRANK PALAZZOLO; MARY PALAZZOLO;
STEPHEN TOBIA; STEPHEN REITANO;
JOSEPH SANTANGELO; LORRAINE
DISTEFANO; GINA THOMAS; F&M
FUNDING LLC; RLA HOLDINGS, LLC;
PREMIUM STAFFING LLC; PREMIUM
PARKING, LLC; ANTOINETTE CITY
CENTER, LLC; B.A.B. GROUP I, LLC; B.A.B.
GROUP II, LLC; FIRST RESOURCE
FUNDING LLC; and REDA, ROMANO &
COMPANY, LLP,

                        Defendants.

No. 16-CV-9188 (KMK)

OPINION & ORDER

---

Appearances:

Adam B. Oppenheim, Esq.
Meister Seelig & Fein LLP
New York, NY
*Counsel for Plaintiff*

Lawrence M. Gottlieb, Esq.
Hass & Gottlieb
White Plains, NY
*Counsel for Defendants Frank Palazzolo, Mary Palazzolo, F&M Funding LLC, Ridgeview
Holdings LLC, B.A.B. Group I, LLC, and B.A.B. Group II, LLC*

Kevin J. Harrington, Esq.
John T.A. Rosenthal, Esq.
Harrington, Ocko & Monk, LLP
White Plains, NY
*Counsel for Defendants Stephen Tobia, Stephen Reitano, Joseph Santangelo, Lorraine
DiStefano, Gina Thomas, RLA Holdings, LLC, Premium Staffing LLC, Premium Parking, LLC,
and First Resource Funding LLC*

David T. Feuerstein, Esq.
Feuerstein Kulick LLP
New York, NY
*Counsel for Defendant Antoinette City Center, LLC*

KENNETH M. KARAS, District Judge:

The Board of Managers of Trump Tower at City Center Condominium, by its President, Alan Neiditch, (the "Board" or "Plaintiff") filed the instant Action against Frank Palazzolo ("Mr. Palazzolo"); Mary Palazzolo ("Palazzolo"); Stephen Tobia ("Tobia"); Stephen Reitano ("Reitano"); Joseph Santangelo ("Santangelo"); Lorraine DiStefano ("DiStefano"); Gina Thomas ("Thomas"); F&M Funding LLC ("F&M"); RLA Holdings, LLC ("RLA"); Premium Staffing LLC ("Premium Staffing"); Premium Parking, LLC ("Premium Parking"); Antoinette City Center, LLC ("ACC"); B.A.B. Group I, LLC ("B.A.B. I"); B.A.B. Group II, LLC ("B.A.B. II"); First Resource Funding LLC ("First Resource"); Ridgeview Holdings LLC ("Ridgeview LLC"); and Reda, Romano & Company, LLP ("Reda Romano") (collectively, "Defendants"), alleging one count of a violation of the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a), by Mr. Palazzolo, one count of a violation of RICO, 18 U.S.C. § 1962(b), by Mr. Palazzolo, one count of a violation of RICO, 18 U.S.C. § 1962(c) by all Defendants except Reda Romano, one count of conspiracy to violate RICO, 18 U.S.C. § 1962(d), by all Defendants except Reda Romano, as well as state law claims against various Defendants for conversion, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, fraud, fraudulent concealment by a fiduciary, unjust enrichment, money had and received, professional malpractice, gross negligence, and breach of contract. (*See* Am. Compl. (Dkt. No. 120).)

Before the Court are three Motions. First, there are two Motions To Dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6)—one on behalf of Tobia, Reitano, Santangelo, DiStefano, Thomas, RLA, Premium Staffing, Premium

2

Parking, and First Resource (collectively "Tobia Defendants"), (*see* Dkt. No. 138), and the other

on behalf of ACC, (*see* Dkt. No. 144). In addition, Plaintiff has filed a Motion To Dismiss the

counterclaims asserted by Mr. Palazzolo, and to strike the affirmative defenses asserted by Mr.

Palazzolo, Palazzolo, F&M, B.A.B. I, B.A.B. II, and Ridgeview LLC, (collectively "Palazzolo

Defendants"). (*See* Dkt. No. 140.)

For the following reasons, the Tobia Defendants' Motion and ACC's Motion are both

denied, and Plaintiff's Motion is granted in part and denied in part.

## I. Background

### A. Parties

This Action involves a large number of parties with various roles in the unlawful scheme

alleged by Plaintiff. For clarity, the Court provides a summary of the Parties and their respective

roles in the alleged scheme.

Plaintiff Board is an unincorporated association and the legal entity responsible for the

control and operation of all common areas and public spaces of the Trump Tower at City Center

Condominium at White Plains (the "Condominium"). (Am. Compl. ¶ 10.) The Board is

comprised of seven members and has governed the Condominium since its opening in 2005. (*Id.*

¶ 2.)

Mr. Palazzolo served as Treasurer of the Condominium from 2007 until his removal by

the Board in 2015. (*Id.* ¶ 11.) Mr. Palazzolo currently resides in the Condominium and remains

a member of the Board as the nominated representative of the commercial spaces in the

Condominium, including the commercial space owned by ACC. (*Id.*) Mr. Palazzolo is a real

estate investor, and owns a commercial building at 800 Central Park Avenue in Scarsdale, New

York known as "Palazzolo Plaza," an address used by Defendants F&M, RLA, First Resource,

Premium Staffing, Premium Parking, ACC, and Ridgeview LLC.  (*Id.*)  Mr. Palazzolo is alleged to have either controlled or have been a member or managing member of a variety of businesses, including F&M, RLA, Premium Staffing, Premium Parking, ACC, Ridgeview LLC, B.A.B. I, and B.A.B. II.  (*Id.*)  Mr. Palazzolo is married to Palazzolo, who herself controlled or was otherwise a member of F&M and Ridgeview LLC.  (*Id.* ¶ 12.)  Defendant Thomas was an employee of Mr. Palazzolo and Palazzolo at F&M.  (*Id.* ¶ 17.)

Mr. Palazzolo's long-time business associate Tobia is also alleged to have either controlled or have been a member or managing member of RLA, ACC, First Resource, and Ridgeview LLC.  (*Id.* ¶ 13.)  Tobia, a real estate investor and businessman, served as a member of the Board from October 2006 through his ouster in 2015, including a term as Vice President of the Board from June 2011 through December 2015.  (*Id.*)  Together, Mr. Palazzolo and Tobia are alleged to have either owned or controlled ACC, a limited liability company that owns one commercial unit in the building alongside RLA, another limited liability company which itself owns two commercial units.  (*Id.* ¶ 177.)

Reitano was also a member of the Board, serving from April 2006 through February 2013.  (*Id.* ¶ 14.)  Reitano is alleged to have controlled and/or been a member or managing member of Ridgeview LLC, along with Mr. Palazzolo and Tobia.  (*Id.*)

Santangelo is the final member of the Ridgeview LLC, and also "controlled and/or was a member or managing member of" Premium Staffing and Premium Parking.  (*Id.* ¶ 15.)

The Ridgeview LLC was created by Mr. Palazzolo, Tobia, Reitano, and Santangelo to manage an investment in a real estate project, Ridgeview, in Elmsford, New York.  (*Id.* ¶ 64.)  Ridgeview LLC received financing through F&M, which itself used funds earmarked for Tobia's company, RLA, on its own balance sheets.  (*Id.* ¶¶ 63, 65.)

Mr. Palazzolo was also involved with Premium Staffing and Premium Parking, of which Santangelo and DiStefano were controlling partners and/or members or managing members.  (*Id.* ¶¶ 11, 15–16.)  Premium Staffing was created in December 2007 by Santangelo and DiStefano to manage the Condominium's Garage finances and ensure that the valet parking provider, Supreme Parking, Inc. ("Supreme"), was paid its monthly service fee from 2008 onward.  (*Id.* ¶¶ 159–60.)  Premium Parking, also created by Santangelo and DiStefano, came into the picture in 2014, where it took over for Supreme as the valet service provider at the Condominium.  (*Id.* ¶ 169.)

B.  Amended Complaint Factual Background

The following facts are drawn from Plaintiff's Amended Complaint and are taken as true for the purpose of resolving Defendants' respective Motions.

The Condominium has 215 units, all but three of which are residential.  (Am. Compl. ¶ 30.)  In 2005, almost immediately after opening, the Condominium encountered financial difficulties.  (*Id.*)  Beginning in 2007, Mr. Palazzolo, a resident of the Condominium, became the Treasurer of the Condominium and negotiated payments from the Condominium's developer, Louis Cappelli ("Cappelli"), to boost the Condominium's reserve account, while also engineering the Condominium's purchase of the garage and recreation deck from Cappelli.  (*Id.* ¶ 31.)  For these actions, among others, Mr. Palazzolo was credited for righting the Condominium's financial ship.  (*Id.*)

Mr. Palazzolo used these past successes to dominate all aspects of the Board.  Outside of a pre-existing business relationship with fellow Board member Tobia, Mr. Palazzolo began to enter into real estate investments with Reitano, also a Board member, and loaned substantial sums of money to two other Board members, John Durante and Fred Mastroianni.  (*Id.* ¶ 32.)

During this early period of Mr. Palazzolo's tenure, he also entered into an agreement with the Trump Corporation, which was then acting as the Condominium's managing agent. (*Id.* ¶ 33.) In exchange for a $100,000 annual fee, Mr. Palazzolo agreed to manage the Condominium's Reserve Account (the "Reserve Account"). (*Id.*)  It is Mr. Palazzolo's management of the reserve account, in addition to his later involvement with Premium Staffing, Premium Parking, and ACC, that spurred this Action.

### 1.  Mr. Palazzolo's Use of the Reserve Accounts

#### a.  The Complex Web of Bank Accounts

Prior to Mr. Palazzolo's tenure as Treasurer of the Condominium, the Reserve Account was maintained together with the operating account in a single account managed by the Trump Corporation. (*Id.* ¶ 42.)  Mr. Palazzolo quickly changed this practice, opening and closing seven different accounts in the Condominium's name—but under his direct control—at four different financial institutions between 2007 and 2015. (*Id.* ¶ 43.)  These accounts are alleged to have been critical to facilitating the actions of the alleged "Palazzolo Enterprise," as it became increasingly difficult to identify how much money the Condominium held in its Reserve Account, while allowing Mr. Palazzolo to transfer funds to and from those accounts without detection. (*Id.* ¶¶ 43–44.)  Indeed, during Mr. Palazzolo's time as Treasurer, the Board only expressly authorized five transfers from the Reserve Account, but there appear to be hundreds of withdrawals during that period. (*Id.* ¶ 45.)

First, Mr. Palazzolo opened an account at Key Bank in June 2008 ("Key 158 Account"). (*Id.* ¶ 46.)  During the two years that account was open, Mr. Palazzolo directed the transfer of $550,000 to F&M from the Key 158 Account without Board authorization. (*Id.*)  Mr. Palazzolo then opened an account at Hudson Valley Bank in June 2010 ("Hudson 9741 Account"), which

was funded by a $400,000 transfer from the Key 158 Account. (*Id.* ¶ 47.) When the Key 158 Account was closed in September 2010, the balance was transferred to an account set up by Mr. Palazzolo at JP Morgan Chase & Co. ("Chase 7595 Account"). (*Id.* ¶ 46.) Similarly, when Mr. Palazzolo closed the Hudson 9741 Account in December 2010, the balance was transferred to a new account at JP Morgan Chase & Co. ("Chase 7742 Account"). (*Id.* ¶ 47.) In September 2012, the Chase 7595 Account was closed, with the balance transferred into the Chase 7742 Account. (*Id.* ¶ 48.) Then, in June 2014, Mr. Palazzolo opened a new account at Hudson Valley Bank ("Hudson 3641 Account") with a $500,000 transfer from the Chase 7742 Account. (*Id.* ¶ 50.) The Hudson 3641 Account was then closed in July 2015, with the balance transferred to a new account at Popular Community Bank ("Popular 5767 Account"). (*Id.*) In between the opening of the Hudson 3641 Account and the Popular 5767 Account, Mr. Palazzolo opened a third account at JP Morgan Chase & Co ("Chase 9221 Account"). (*Id.* ¶ 51.) The Chase 9221 Account was closed in July 2015 as well, with the balance flowing to the still-open Popular 5767 Account. (*Id.* ¶ 52.)

### b.  Transfers to and from the Reserve Account

In April 2010, Mr. Palazzolo approached the Board with a business opportunity: the Condominium could loan $400,000 to RLA at an interest rate of six percent per annum. (*Id.* ¶ 56.) At the time, Mr. Palazzolo did not disclose to the Board that RLA was owned by fellow Board member Tobia, nor did he disclose that RLA's business address was at Palazzolo Plaza. (*Id.* ¶¶ 56–57.) Mr. Palazzolo also agreed to personally guaranty the repayment of the funds from RLA. (*Id.* ¶ 58.)

Ultimately, the Board approved the loan to RLA, with Mr. Palazzolo—and not Tobia— recusing himself from the vote. (*Id.* ¶¶ 59, 61.) However, unbeknownst to the Board and the

Condominium, the money was actually being loaned from the Condominium's reserve funds to F&M, which was owned by Mr. Palazzolo and Palazzolo.  (*Id.* ¶¶ 60–62.)  On April 13, 2010, Mr. Palazzolo transferred $400,000 from the Key 158 Account to F&M, which F&M used to qualify for financing in connection with the Ridgeview development managed by Ridgeview LLC.  (*Id.* ¶¶ 62–63.)

Soon after the transfer was consummated, the minutes of the Board meeting at which the loan to RLA was approved were made available to all unit owners in the Condominium.  (*Id.* ¶ 66.)  The owners were displeased with the use of Condominium reserve funds to an outside business, RLA, and demanded restitution of the funds.  (*Id.* ¶ 67.)  Mr. Palazzolo agreed to return the funds, which came via a transfer of $404,117 from F&M into the Key 158 Account.  (*Id ¶* 68.)

In response to the undoing of the April 2010 RLA loan, Mr. Palazzolo decided to open three JP Morgan Chase & Co. accounts for the Condominium's reserve funds (the Chase 7742, 9221, and 7595 Accounts) that he could then link to his personal bank accounts.  (*Id.* ¶ 72.)  This allowed Mr. Palazzolo to alter the Condominium accounts to make it appear as if there was more money in the Reserve Account than there actually was, and also allowed Mr. Palazzolo to quickly transfer funds between the Condominium's accounts into his own accounts without any authorization from the Board.  (*Id.* ¶ 73.)

Indeed, in December 2010, Mr. Palazzolo began this pattern of unauthorized transfers between the Condominium's JP Morgan Chase accounts and his personal JP Morgan Chase accounts.  On December 1, 2010, Mr. Palazzolo transferred $400,000 from the Chase 7742 Account to F&M without notifying the Board.  (*Id.* ¶¶ 75–76.)  Later that month, on December 29, 2010, Mr. Palazzolo transferred an additional $500,000 from the very same Chase account to

his attorney, Lawrence Gottlieb, without notifying the Board.  (*Id.* ¶ 77.)  All told, from February 28, 2011 through June 12, 2015, Mr. Palazzolo made 22 additional unauthorized transfers, for a total of $2,893,369.16, from the Condominium's reserve funds held in the Chase 7742 Account to F&M through his personal accounts.  (*Id.* ¶ 80; *id.* Ex. A.)  This included an additional $400,000 transfer from the Chase 7742 Account to F&M and $100,000 to an unknown recipient on February 28, 2011 and March 10, 2011, respectively.  (*Id.* ¶ 92.)  On April 8, 2011, $500,000—the total previously transferred out of the Chase 7742 Account—was transferred from Ridgeview LLC back to the Chase 7742 Account.  (*Id.*)  Those funds were then transferred back to Ridgeview LLC three days later, (*id.*), and returned again to the Chase 7742 Account from an unidentified source on June 6, 2011, (*id.*).

As for the two other Chase accounts, Mr. Palazzolo engaged in the very same pattern of transfers.  Specifically, on July 19, August 5, and November 10, 2011, Mr. Palazzolo transferred a combined total of $79,481.69 from the Condominium's Chase 7595 Account to F&M without notifying the Board.  (*Id.* ¶ 84.)  Similarly, Mr. Palazzolo used the Chase 9221 Account to transfer $120,340.27 to F&M through three transactions between March and July 2015.  (*Id.* ¶ 85.)  All told, over the course of his tenure as Treasurer, Mr. Palazzolo transferred $8,078,985.26 from the Condominium's Reserve Account without authorization, failing to return $668,271.33.  (*Id.* ¶ 90.)

Mr. Palazzolo also used the Chase accounts to divert funds due to the Condominium.  For example, the Condominium was in receipt of a $650,122.70 check that accounted for the total amount to be refunded to each current or former unit owner in the Condominium based on a tax certiorari proceeding reducing the real property taxes owed by the unit owners.  (*Id.* ¶ 86.)  Mr. Palazzolo deposited the full amount of the tax certiorari proceeds into the Chase 7595 Account,

which he then used to disburse refund checks to unit owners.  (*Id.* ¶ 88.)  Mr. Palazzolo and

Reitano then circulated notices throughout the Condominium that the checks were available for

unit owners, and those that picked up their check received checks frequently signed by Tobia.

(*Id.* ¶ 89.)  Although Mr. Palazzolo knew precisely how much each unit owner was due, he made

no attempt to issue refunds to the 17 unit owners who did not pick up their check, and kept the

money for himself.  (*Id.*)  Similarly, in 2012, Mr. Palazzolo diverted insurance proceeds that

flowed to the Condominium as a result of Superstorm Sandy on four separate occasions between

November 2012 and May 2013.  (*Id.* ¶¶ 97–98.)  Within days of receipt of the check from the

Condominium's insurer, Mr. Palazzolo would transfer, the identical amount of insurance

proceeds—or more—to F&M.  (*Id.* ¶ 98.)  Ultimately, Mr. Palazzolo transferred $478,095.14 in

insurance proceeds to F&M, as well as an additional $15,774.02 tacked onto those proceeds.  (*Id.*

¶¶ 99–100.)

### c.  The Foreclosed Units

In April 2012, the Board was approached by Ridgewood Savings Bank's subsidiary,

Ridge Forest Realty Corp. ("Ridgewood"), with an opportunity to purchase three units in the

Condominium that were owned by Mr. Palazzolo, or by related persons or entities under his

control, and had entered foreclosure, for $900,000.  (*Id.* ¶ 102.)  The Board considered the offer,

but prepared to decline it, believing the purchase price would deplete its Reserve Account.  (*Id.*

¶ 104.)  Mr. Palazzolo, however, insisted that the Condominium purchase the units on his behalf,

and offered to advance the down payment for purchase.  (*Id.* ¶¶ 105–06.)  The Board agreed, not

knowing that it had less than $7,000 in its Reserve Account.  (*Id.* ¶ 105.)

Thus, after negotiating a price reduction to $875,000, Mr. Palazzolo transferred $87,500

to the Condominium for a down payment, and the Condominium entered into a contract to

purchase the units, then assigning its rights to Mr. Palazzolo. (*Id.* ¶ 106.) Mr. Palazzolo then compiled the balance due by using the Condominium's reserve funds, and with less than one month before closing, Mr. Palazzolo had amassed $725,000 by transferring funds from the Condominium's accounts to F&M's accounts. (*Id.* ¶ 107.) Mr. Palazzolo then transferred $800,000 back to the Chase 7742 Account as the balance of the purchase price he owed, although that money was actually just a return of the Condominium's funds. (*Id.* ¶ 108.) Thus, Mr. Palazzolo simply used the Condominium's own money to finance a purchase of three units on his own behalf. (*Id.*)

### 2.  Depletion of the Operating Account

By March 2014, the Condominium began to have liquidity issues and it became clear that the Condominium's Reserve Account had reached an unsustainably low amount. (*Id.* ¶ 109.) This led to a depletion of the Condominium's Operating Account, which impacted the Condominium's ability to pay for basic needs and services such as taxes, payroll, security, and routine maintenance. (*Id.* ¶ 110.) In response, Mr. Palazzolo authorized numerous transfers to cover up the fact that there were gross deficiencies in the Operating Account. (*Id.* ¶ 111.) For example, Mr. Palazzolo caused F&M to transfer $945,000 to the Chase 7742 Account on March 21, 2014, making it appear that the Condominium was solvent, when in fact that money had been long since taken by F&M and Mr. Palazzolo. (*Id.*)

### 3.  The FloTV Deal

In 2010, FloTV, a subsidiary of Qualcomm Incorporated, negotiated with the Condominium to obtain an easement permitting FloTV to install an antenna on the rooftop of the building in exchange for a $4,200 monthly payment. (*Id.* ¶ 114.) FloTV, however, folded in 2014, and began to wind down operations. (*Id.* ¶ 115.) Mr. Palazzolo conducted the

negotiations over what would be paid to the Condominium under the contract in light of this early termination, which resulted in a $143,714 payment to the Condominium. (*Id.* ¶¶ 115–16.) However, instead of depositing this check into the Condominium's Reserve Account, the check was deposited in the account of Premium Staffing, which maintained the "Garage Account." (*Id.* ¶ 118.) The proceeds of the FloTV deal were never turned over to the Condominium. (*Id.*)

### 4.  Misrepresentations in Financial Statements and Bank Documents

According to Plaintiff, since 2010, Mr. Palazzolo has altered account documents generated by the bank with regard to the Chase 7742 Account. (*Id.* ¶ 120.) Plaintiff provides several examples of this conduct. First, on December 29, 2010, Mr. Palazzolo transferred $500,000 from the Chase 7742 account to his attorney's escrow account. (*Id.*) This left the Chase 7742 Account with an actual balance of $42,827.27. (*Id.*) However, Mr. Palazzolo altered—and Lori Overton, a Chase employee, signed—the year-end statement to reflect the balance from December 28, 2010: $542,618.78. (*Id.*) Mr. Palazzolo then provided this account balance to employees of the Trump Corporation and employees of O'Connor Davies LLP, who did the annual audit work for the Condominium, without informing them that the true balance was approximately $500,000 less than presented on the balance statement. (*Id.*)

The next year, in December 2011, Mr. Palazzolo undertook a similar course of action, providing false documentation to the Trump Corporation and O'Connor Davies LLP that reflected a total balance of $723,580.69 in the Condominium's Reserve Account. (*Id.* ¶ 121.) However, the true balance was only $15,152.40. (*Id.*) And the year after that, December 2012, the Condominium's Reserve Account fell to $9,064, although Mr. Palazzolo reported a balance of $829,264 in the financial statements. (*Id.* ¶ 122.) In December 2013, Mr. Palazzolo again presented fabricated account documents to reflect a Reserve Account balance of $940,472, when

the actual balance was $5,372.  (*Id.* ¶ 123.)

### 5.  One Final Transfer from the Reserve Account

On May 12, 2015, the Board drafted and adopted an Ethics Policy and Code of Conduct ("Ethics Policy") aimed at prohibiting self-dealing and any attempted preferential treatment for a Board member or their relatives in the use of Condominium property or business.  (*Id.* ¶ 146.) Both Mr. Palazzolo and Tobia signed the Ethics Policy.  (*Id.*)

Nonetheless, on June 29, 2015, Mr. Palazzolo effectuated the transfer of $931,250 in refinancing proceeds into the Chase 7742 Account.  (*Id.* ¶ 147.)  The very next day, Mr. Palazzolo transferred a total of $1.2 million from the Chase 7742 Account to RLA without the Board's approval.  (*Id.*)  This transfer did not go unnoticed, as the Board was notified in July 2015 by an employee of Trump Corporation who had reviewed a summary of the Reserve Account prepared by Tobia reflecting this transfer.  (*Id.* ¶ 148.)  The Board confronted Mr. Palazzolo, who responded that Tobia executed the note and agreed to pay interest at six percent. (*Id.* ¶ 151.)  The Board demanded that Mr. Palazzolo and Tobia undo the transaction, which he eventually did on July 20, 2015.  (*Id.* ¶ 152.)  However, the funds were returned to the Condominium via F&M and no RLA.  (*Id.* ¶ 153.)  Two days later, Mr. Palazzolo transferred the $1.2 million back to F&M from the Chase 7742 Account, and then returned the money to the Condominium by a transfer into a Banco Popular account controlled by the Condominium.  (*Id.* ¶ 154.)

On December 16, 2015, as a result of the June and July 2015 transactions, Mr. Palazzolo and Tobia were voted off the Board.  (*Id.* ¶ 155.)  However, Mr. Palazzolo was reappointed to the Board shortly thereafter by RLA and ACC, the owners of the Condominium's three commercial units, as their representative.  (*Id.*)

6.  The Garage Account

After Mr. Palazzolo and Tobia's ouster, the Board conducted an internal investigation of the Condominium's Reserve and Operating Accounts.  (*Id.* ¶ 156.)  During this investigation, it came to light that Palazzolo, together with DiStefano and Santangelo, used the Condominium's parking garage in much the same way as the Reserve Account.  (*Id.* ¶ 158.)

The Condominium had initially purchased the parking garage from Cappelli in 2008, after which the Board hired Supreme to provide valet services from the Condominium for $32,000 per month.  (*Id.* ¶ 159.)  On December 27, 2007, prior to the Condominium's purchase of the garage, DiStefano opened a bank account at Commerce Bank in the name of "Premium Staffing, LLC TTCC Garage" (the "Garage Account").  (*Id.* ¶ 160.)  DiStefano was the sole signatory of the Garage Account, and upon its creation and without notifying the Board, Mr. Palazzolo directed all garage income into the Garage Account.  (*Id.*)  DiStefano and Santangelo would then issue the $32,000 monthly payment to Supreme.  (*Id.*)  Premium Staffing would also pay itself a monthly fee from the Garage Account for this service.  (*Id.*)  Indeed, beginning in 2008, Premium Staffing collected virtually all revenue generated by the operation of the garage, and was thus responsible for payment of Garage expenses, including payments related to financing the acquisition of the garage from Cappelli.  (*Id.* ¶ 163.)

Premium Staffing initially charged the Condominium a $3,000 monthly fee for managing the garage.  (*Id.* ¶ 166.)  This fee was increased to $4,000 in 2008, $4,500 in 2009, and $5,000 in 2010.  (*Id.*)  Beginning in October 2010, Premium Staffing began to pay its fees and Supreme's fees in a single transfer from the Garage Account, which resulted in Premium Staffing stealthily increasing its monthly fee to $7,800.  (*Id.* ¶ 167.)  In February 2011, Premium Staffing's fee increased to $10,800 per month, increasing again in September 2011 to $11,800 per month.  (*Id.*

¶ 168.) All told, between 2011 and 2014, Premium Staffing paid itself roughly $873,475—without Board authorization—for the services of paying Supreme, paying utilities, and paying certain other monthly expenses. (*Id.*)

In 2014, Palazzo and DiStefano approached the Condominium with a "Parking Agreement," under which Premium Parking would provide valet services. (*Id.* ¶ 169.) Those services were actually performed by Supreme, but the Parking Agreement made it impossible to determine what amount Premium Parking and Supreme would each be paid. (*Id.*) Ultimately, the amounts listed in the Parking Agreement were meaningless, as Premium Parking was paid significantly more than any amount described therein before the Parking Agreement was terminated in 2016. (*Id.*) In fact, by 2014, the amount paid to Premium Parking and Premium Staffing grew to be roughly 93% of the gross income generated by the garage, as opposed to 60% in 2008. (*Id.* ¶ 170.) Due to these increased fees, the garage incurred $35,259 in losses in 2014, as opposed to a $225,000 profit in 2009. (*Id.*) Moreover, when the garage was profitable, Premium Staffing never returned those profits to the garage. (*Id.* ¶ 171.) As a result, Premium Parking and Premium Staffing facilitated the transfer of roughly $680,964.82 of the Condominium's money from the Garage Account to various Defendants from 2008 to 2015. (*Id.* ¶ 172.) These transfers include: ten transfers to F&M for a total of $152,944.79; three transfers to RLA for a total of $15,000; four transfers to First Resource for a total of $23,335.27; three transfers to B.A.B. I and II for a total of $43,167; 29 transfers to DiStefano for a total of $167,790; 15 transfers to Thomas for a total of $72,400; one transfer to Premium Staffing's parking operations at the White Plains Ritz Carlton for $60,000; and dozens of other transfers to individuals and businesses unaffiliated with the garage. (*Id.*) In addition, Premium Staffing is alleged to have charged the Condominium $187,600 for a handyman, to be paid from the Garage

Account, only to pay the handyman $30,000 and keep the remainder.  (*Id.* ¶¶ 174–75.)
Since replacing Premium Staffing and Premium Parking in 2016, the Board has saved nearly
$500,000.  (*Id.* ¶ 173.)

### 7.  Diversion of Commercial Unity Utility Payments

The Condominium employed a third-party service provider, Quadlogic Corp.
("Quadlogic") to determine the appropriate charges for electricity to be allocated to each
residential and commercial unit and the common areas.  (*Id.* ¶ 177.)  One of the three commercial
units was owned by ACC, with the other two owned by RLA and leased to a hair salon,
Demirjian.  (*Id.*)  Unbeknownst to the Board, but allegedly known by Palazzolo and Tobia,
Quadlogic incorrectly believed that the commercial sub-meters did not need to be tracked
because the amounts within those units reflected the electrical use by all common areas in the
Condominium.  Quadlogic thus never charged the commercial units for their electricity use but
rather passed those costs onto the Condominium.  (*Id.* ¶ 178.)

After Mr. Palazzolo was removed from the Board, this mistake came to light, and the
Board sought to determine why the commercial tenants were not paying for utilities.  (*Id.* ¶ 179.)
Demirjian explained that Mr. Palazzolo had informed them that he was paying the electric bills
on their behalf, and that the commercial tenants should simply pay him directly.  (*Id.*)  Demirjian
then showed the Board a copy of a check that Mr. Palazzolo had shown him, which purported to
show that Mr. Palazzolo had paid the Condominium $27,694 in unpaid electrical charges.  (*Id.*)
However, no such payments were ever made to the Condominium.  (*Id.* ¶ 180.)  ACC in fact
refuses to return any funds owed to the Condominium and refuses to pay for any portion of the
maintenance charges or utilities owed to the Condominium.  (*Id.* ¶ 179.)

Instead, Mr. Palazzolo and Tobia contend that the Board agreed that commercial unit

owners would not pay for electricity, a contention for which there is no evidence.  (*Id.* ¶ 180.) Accordingly, Mr. Palazzolo and Tobia simply kept the more than $300,000 paid by the commercial tenants for themselves, as opposed to turning those payments over to the Condominium for the electrical bills.  (*Id.*)

    C.  Palazzolo Counterclaims Factual Background

    The following facts are drawn from the Palazzolo Defendants' Counterclaims and are taken as true for the purpose of resolving Plaintiff's Motion.

    In the fall of 2004, Mr. Palazzolo entered into multiple contracts wherein he purchased 21 units in the Condominium for $21 million dollars from the Condominium's sponsor. (Counterclaims ¶ 235 (Dkt. No. 122).)  The purchase was conditioned upon the payoff of unpaid trade debt by the sponsor.  (*Id.* ¶ 239.)  Prior to closing, Cappelli, the principal of the Condominium's sponsor, offered Mr. Palazzolo a five percent discount if he closed immediately. (*Id.* ¶ 242.)  Mr. Palazzolo rejected this offer, and instead asked that the sponsor contribute $800,000 to the Condominium to establish the Reserve Account.  (*Id.* ¶ 244.)

    According to Mr. Palazzolo, in reliance upon representations made by the Board to him, he gave up multiple personal business opportunities and forewent the monetary benefits that would have flowed to him based on those opportunities.  (*Id.* ¶ 251.)  In June or July 2009, the Board granted Mr. Palazzolo full control over the Reserve account and he used the Reserve account to enhance its value and further the business of the Condominium.  (*Id.* ¶¶ 259–60.)  It is not alleged that he was promised compensation for these actions, but rather that he could do what he wanted with the Reserve Account on behalf of the Condominium.  (*Id.* ¶¶ 259–60.)

    One such occasion was in 2006, prior to the date which Mr. Palazzolo says he was elected to the board, when Mr. Palazzolo convinced "his fellow members of the Board" to

purchase energy from someone other than Con Edison.  (*Id* ¶ 316).  Explaining that this kind of "speculation" was "somewhat obscure," Mr. Palazzolo alleges that he saved the Condominium approximately $1,154,000 during the ten-year period that he served as a member of the Board, without "obtaining" any fees or compensation for "arranging the Condominium to obtain its money in this matter."  (*Id.* ¶¶ 318–19.)

Then, in July 2007, the Board sought to hire Lawrence Gomez ("Gomez") as a live-in resident manager.  (*Id.* ¶¶ 265–66.)  The only available unit owned by the Condominium was a one bedroom, but Gomez required a two bedroom for his family.  (*Id.* ¶¶ 266.)  To facilitate the hiring of Gomez, Mr. Palazzolo agreed to sell a unit he controlled valued at $750,000 to the Board for a discount of $40,000 for Gomez's use.  (*Id.* ¶¶ 269–273.)  Mr. Palazzolo also declined to collect no less than $165,000 in interest income for the benefit of the Board.  (*Id.* ¶ 279.)

At an unspecified time in 2007, the Condominium's sponsor approached Mr. Palazzolo with another opportunity.  This time, it was to purchase the garage and recreation center attached to the Condominium.  (*Id.* ¶ 283.)  While this would have resulted in substantial personal financial gain for Mr. Palazzolo, he instead advised the Board to purchase these assets from Cappelli.  (*Id.* ¶¶ 283–86.)  However, this purchase could not be consummated until the mortgage on the Condominium's retail spaces was satisfied.  (*Id.* ¶ 287.)  Given these circumstances, Mr. Palazzolo agreed to acquire the retail spaces through RLA, thus allowing the Condominium to close upon the purchase of the garage and recreation space in 2007.  (*Id.* ¶¶ 289–90.)

Next, at an unspecified time, but during Mr. Palazzolo's tenure as Treasurer of the Board, Mr. Palazzolo implemented a hybrid staffing model where the Condominium saved at least $1,690,000 over a ten-year period by hiring non-union employees without "obtaining

management fees, consulting fees, or other payments for staffing the organization he created." (*Id.* ¶¶ 305–13.)

Mr. Palazzolo then, at an unspecified time, was able to secure leases that generated income of $570,000 for the Condominium.  (*Id.* ¶¶ 314–15.)  However, Mr. Palazzolo does not allege that he personally forewent an opportunity in favor of providing this business to the Board.

At yet another unspecified point in time, Mr. Palazzolo alleges he purchased cheaper insurance policies for the Condominium, saving at least $880,000 over a ten-year period without "obtaining" management or consulting fees.  (*Id.* ¶¶ 320–23.)

Additionally, at an unspecified time between 2006 and 2009, Mr. Palazzolo "directed" the opportunity to secure control of certain foreclosed apartments to the Board, rather than taking "the[] clear business opportunities for himself personally to purchase," said apartments.  (*Id.* ¶¶ 324–27.)  Mr. Palazzolo secured control of the units for the board, and was able to generate $1,020,660.33 in rental income between 2009 and 2015 for the Condominium.  (*Id.* ¶¶ 328–33.) Moreover, these units resulted in income of no less than $2,470,000, in combined rental and common charges, for the Condominium.  (*Id.* ¶ 338.)

Finally, in October 2012, Mr. Palazzolo contends that via F&M, he was able to perform emergency flood repairs for at least 23 unit owners in the Condominium, presumably caused by Superstorm Sandy.  (*Id.* ¶¶ 296–304.)  Mr. Palazzolo "laid out significant money to effect those repairs," (*id.* ¶ 297), and "used his personal contact . . . to effect the emergency repairs, for the benefit of the Board and unit owners, without payment or commissions he otherwise could have obtained as a private investor, [or] an insurance or construction consultant," (*id.* ¶ 298).  Mr. Palazzolo used the excess funds from the insurance proceeds, due to these below market repair

rates, "to effect capital improvements and amenity upgrades" in the Condominium.  (*Id.* ¶ 303.)

In total, the cost of the repairs and amenity improvements totaled "a fair market value well in

excess of" the insurance proceeds, to Mr. Palazzolo's own detriment as he received no

compensation for these actions.  (*Id.* ¶ 304.)

    D.  Procedural Background

Plaintiff filed its Complaint on November 28, 2016.  (Dkt. No. 1.)  After receiving

numerous extensions of time to file an answer, (*see* Dkt. Nos. 42, 44, 48, 53–54, 58, 63),

Defendants Reitano and former Defendant Lori Overton ("Overton") filed pre-motion letters on

January 31, 2017 seeking to dismiss the Complaint, (Dkt. Nos. 55–56).  Defendant Reda

Romano then filed a pre-motion letter on February 23, 2017, (Dkt. No. 65), and shortly

thereafter, on February 27 and 28, 2017, the remaining Defendants filed their respective pre-

motion letters, (Dkt. No. 67, 70).  Plaintiff then filed its responsive letters on March 3, 2017,

(Dkt. Nos. 72–77), and the Court held a pre-motion conference on May 2, 2017, (Dkt. (entry for

May 2, 2017)).  The Court then set a briefing schedule, allowing Overton, ACC, and Reda

Romano to file their respective Motions To Dismiss.  (Mot. Scheduling Order (Dkt. No. 81).)

However, on May 22, 2017, Plaintiff voluntarily dismissed the claims against Overton, (Dkt. No.

84), and then dismissed the claims relevant to Reda Romano's Motion on July 11, 2017, (Dkt.

No. 89).  Reda Romano then filed its Answer on August 8, 2017, along with crossclaims against

all remaining Defendants.  (Reda Romano Answer (Dkt. No. 97).)  In the meantime, ACC filed

its Motion on June 16, 2017, in accordance with the briefing schedule.  (Dkt. Nos. 85–86.)

Following another extension of time to file an answer, (Dkt. No. 95), Defendants

DiStefano, First Resource, RLA, Premium Parking, Premium Staffing, Santangelo, Thomas,

Tobia, and Reitano filed their Answer and Counterclaim against Plaintiff on August 22, 2017,

(Answer (Dkt. No. 100)).  Mr. Palazzolo and Palazzolo, B.A.B. Group I and II, F&M, and Ridgeview LLC filed their Answer and Counterclaim the same day.  (Palazzolo Answer (Dkt. No. 102).)  All Defendants filed their respective answers to Reda Romano's crossclaims on August 28, 2017.  (Dkt. Nos. 104–105.)

Plaintiff filed an Answer to Premium Staffing's counterclaim, (Dkt. No. 108), and a pre-motion letter in response to the Palazzolo counterclaims, (Dkt. No. 107), to which the Palazzolo Defendants responded on September 15, 2017, (Dkt. No. 109).  Next, the remaining Defendants, but for the Palazzolo Defendants, ACC, and Reda Romano, filed a pre-motion letter seeking to file a Motion for Judgment on the Pleadings, (Dkt. No. 111), which the Palazzolo Defendants joined in on September 29, 2017, (Dkt. No. 113).  The Court held a conference on the putative Motions, allowing the Parties to amend their respective complaints and counterclaims by November 22, 2017.  (Dkt. (entry for October 25, 2017).)  Plaintiff filed an Amended Complaint on November 21, 2017, (Dkt. No. 120), and the Palazzolo Defendants filed and answer and counterclaims the next day, (Dkt. No. 122).  Reda Romano filed an answer and crossclaim against all Defendants on December 12, 2017, (Dkt. No. 127), and the Defendants filed their respective answers to Reda Romano's crossclaim shortly thereafter, (Dkt. Nos. 131, 134, 136).

Defendants DiStefano, First Resource, Premium Parking, Premium Staffing, RLA, Reitano, Santangelo, Thomas, and Tobia Defendants, and ACC, filed pre-motion letters, this time seeking to file a Motion To Dismiss Plaintiff's Amended Complaint.  (Dkt. Nos. 125, 129.)  Plaintiff filed responsive letters on December 13 and 15, 2017, (Dkt. No. 130, 132–33), and filed its own pre-motion letter on December 6, 2017 seeking to dismiss the Palazzolo counterclaims, (Dkt. No. 124).

The Court held a conference on January 18, 2018, and adopted a briefing schedule for the

present Motions.  (Mot. Scheduling Order (Dkt. No. 137).)  The Court terminated the prior ACC

Motion, and had all Parties refile their respective Motions by February 16, 2018, with opposition

due on March 16, 2018, and replies by March 30, 2018.  (*Id.*)

Defendants DiStefano, First Resource, Premium Parking, Premium Staffing, RLA,

Reitano, Santangelo, Thomas, and Tobia ("Tobia Defendants") filed their Motion on February

16, 2018.  (Dkt. Nos. 138–39, 143.)  ACC filed its Motion that same day.  (Dkt. Nos. 144–146.)

Plaintiff filed its Motion To Dismiss the Palazzolo counterclaims as well.  (Dkt. Nos. 140–142.)

Plaintiff filed their opposition to the ACC Motion, (Dkt. No. 147), and the Tobia Defendants'

Motion, (Dkt. No. 148), on March 16, 2018.  The Palazzolo Defendants filed their Opposition to

Plaintiff's Motion that same day.  (Dkt. No. 149.)  ACC filed its Reply on March 29, 2018, (Dkt.

No. 152), the Tobia Defendants filed their Reply on March 30, 2018, (Dkt. No. 154), and

Plaintiff filed its Reply that same day, (Dkt. No. 153).

## II. Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual

allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(alteration and internal quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil

Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  "Nor does a

complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.*

(alteration and internal quotation marks omitted).  Instead, a complaint's "[f]actual allegations

must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering the respective Motions To Dismiss, the Court is required to "accept as true all of the factual allegations contained in the [C]omplaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same).  And, the Court must "draw[] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d

23

99, 107 (2d Cir. 1999) (internal quotation marks omitted); *see also Wang v. Palmisano*, 157 F.

Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).   These aforementioned standards are equally

applicable to a motion to dismiss counterclaims under Rule 12(b)(6).   *See Tacopina v. Kerik*, No.

14-CV-749, 2016 WL 1268268, at *3 (S.D.N.Y. Mar. 31, 2016) ("A motion to dismiss

counterclaims under Rule 12(b)(6) is decided under the same standard applied to a motion to

dismiss the claims of a complaint." (internal quotation marks omitted)).

     B.  Analysis

        1.  Plaintiff's Claims

As is relevant here, the Amended Complaint alleges that all Defendants, but for Reda

Romano, as members of the "Palazzolo Enterprise," violated RICO, 18 U.S.C. § 1962(c), and

that those same Defendants conspired to violate RICO, 18 U.S.C. § 1962(d).   (Am. Compl.

¶¶ 209–224.)   Plaintiff also alleges that all moving Defendants aided and abetted Mr. Palazzolo's

breach of fiduciary duty, (*id.* ¶¶ 233–36), and that all moving Defendants, but for Reitano, are

liable under state law for conversion, unjust enrichment, money had and received, and aiding and

abetting Mr. Palazzolo's breach of fiduciary duty (*id.* ¶¶ 225–28, 233–35, 246–49, 250–52).   The

Court will address Plaintiff's RICO claims in turn, and then consider Plaintiff's state law claims.

        a.  Plaintiff's RICO Allegations under § 1962(c)

Plaintiff's substantive RICO cause of action against all moving Defendants is brought

pursuant to 18 U.S.C. § 1962(c).   Under § 1962(c), it is "unlawful for any person employed by or

associated with any enterprise engaged in, or the activities of which affect, interstate or foreign

commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's

affairs through a pattern of racketeering activity[.]"   18 U.S.C. § 1962(c).   To establish a claim

for a civil violation of section 1962(c), a plaintiff must show "that a person engaged in (1)

conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (internal quotation marks omitted).

### i.  Enterprise Requirement

A RICO enterprise is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  The Amended Complaint identifies a single "association-in-fact" enterprise: the "Palazzolo Enterprise," consisting of all Defendants except Reda Romano.  (Am. Compl. ¶¶ 5, 188, 209–15.)  An association-in-fact enterprise means "a group of persons associated together for a common purpose of engaging in a course of conduct," which "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981). This type of RICO enterprise "must have at least three structural features: [1] a purpose, [2] relationships among those associated with the enterprise, and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).  However, the "group need not have a hierarchical structure or a chain of command." *Id.* at 948 (internal quotation marks omitted).

The Court must, as a threshold matter, address the Tobia Defendants' contention that Plaintiff's claim under § 1962(c) fails as to all Defendant members of the Palazzolo Enterprise "for lack of distinctness."  (Tobia, et al Defs.' Mem in Supp. of Mot. To Dismiss ("Tobia Defs.' Mem.") 4 (Dkt. No. 143).)  Under the distinctness requirement, "a plaintiff must allege the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cruz*, 720 F.3d at 120 (alterations and internal quotation marks omitted); *see also Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161

(2001) (same, because the statute applies only to "'person[s]' who are 'employed by or associated with' the 'enterprise.'") (internal citation omitted).  "[T]he 'person'—not the 'enterprise'—is the party who may be named as the defendant in a civil RICO claim based on a substantive violation of § 1962(c)."  *Palatkevich v. Choupak*, Nos. 12-CV-1681, 12-CV-1682, 2014 WL 1509236, at *12 (S.D.N.Y. Jan. 24, 2014); *see also Cruz*, 720 F.3d at 120 ("[A] *person* violates the [RICO] statute by conducting an *enterprise* through a pattern of criminality.").

First, the Tobia Defendants claim that "because all of the members of the association-in-fact enterprise are also named as RICO Defendants," it cannot be distinct as defined by the Second Circuit.  (Tobia Defs.' Mem. 4.)  This, however, is a fundamental misunderstanding of the distinctness requirement.  The case law is clear that the same entity cannot be both the person *and* the enterprise, *see e.g.*, *Cruz*, 720 F.3d at 120, but that is simply not the same as saying that the defendants cannot collectively constitute the enterprise.  For example, in *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256 (2d Cir. 1995), the Second Circuit concluded that an individual person and "two separate and distinct corporations" may be held liable, as the three are "clearly . . . RICO person[s] as well as . . . member[s] of a RICO enterprise."  *Id.* at 263. Indeed, the distinctness cases are not necessarily concerned with complete overlap of RICO persons and RICO enterprises.  Rather, the core question is whether the RICO enterprise is distinct from each of the RICO persons, in which case it satisfies the distinctness requirement, *id.*, or if the RICO enterprise is deemed associated with itself, *Bennett v. U.S. Trust Co. of N.Y.*, 770 F.2d 308, 315 (2d Cir. 1985); *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143 (1987), which is not permissible.  In fact, the Tobia Defendants' core authority, *City of New York v. Cyco.Net, Inc.*, 383 F. Supp. 2d 526 (S.D.N.Y. 2005), acknowledges that "it is possible for an entity to be both a RICO person and a member of a RICO enterprise," so long as

the enterprise "meet[s] the distinctness requirement." *Id.* at 550. Tobia Defendants rightly note it is *mandatory* for Plaintiff to allege "that other entities in the enterprise are not defendants," but that was but one of multiple examples of enterprise structures given by the court in *Cyco.Net*. *Id.* The court there recognized that distinctness may be met, as is relevant here, where "the entities that comprise the enterprise are different corporations." *Id.*; *see also Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 113 F. Supp. 2d 345, 365 (E.D.N.Y. 2000) ("Multiple corporations or other legal entities can, when working in concert either overtly or covertly, form an association-in-fact RICO enterprise."); *In re Energy Sys. Equip. Leasing Sec. Litig.*, 642 F. Supp. 718, 740–41 (E.D.N.Y. 1986) (holding that an "enterprise composed of an association-in-fact, even if made up entirely of individual defendants deemed to be § 1961(3) 'persons,' is to be viewed for purposes of RICO claims as possessing a separate existence from its individual members" and thus finding that "the various defendants constitute persons under RICO, while the interaction and relationship between these defendants with regard to the alleged scheme . . . comprises an association-in-fact enterprise separate and distinct from these individual persons").

Here, Plaintiff alleges that Defendants Mr. Palazzolo, Palazzolo, Tobia, Reitano, Santangelo, DiStefano, Thomas, F&M, RLA, Premium Staffing, Premium Parking, ACC, Ridgeview LLC, B.A.B. I, B.A.B. II, and First Resource comprise the "Palazzolo Enterprise." (Am. Compl. ¶ 5.) Accordingly, the Palazzolo Enterprise consists of seven individuals and nine businesses, each of whom is alleged to have committed predicate acts of racketeering in support of the Palazzolo Enterprise. (*Id.* ¶ 7.) Plaintiff further alleges that the members of the enterprise "conspired with each other to conduct, finance, and acquire ownership interests in the Enterprise and its business affairs through a pattern of racketeering," and that the members of the enterprise "knowingly and improperly used the Condominium's money to fund their own business

activities." (*Id.* ¶ 40; *see also id.* ¶ 188 ("The defendants are a group of persons and entities associated together in fact as the Palazzolo Enterprise for the common purpose of carrying out an ongoing enterprise . . . [n]amely, through years of individual acts of theft and fraud to cover that theft, these defendants stole money from the Condominium.").)

As pled, the Amended Complaint does not allege that the persons and entities that comprise the Palazzolo Enterprise all "operate within a unified corporate structure." *Discon v. Nynex Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996). The Court notes that the pleadings indicate that nearly all of the corporate entities share an address at Palazzolo Plaza, and that Mr. Palazzolo is alleged to have "controlled or was otherwise a member or managing member" of seven of the nine corporate entities. (Am. Compl. ¶ 11.) For example, Mr. Palazzolo is alleged to have "controlled or was otherwise a member or managing member" of RLA, (*id.*), but also, "[a]t all relevant times, *[D]efendant Tobia* controlled and/or was a member or managing member of RLA," without mention of Mr. Palazzolo, (*id.* ¶ 19). It may well be that, after discovery, Defendants could establish that the seven corporate entities and their nine respective employees were all "operat[ing] as part of a single, unified corporate structure and are, as such, not sufficiently distinct to demonstrate the existence of a RICO enterprise," *Cruz*, 720 F.3d at 121, but, as currently pled in the Amended Complaint, that is not the case. Indeed, the Amended Complaint does not specifically allege that each corporate entity has identical ownership, employees, or membership; rather, the individual Defendants have varying, non-overlapping roles in corporations that, as is alleged here, share nothing more than an address and a connection to Mr. Palazzolo. Accordingly "[u]nlike enterprises that only consist of a corporation and its employees, here the [Palazzolo] [E]nterprise is an amalgam of . . . individual defendants and corporations." *Stolow v. Greg Manning Auctions Inc.*, 258 F. Supp. 2d 236, 247 (S.D.N.Y.

2003), *aff'd*, 80 F. App'x 722 (2d Cir. 2003); *cf. Crabhouse of Douglaston Inc. v. Newsday Inc.*, 801 F. Supp. 2d 64, 78 (E.D.N.Y. 2011) (acknowledging that distinctiveness would be satisfied had there been "three separate companies and three distinct sets of employees/agents," but noting that the companies in that case were all "wholly owned subsidiaries" of the parent defendant and thus "not distinct from their parent company for the purposes of alleging a RICO enterprise"). This is unlike *Riverwoods, Cruz,* or *Discon*, as Plaintiff alleges the existence of an enterprise consisting of several distinct businesses and individuals associated with those businesses, as opposed to a single corporate entity associating solely with its employees or agents. Accordingly, as pled, the Amended Complaint sufficiently alleges distinctness for purposes of establishing a RICO enterprise.

## ii.  Predicate Racketeering Acts

Next, all Defendants argue that "[t]he Amended Complaint fails to allege that any Defendant, other than Mr. Palazzolo, personally committed any RICO predicate acts."  (Tobia Defs.' Mem 7; *see also* ACC Mem. of Law in Supp. of Mot. To Dismiss ("ACC Mem.") 6 (Dkt. No. 146) ("The Complaint . . . entirely fails to identify, much less particularize, which of these predicate acts was committed by ACC in furtherance of the . . . purported RICO enterprise.").) In effect, Defendants actually argue that Plaintiff has made collective allegations and has failed to identify what, if any, predicate acts were taken by the moving Defendants.  (Tobia Defs.' Mem 7 ("[S]imply lumping . . . Defendants into collective allegations, as Plaintiff does in the Amended Complaint, fails the particularity requirement of Rule 9(b) regarding RICO claims under § 1962(c)." (internal quotation marks omitted); ACC Mem. 6 ("[A] plaintiff must allege that *each* RICO defendant committed at least two predicate acts of racketeering activity within the last 10 years.").)

Rule 9(b)'s heightened pleading standard requires plaintiffs "alleging fraud" to "state with particularity the circumstances constituting fraud . . ." Fed. R. Civ. P. 9(b).  In the context of a civil RICO claim, "all allegations of fraudulent predicate acts[] are subject to the heightened pleading requirement of [Rule 9(b)]."  *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004).  This includes allegations of predicate acts of mail, wire, and bank fraud, and conduct under the National Stolen Property Act ("NSPA").  *See Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008) (holding that the plaintiff's mail and wire fraud allegations were not "pled with the requisite particularity"); *Leung v. Law*, 387 F. Supp. 2d 105, 113 (E.D.N.Y. 2005) (applying Rule 9(b)'s pleading standard to RICO claims alleging predicate acts of bank fraud); *Kriss v. Bayrock Grp. LLC*, No. 10-CV-3959, 2016 WL 7046816, at *7–8 (S.D.N.Y. Dec. 2, 2016), *on reconsideration in part*, 2017 WL 1901966 (S.D.N.Y. May 8, 2017) (applying Rule 9(b)'s pleading standard to claims RICO claims alleging predicate acts under the NSPA).

"The essential elements of a mail or wire fraud violation are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Shellef*, 507 F.3d 82, 107 (2d Cir. 2007) (internal quotation marks omitted).  In general, "[p]laintiffs must plead . . . mail [or wire] fraud with particularity, and establish that the [communications] were in furtherance of a fraudulent scheme." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013).  This normally requires that "allegations of predicate mail and wire fraud acts . . . state the contents of the communications, who was involved, and where and when they took place, and [should] explain why they were fraudulent." *Spool*, 520 F.3d at 185 (alterations and internal quotation marks omitted).  However, "courts in the Second Circuit have applied a different standard in cases

where plaintiff claims that mails or wires were simply used in furtherance of a master plan to defraud, but does not allege that the communications themselves contained false or misleading information." *Angermeir v. Cohen,* 14 F. Supp. 3d 134, 145 (S.D.N.Y. 2014) (alterations and internal quotation marks omitted). "In such cases, including complex civil RICO actions involving multiple defendants, Rule 9(b) does not require that the temporal or geographic particulars of each mailing or wire transmission made in furtherance of the fraudulent scheme be stated with particularity." *Id.* (citation internal quotation marks omitted). "Instead, Rule 9(b) requires only that the plaintiff delineate with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme." *Id.* (internal quotation marks omitted); *see also Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 177 (E.D.N.Y. 2010) ("[I]n cases where plaintiffs allege that the mails or wires were simply used in furtherance of a master plan to defraud, . . . particularity as to the mailings themselves is unnecessary . . . " (citations and internal quotation marks omitted)); *Serin v. N. Leasing Sys., Inc.*, No. 06-CV-1625, 2009 WL 7823216, at *7 (S.D.N.Y. Dec. 18, 2009) ("In applying Rule 9(b) to predicate acts of mail or wire fraud, Southern District of New York courts have articulated different requirements to apply in . . . [the] 'in furtherance of fraud' context."); *Am. Med. Ass'n v. United Healthcare Corp.*, 588 F. Supp. 2d 432, 442 (S.D.N.Y. 2008) ("Allegations said to be in furtherance of fraud are held to a different pleading standard entirely."); *Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612, 624 (S.D.N.Y. 2006) ("[W]here the plaintiff claims that the mail or wires were simply used in furtherance of a scheme to defraud, the complaint need not be specific as to each allegation of mail or wire fraud as long as the nature of the RICO scheme is sufficiently pleaded so as to give notice to the defendants." (internal quotation marks omitted)); *cf. Schmuck v. United States*, 489 U.S. 705, 710–11 (1989)

("To be part of the execution of [a] fraud . . . the use of the mails need not be an essential element of the scheme.  It is sufficient for the mailing to be incident to an essential part of the scheme or a step in the plot." (citations, alterations, and internal quotation marks omitted)).  As one court has explained,

> [t]he rationale for this approach is twofold: one, mailings made only in furtherance of a scheme are not technically allegations of fraud within the meaning of Rule 9(b); and two, the very purpose of applying Rule 9(b) to mailings in furtherance of the scheme is obviated where a plaintiff alleges the wider scheme with the requisite particularity.

*Crabhouse of Douglaston Inc*, 801 F. Supp. 2d at 88.

Here, Plaintiff alleges "a scheme that defrauded, and was intended to defraud, the Condominium" and that used the mails and wires in furtherance of that scheme.  (Am. Compl. ¶¶ 192–93.)  Defendants do not challenge the sufficiency of the allegations as to the *scheme*, but rather, they contend that the Amended Complaint fails to allege any acts that were committed by the moving Defendants in furtherance of that scheme.  (Tobia Defs.' Mem. 7–8; ACC Mem. 6.) "Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987); *see also Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent [acts] to 'defendants.'"); *Potter v. Retail Automation Prods., Inc.*, No. 13-CV-4506, 2014 WL 494521, at *2 (S.D.N.Y. Feb. 5, 2014) ("Where allegations of fraud involve multiple defendants, the complaint must set forth allegations specifically attributable to each individual defendant."); *Pullman v. Alpha Media Pub., Inc.*, No. 12-CV-1924, 2013 WL 1290409, at *23 (S.D.N.Y. Jan. 11, 2013) (dismissing complaint under Rule 9(b) because plaintiff "[did] not specifically connect [a defendant] to the

fraud in [the] complaint's recitation of the allegations for fraud," but instead made specific allegations with respect to certain defendants and otherwise "refer[red] to 'defendants' in general"), *adopted by* 2013 WL 1286144 (S.D.N.Y. Mar. 28, 2013); *DeFazio v. Wallis*, No. 05-CV-5712, 2006 WL 4005577, at *2 (E.D.N.Y. Dec. 9, 2006) ("Where there are multiple defendants, Rule 9(b) requires that the plaintiffs allege facts specifying each defendant's contribution to the fraud."); *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000) ("When fraud is alleged against multiple defendants, a plaintiff must plead with particularity by setting forth separately the acts or omissions complained of by each defendant.").  Ultimately, the Court determines whether the Complaint's allegations are

> sufficiently particular to serve the three goals of Rule 9(b), which are (1) to provide a defendant with fair notice of the claims against him or her; (2) to protect a defendant from harm to reputation or goodwill by unfounded allegations of fraud; and (3) to reduce the number of strike suits.

*Am. Fin. Int'l Grp.-Asia, L.L.C. v. Bennett*, No. 05-CV-8988, 2007 WL 1732427, at *6 (S.D.N.Y. June 14, 2007) (internal quotation marks omitted) (citing *DiVittorio*, 822 F.2d at 1247)).

The Complaint's allegations of mail and wire fraud satisfy Rule 9(b) as to each Defendant.  First, the Amended Complaint alleges that Santangelo and DiStefano controlled or were managing members of Premium Parking and Premium Staffing, (Am. Compl. ¶¶ 21), and that from 2007 through 2014, they, along with Mr. Palazzolo, began charging the Condominium a fee for managing the Garage Account without any authorization from the Board, (*id.* ¶¶ 164, 166.  Indeed, Plaintiff alleges that Santangelo and DiStefano, "without authorization," paid themselves, via Premium Staffing, $873,475 between 2010 and 2014 "for simply handing money from the Condominium to . . . its valet parking service provider, paying utilities, and a few other

monthly expenses." (*Id.* ¶ 168.) Moreover, in 2014, DiStefano and Mr. Palazzolo allegedly presented the Condominium with a "Parking Agreement" on behalf of Premium Parking, and Premium Parking thereafter "paid itself far in excess of the amounts described in the Parking Agreement in 2015 and 2016." (*Id.* ¶ 169.) Plaintiff described the actions of DiStefano, Santangelo, Premium Parking, and Premium Staffing by alleging that "when the garage was making money . . . , Premium Staffing was simply distributing those profits to members of the Palazzolo Enterprise. Mr. Palazzolo, DiStefano, and Santangelo were allegedly stealing from the Condominium in two ways: first, by diverting enormous unauthorized monthly fees to Premium Staffing and/or Premium Parking; and second, by distributing any profits the garage made to the coffers of the members of the Palazzolo Enterprise." (*Id.* ¶ 171.) In total, these individuals and entities allegedly transferred $680,964.82 of the Condominium's money to members of the Palazzolo Enterprise or others from 2008 to 2015. (*Id.* ¶ 172.) Indeed, the Premium Parking and Premium Staffing entities encompassed Thomas as well, who was a recipient of fifteen transfers from these entities, totaling $72,400. (*Id.*) Moreover, Thomas notarized an agreement executed by DiStefano regarding the unauthorized payment of $187,600 to Gomez, "even though Thomas was not present when Mr. Gomez signed the agreement," (*id.* ¶ 174), which led to the payment of additional monies from the Condominium to the Garage Account, (*id.* ¶ 175).

Second, Reitano is alleged to have controlled or have been a managing member of Ridgeview LLC, (Am. Compl. ¶ 14), which participated in numerous "unauthorized, undisclosed, and illegal round trip transfers back and forth of the Condominium's funds to Ridgeview and other entities within the Palazzolo enterprise," (*id.* ¶ 93). Reitano also allegedly "caused notices to be circulated within the Condominium building that refund checks were available," and "set up shop in the Business Center and issued checks for refunds to those

owners who appeared before them."  (*Id.* ¶ 89.)  However, because of the refund scheme

allegedly created by Reitano and Palazzolo, tax certiorari refunds for 17 Unit Owners were

"knowingly and intentionally" withheld.  (*Id.*)

Third, Tobia is alleged to have controlled or have been a managing member of RLA,

First Resource, Ridgeview LLC, and ACC, each of which is a central figure within the Palazzolo

Enterprise.  (Am. Compl ¶ 13.)  As the principal of RLA, Tobia is alleged to have facilitated the

fraudulent transfer of funds from the Condominium to F&M, as Tobia approved the transfer of

$400,000 to RLA, with the understanding that the RLA loan was in fact to be transferred—

without authorization—to Mr. Palazzolo and F&M.  (*See id.* ¶¶ 56–62.)  Indeed, Tobia voted to

transfer the money to RLA based on representations he allegedly made, through Mr. Palazzolo,

that he would repay the loan at six percent interest.  (*See id.* ¶ 58.)  Tobia, obviously self-

interested in a transaction between the Board, of which he was a member, and RLA, of which he

was a managing member, did not recuse himself and instead voted to facilitate the allegedly

sham transfer.  (*Id.* ¶ 59–60.)  In sum, Tobia, with Mr. Palazzolo, "conspired to present the 2010

RLA Loan as a good investment that was secure . . . [when,] [i]n fact, . . . none of these things

[was] true," and instead, "[Mr.] Palazzolo and Tobia were . . . conspiring to disguise their

transfer of the Condominium's reserve funds to F&M."  (*Id.* ¶ 60.)  This was allegedly done to

inflate the value of F&M, (*see id.* ¶ 62), which would then be able to qualify for financing in

Ridgeview, a real estate investment that Tobia, Mr. Palazzolo, Santangelo, and Reitano all

managed, (*see id.* ¶ 64).  All told, Ridgeview LLC, RLA, and First Resource, with Tobia's

control, allegedly received, and facilitated the receipt of, numerous transfers totaling hundreds of

thousands of dollars in allegedly stolen funds.  (*See, e.g., id.* ¶¶ 135, 147, 172; *id.* Ex. A.)

As to ACC in particular, Plaintiff does not allege that ACC itself undertook any acts.  Rather,

Plaintiff alleges that Mr. Palazzolo and Tobia "repeatedly claimed in communications with the Board that they either owned or controlled ACC." (*Id.* ¶ 177.) Palazzolo and Tobia, as the owners of ACC, knew that the unit owned by ACC was not being charged for electricity use, and instead that the cost was being borne by the Condominium and its unit owners. (*See id.* ¶ 178.) Indeed, Mr. Palazzolo allegedly concocted a scheme in which he told ACC's tenants that ACC was paying the Condominium for the electrical charges, and thus the bill could be paid directly to Mr. Palazzolo, as the owner of ACC, which in turn was the owner of the commercial space. (*Id.* ¶ 179.) These payments were notarized by Thomas. (*Id.*) In fact, no payments were ever made by Mr. Palazzolo, Tobia, or ACC for electricity; instead, Mr. Palazzolo and Tobia, the owners of ACC, used in excess of $300,000 that ACC should have been paying the Condominium for the enrichment of the Palazzolo Enterprise. (*Id.* ¶ 180.)

It is true that courts in the Second Circuit "generally do not impose vicarious liability under RICO unless the corporate . . . defendant is a central figure in the RICO scheme," and thus, "[p]laintiffs seeking to impose vicarious liability must, at a minimum, show that a corporate . . . officer had knowledge of or was recklessly indifferent toward the unlawful activity." *Fairfield Fin. Mortg. Grp., Inc. v. Luca*, 925 F. Supp. 2d 344, 350 (E.D.N.Y. 2013) (quoting *Makowski v. United Bhd. of Carpenters & Joiners of Am.*, No. 08-CV-6150, 2010 WL 3026510, at *6 (S.D.N.Y. Aug. 2, 2010)). Moreover, "courts consider other factors, such as the number of high-level employees involved in the racketeering activity, their degree of participation in the racketeering activity, whether these employees themselves committed the alleged predicate acts, and whether the corporation substantially benefited from the racketeering activity." *Makowski*, 2010 WL 3026510, at *6 (alteration and internal quotation marks omitted). Here, Plaintiff has pled that Mr. Palazzolo and Tobia "repeatedly claimed in communications with the Board that

they either owned or controlled ACC," (*id.* ¶ 177), and that Mr. Palazzolo and Tobia, in their controlling positions at ACC, committed racketeering acts, which included the intentional and knowing monthly diversion of funds due to the Condominium from ACC for electricity. (*See* Am. Compl. ¶¶ 177–180.) Plaintiff has further pled that ACC participated in and benefited from these acts, and that ACC has refused to return the more than $300,000 allegedly diverted from the Condominium to ACC and other members of the Palazzolo Enterprise. (*See id.* ¶ 179.) Accordingly, the Plaintiff has met its burden in order to plead a RICO claim based on vicarious liability against ACC. *See Needham & Co., LLC v. Access Staffing, LLC*, No. 15-CV-2487, 2016 WL 4399288, at *14 (S.D.N.Y. Aug. 12, 2016) (holding that the defendant corporation "can be held vicariously liable" because it "was a central figure in and benefited from the schemes and that [the individual defendants] owned and controlled [the corporate defendant]"); *Fairfield Fin. Mortg. Grp., Inc.*, 925 F. Supp. 2d at 350 (finding vicarious liability appropriate where the individual committing the racketeering acts "was the sole shareholder" of the company and that the company "participated in and benefitted from th[o]se acts").[1]

---

[1] To the extent that ACC claims Plaintiff's RICO claim is improper because it is actually a breach of contract claim, (ACC Mem. 7), that argument is without merit. Not once in the Amended Complaint does Plaintiff allege the existence of a contract between ACC and Plaintiff, nor does Plaintiff allege damages resulting from a contract. Instead, Plaintiff's allegations regarding ACC's conduct, based on the actions of Mr. Palazzolo and Tobia, are that it knew that the meters were improperly tracking the electrical usage of ACC's space, and that ACC, via its owners, knowingly withheld that information from Plaintiff and deprived the Condominium of money that Mr. Palazzolo is alleged to have known was due to Plaintiff. (Am. Compl. ¶ 178–79.) The concealment was allegedly "designed to prevent detection and prosecution of the organization's illegal activities, and [was] part of a consistent pattern, such that [it was] done in furtherance of the main criminal objectives of conspiracy," which may constitute a RICO predicate act. *Hemmerdinger Corp. v. Ruocco*, 976 F. Supp. 2d 401, 416 (E.D.N.Y. 2013) (alteration and internal quotation marks omitted); *see also United States v. Coiro*, 922 F.2d 1008, 1017 (2d Cir. 1991) ("[T]he evidence established that . . . [the defendant's] activities designed to prevent detection and prosecution of the organization's illegal activities were part of a consistent pattern that was likely to continue for the indefinite future, absent outside intervention.").

Regarding the wire and mail fraud claims, Plaintiff need only allege that each defendant "directly participated in the scheme and could reasonably foresee that the mails would be used in furtherance of the same." *Rothstein v. GMAC Mortg., LLC*, No. 12-CV-3412, 2013 WL 5437648, at *16 (S.D.N.Y. Sept. 30, 2013) *rev'd on other grounds* 794 F.3d 256 (2d Cir. 2015); *see also In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998) ("In complex civil RICO actions involving multiple defendants . . . Rule 9(b) does not require that the temporal geographic particulars of each mailing or wire transmission made in furtherance of the fraudulent scheme be stated with particularity.  In such cases, Rule 9(b) requires only that the plaintiff delineate, with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme." (internal citation and footnote omitted)).  Here, as discussed above, the Amended Complaint plausibly alleges that each Defendant directly participated in the scheme, and because the scheme involved multiple communications with individuals outside of New York, (Am. Compl. Ex. A), each participant could "reasonably foresee" that mails and interstate wires "would be used in furtherance" of the scheme.  *Rothstein*, 2013 WL 5437648, at *16; *see also United States v. Amico*, 486 F.3d 764, 781 (2d Cir. 2007) ("To prove that a defendant caused a mailing, it is sufficient to prove that he could have reasonably foreseen that the mailing would take place."); *SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68, 76 (E.D.N.Y. 2006) (noting that even "[t]he fact that a third party may have caused the use of the mails does not render the pleading defective, so long as the defendants could reasonably have foreseen that the third-party would use the mails in the ordinary course of business as a result of defendants' act" (internal quotation marks omitted)).  Accordingly, the Court finds that Plaintiff's allegations of Defendants' use of the mails and wires, (*see* Am. Compl. ¶¶ 192–194; *id.* Ex. A), combined with Plaintiff's specific allegations

against each Defendant described above, satisfies its obligation under Rule 9(b) as to the mail and wire fraud predicate acts.[2]

### iii.  Operation and Management

Moving Defendants argue that Plaintiff has not adequately alleged that they participated in the operation or management of the alleged RICO enterprise.  (Tobia Defs.' Mem 8; ACC Mem. 8-9.)  The Supreme Court first articulated the operation and management requirement in *Reves v. Ernst & Young*, 507 U.S. 170 (1993), where it explained that "to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs."  *Id*. at 179 (quoting § 1962(c)).  *See also id.* at 184 ("[I]t is clear that Congress did not intend to extend RICO liability under § 1962(c) beyond those who participate in the operation or management of an enterprise through a pattern of racketeering activity.").  In the Second Circuit, "the 'operation or management' test typically has proven to be a relatively low hurdle for plaintiffs to clear, especially at the pleading stage."  *First Capital Asset Mgmt., Inc.*, 385 F.3d at 176 (citations omitted).  The question for the Court is simply whether "the RICO defendant . . .

---

[2] Because Plaintiff has adequately pled the two RICO predicates of wire fraud and mail fraud, the Court need not address the Plaintiff's allegations regarding the acts of bank fraud and violations of the NSPA.  *See Kriss*, 2016 WL 7046816, at *14  ("Because the [Third Amended Complaint] satisfies the racketeering element based on the alleged predicate acts of mail or wire fraud and violations of the NSPA against Plaintiffs, it is not necessary to determine whether the other predicate acts alleged in the Third Amended Complaint satisfy the pleading standard."); *Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 405 (S.D.N.Y. 2013) (declining to address the predicate acts of witness tampering, extortion, and money laundering where the amended complaint "adequately pleads . . . individual instances of alleged mail or wire fraud corresponding to the allegedly fraudulent [scheme]"); *Attick v. Valeria Assocs., L.P.*, 835 F. Supp. 103, 113 (S.D.N.Y. 1992) ("Since the complaint adequately pleads the two RICO predicate acts of bank fraud and interstate transportation of money obtained through fraud, there is no need to consider the alleged defects in the pleading of the mail and wire fraud claims.").  The Court also notes that none of the Moving Defendants addressed any of the allegations of bank fraud or violations of the NSPA in their papers.  (*See generally* Tobia Defs.' Mem.; ACC Mem.)

played *some* part in directing the enterprise's affairs." *Id.* (alteration and internal quotation marks omitted). "*Reves*' 'operation or management test' requires neither primary responsibility for enterprise affairs, nor . . . a formal position in the enterprise, only that a defendant have "'some part in directing the enterprise's affairs.'" *City of New York v. LaserShip, Inc.*, 33 F. Supp. 3d 303, 310 (S.D.N.Y. 2014) (quoting *Reves*, 507 U.S. at 179).[3]

As discussed above, Plaintiff has alleged that each defendant "played *some* part in directing the enterprise's affairs." *First Capital Asset Mgmt., Inc.*, 385 F.3d at 176 (internal quotation marks omitted). For example, Santangelo and DiStefano, "without authorization," paid themselves, via Premium Staffing, $873,475 between 2010 and 2014 "for simply handing money from the Condominium to . . . its valet parking service provider, paying utilities, and a few other monthly expenses." (Am. Compl. ¶ 168.) Moreover, Premium Parking is alleged to have, on its own accord, "paid itself far in excess of the amounts described in the Parking Agreement in 2015 and 2016." (*Id.* ¶ 169.) These individuals and entities allegedly transferred $680,964.82 of the Condominium's money to members of the Palazzolo Enterprise or others from 2008 to 2015. (*Id.* ¶ 172.) Moreover, Reitano, Tobia, RLA, First Resource, and Ridgewood LLC are all alleged to have played a part in the numerous "unauthorized, undisclosed, and illegal round trip transfers back and forth of the Condominium's funds." (*Id.*

---

[3] ACC cites to case law that states that the "operation and management test set forth in *Reves* is a very difficult test to satisfy." (ACC Mem. 8. (alteration omitted) (quoting *Amsterdam Tobacco v. Philip Morris Inc.*, 107 F. Supp. 2d 210, 216 (S.D.N.Y. 2000) (alterations and internal quotation marks omitted).) However, this case predates *First Capital* and does not reflect the law in the Second Circuit. *See First Capital Asset Mgmt., Inc.*, 385 F.3d at 176 ("In this Circuit, the 'operation or management' test typically has proven to be a relatively low hurdle for plaintiffs to clear, especially at the pleading stage" (citing *Baisch v. Gallina*, 346 F.3d 366, 377 (2d Cir. 2003); *De Falco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001); and *United States v. Allen*, 155 F.3d 35, 42–43 (2d Cir. 1998))). Notably, ACC abandoned its argument regarding operation and management in its Reply. (*See* ACC Reply Mem. of Law in Supp. of Mot. To Dismiss ("ACC Reply") (Dkt. No. 152).)

¶ 93).  Indeed, Ridgeview LLC, RLA, and First Resource, under Reitano's and/or Tobia's

control, allegedly received, and facilitated the receipt of numerous transfers totaling hundreds of

thousands of dollars in allegedly stolen funds.  (*See, e.g.*, *id.* ¶¶ 135, 147, 172; *id.* Ex. A.)  At this

stage, Plaintiff has sufficiently alleged that the individual Defendants not only provided services

which were essential to the Palazzolo Enterprise's operation, but also had some part in directing

its affairs and exercised discretion over the operation of the enterprise.

### b.  RICO Conspiracy under § 1962(d)

Defendants next argue that the Complaint fails to plead a RICO conspiracy claim under

18 U.S.C. § 1962(d), (*see* Tobia Defs.' Mem. 10–12; ACC Mem. 9–10), which makes it

"unlawful for any person to conspire to violate any of the provisions of [§ 1962(c)]," 18 U.S.C.

§ 1962(d).  To the extent that Defendants base this argument on their challenges to the

substantive RICO claim under § 1962(c), the argument fails because the Court has declined to

dismiss the substantive RICO claim.  *See SKS Constructors, Inc.*, 458 F. Supp. 2d at 81

("Because the court holds that Plaintiff has properly alleged a RICO claim, the court denies the

motion to dismiss the conspiracy claim.").[4]  However, Defendants also argue that Plaintiff's

---

[4] Moreover, to the extent the Tobia Defendants attempt to dismiss the substantive claims
asserted against Mr. Palazzolo, they base the entirety of their standing to challenge such claims
on the fact that the § 1962(d) claims are brought against them based on underlying violations of
§ 1962(a), (b), and (c).  (*See* Tobia Defs.' Reply in Supp. of Mot. To Dismiss ("Tobia Defs.'
Reply") 6 (Dkt. No. 154).)  However, there is no need for the Court to address the Tobia
Defendants' arguments on the basis of Plaintiff's substantive RICO claims against Mr. Palazzolo
under § 1962(a) and (b), because Plaintiff has adequately pled a substantive RICO violation
under § 1962(c).  Insofar as the substantive claims are attacked outside of the context of the
conspiracy claim, Defendants do not have standing to move to dismiss the substantive claims not
actually asserted against them.  *See Gordon v. Sonar Capital Mgmt. LLC*, 962 F. Supp. 2d 525,
533 n.4 (S.D.N.Y. 2013) ("The Court however, rejects the moving defendants' other arguments
for dismissal of the state law claims, as these defendants lack standing to attack the sufficiency
of the claims that proceed only against the unnamed 'John Doe' defendants."); *Chabad
Lubavitch of Litchfield Cty, Inc. v. Borough of Litchfield, Conn.*, No. 09-CV-1419, 2010 WL
1882308, at *3 (D. Conn. May 10, 2010) ("[A] party may only file a Rule 12(b) motion

allegations "are far too vague and conclusory to state a claim." (Tobia Defs.' Mem. 10; *see also* ACC Mem. 9–10.)  This challenge also fails.

"To establish a RICO conspiracy, a plaintiff must plead that a defendant agreed to participate in the affairs of the enterprise through a pattern of racketeering activity." *N.Y. Dist. Council of Carpenters Pension Fund v. Forde*, 939 F. Supp. 2d 268, 282 (S.D.N.Y. 2013).  In doing so, a defendant need not agree specifically to commit at least two predicate acts; instead, a defendant may violate § 1962(d) if he or she "commit[s] at least two acts of racketeering activity" and "knew about and agreed to facilitate the scheme." *Salinas v. United States*, 522 U.S. 52, 66 (1997); *accord United States v. Yannotti*, 541 F.3d 112, 122 (2d Cir. 2008) ("*Salinas* held that to be found guilty of RICO conspiracy, a defendant need only know of, and agree to, the general criminal objective of a jointly undertaken scheme." (citing *Salinas*, 522 U.S. at 63)); *United States v. Zichettello*, 208 F.3d 72, 100 (2d Cir. 2000) ("To be convicted as a conspirator, one must be shown to have possessed knowledge of only the general contours of the conspiracy.").  Therefore, Plaintiff "must allege some factual basis for a finding of a conscious agreement among the defendants." *Picard v. Kohn*, 907 F. Supp. 2d 392, 400 (S.D.N.Y. 2012) (quoting *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 26 n.4 (2d Cir. 1990).)).  But "a defendant's agreement to join a conspiracy can be inferred from circumstantial evidence of the defendant's status in the enterprise or knowledge of wrongdoing." *N.Y. Dist. Council of*

---

presenting a defense to claims asserted against it."); *Kuklachev v. Gelfman*, 600 F. Supp. 2d 437, 455 (E.D.N.Y. 2009) ("Movants do not have standing to move on behalf of other defendants to this action."); *Dover Ltd. v. A.B. Watley, Inc.*, No. 04-CV-7366, 2006 WL 2987054, at *8 (S.D.N.Y. Oct. 18, 2006) ("What [the defendant] fails to note is that he has not been named as a defendant in any claim for relief other than Count I.  Accordingly, he lacks standing to attack the legal sufficiency of those other counts.").  Accordingly, the Court will not address the Tobia Defendants' arguments as to the merits of Plaintiff's claims asserted solely against Mr. Palazzolo.

*Carpenters Pension Fund*, 939 F. Supp. 2d at 282 (internal quotation marks omitted).  The Court analyzes the Amended Complaint's allegations of a § 1962(d) conspiracy under the "more liberal pleading requirements of Rule 8(a)."  *Hecht*, 897 F.2d at 26 n.4.

Here, the Complaint satisfies this standard.  While Plaintiff alleges, in somewhat conclusory fashion, that "[D]efendants entered into a series of agreements between and among each other to engage in a conspiracy," (Am. Compl. ¶ 220), Plaintiff also alleges facts that support an inference that such an agreement did exist, *see U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 454 (S.D.N.Y. 2004) (denying motion to dismiss RICO conspiracy claim where "conclusory statements [in the complaint] [were] buttressed by . . . more specific allegations").  For example, the Amended Complaint alleges that each Defendant "participat[ed], directly or indirectly, in the conduct of the affairs of the Palazzolo Enterprise through a pattern of racketeering activity, including an agreement that the conspirators, or one of them, would commit or cause the commission of two or more racketeering acts constituting such a pattern." (Am. Compl. ¶ 221.)  The Court has already held that Plaintiff has alleged such knowledge with respect to the Defendants, given their positions within the Palazzolo Enterprise and the individual acts that they undertook on its behalf.  *See De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 311 (S.D.N.Y. 2013) (denying motion to dismiss a RICO conspiracy claim where the complaint "pled facts demonstrating . . . that each of the individual defendants, by nature of their positions in the alleged racketeering enterprise, knew of the general nature of the conspiracy and facilitated the furtherance of the conspiracy"); *Crabhouse of Douglaston Inc.*, 801 F. Supp. 2d at 90 (denying motion to dismiss RICO conspiracy claim where the plaintiff alleged that each defendant "agreed to participate in a scheme whose ultimate objective must have been known to its participants, or so a jury could reasonably conclude," and where one

defendant, "who operated solely at the behest of his superiors, would have known that the purpose behind his task" was to further the fraudulent scheme); *Metro. Transp. Auth. v. Contini*, No. 04-CV-104, 2005 WL 1565524, at *5 (E.D.N.Y. July 6, 2005) (denying motion to dismiss RICO conspiracy claim where the plaintiff "alleged [an individual defendant] to have been in charge of the day-to-day operations of [a corporate defendant]," such that the individual was alleged to be "a sufficiently high level employee to impute knowledge of the wrongdoing on [the corporate defendant]"); *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*, 375 F. Supp. 2d 141, 151 (E.D.N.Y. 2005) (denying motion to dismiss conspiracy claim against defendants whom plaintiffs alleged to have played a "'support' role . . . in furtherance of the pattern of racketeering activity," including mailing fraudulent documents).

Moreover, the Amended Complaint alleges that each Defendant benefitted financially from the scheme in the form of profits and income derived directly from their participation in the scheme.  (*See* Am. Compl ¶ 17 ("Thomas conspired with [D]efendants to enrich herself and fund the business activities of the Palazzolo Enterprise."); *id*. ¶ 171 ("[W]hen the garage was making money . . . , Premium Staffing was simply distributing those profits to members of the Palazzolo Enterprise.  Palazzolo, DiStefano, and Santangelo were stealing from the Condominium in two ways: first, by diverting enormous unauthorized monthly fees to Premium Staffing and/or Premium Parking; and second, by distributing any profits the garage made to the coffers of the members of the Palazzolo Enterprise."); *see also id*. ¶¶ 13–16 (alleging that Tobia, Reitano, Santangelo, and DiStefano "conspired to fund his [or her] business activities and the business activities of the Palazzolo Enterprise with money stolen from the Condominium by Palazzolo"); *id.* ¶¶ 19–22, 26 (alleging that RLA, Premium Parking, Premium Staffing, ACC, and First Resource "received monies—and facilitated the receipt of monies by others—that were

stolen from the Condominium by Palazzolo").)  This supports an inference that Defendants knowingly participated in the conspiracy.  *See United States v. Heras*, 609 F.3d 101, 111 (2d Cir. 2010) (holding that "anticipated compensation" based on the possible "achievement of [a] . . . scheme" may "support[] a jury inference that a defendant knows and has adopted the conspiracy's goals"); *United States v. Aleskerova*, 300 F.3d 286, 293 (2d Cir. 2002) ("A defendant's knowing and willing participation in a conspiracy may be inferred from . . . evidence that the defendant . . . received or expected to receive a share of the profits from the conspiracy.") (internal citation omitted).  The Court therefore denies both of the Motions to Dismiss the conspiracy claim.  *See Serin*, 2009 WL 7823216, at *14 ("The [p]laintiffs allege that the [d]efendants conspired with others to commit predicate acts of mail fraud in furtherance of their scheme to extort money from the [p]laintiffs; that each of the individual [d]efendants, by nature of their positions . . . knew of the general nature of the conspiracy and facilitated the furtherance of the conspiracy; and that none of the [d]efendants have withdrawn or otherwise dissociated themselves from the conspiracy or the other conspirators. . .  Thus the Plaintiff has sufficiently alleged their RICO conspiracy claim against all of the [d]efendants under the liberal pleadings requirements of Rule 8(a) . . . " (citation omitted)).

### c.  State Law Claims

#### i.  Conversion, Unjust Enrichment, and Money Had and Received

ACC moves to dismiss Plaintiff's claims for conversion, unjust enrichment, money had and received, and aiding and abetting breach of fiduciary duty.  (*See* ACC Mem. 10–11.)  The crux of ACC's argument is that the claims for conversion, unjust enrichment, and money had and received are simply duplicative of a breach of contract claim.  (*See id.* at 10–11.)  However, as discussed above, Plaintiff does not assert a breach of contract claim against ACC—that claim is

solely directed at Reda Romano and is wholly unrelated to the conduct of ACC.  (*See* Am.

Compl. ¶¶ 266–71.)  Indeed, Plaintiff does not allege the existence of *any* contract between it and

ACC, nor does it allege any provisions of a hypothetical contract that ACC hypothetically

breached.  There is no contract attached to the pleadings, nor is there any contract attached to any

Party's motion papers of which the Court could, hypothetically, take judicial notice.  *See*

*Schwartz v. Schwartz*, No. 14-CV-3877, 2014 WL 6390316, at *4 (E.D.N.Y. Nov. 17, 2014)

("[The] [p]laintiff's fraud claim is not duplicative or redundant of any contract claim, as no

breach of contract claim is pled.").  Moreover, even if this hypothetical contract did exist, under

Federal Rule of Civil Procedure 8(d), a plaintiff can plead in the alternative such that it can

challenge the validity of the contract *and* allege unjust enrichment.  *See Adler v. Pataki,* 185 F.3d

35, 41 (2d Cir. 1999) ("[Rule 8(d)] offers sufficient latitude to construe separate allegations in a

complaint as alternative theories, at least when drawing all inferences in favor of the nonmoving

party as we must do in reviewing orders granting motions to dismiss."); *Singer v. Xipto Inc.*, 852

F. Supp. 2d 416, 426 (S.D.N.Y. 2012) ("While a party generally may not simultaneously recover

upon a breach of contract and unjust enrichment claim arising from the same facts, it is still

permissible to plead such claims as alternative theories.").  Indeed, "[u]njust enrichment may be

plead in the alternative where the plaintiff challenges the validity of the contract; it may not be

plead in the alternative alongside a claim that the defendant breached an enforceable contract."

*King's Choice Neckwear, Inc. v. Pitney Bowes, Inc.,* No. 09-CV-3980, 2009 WL 5033960, at *7

(S.D.N.Y. Dec. 23, 2009), *aff'd*, 396 F. App'x 736 (2d Cir. 2010).  As is made clear by

Plaintiff's failure to even plead the existence of a contract between it and ACC, the Parties do not

agree that a single, enforceable contract governs their dispute.  "Thus, it is not settled that an

enforceable contract exists which would preclude equitable remedies, such as unjust

enrichment," conversion, or money had and received.  *Singer*, 852 F. Supp. 2d at 426; *Gladsky v. Frank Scobbo Contractors, Inc.*, No. 16-CV-2365, 2017 WL 3731323, at *5 (E.D.N.Y. Aug. 29, 2017) ("Where, as here, there is a dispute whether a valid and enforceable contract exists between the parties, the unjust enrichment claim should not be dismissed.").

As to the merits of these state law claims, which ACC fails to even address in its Motion, (*see* ACC Mem.), Plaintiff has pled that ACC, through its controlling owners Mr. Palazzolo and Tobia, knew that the unit owned by ACC was not being charged for electricity use, and instead, that cost was being unjustly borne by the Condominium and its unit owners.  (*See* Am. Compl. ¶ 178.)  Indeed, Plaintiff alleges that Mr. Palazzolo allegedly concocted a scheme in which he told ACC's tenants that ACC was paying the Condominium for the electrical charges, and thus the bill could be paid directly to Palazzolo, as the owner of ACC, which in turn was the owner of the commercial space.  (*Id.* ¶ 179.)  In fact, no payments were ever made by Mr. Palazzolo, Tobia, or ACC, for electricity.  (*Id.* ¶¶ 178–80.)  ACC continues to refuse to pay any portion of the charges for maintenance and utilities owed by it to the Condominium that ACC was, according to Plaintiff, obligated to pay initially.  (*Id.* ¶ 179.)  To state a claim for conversion, "a plaintiff must show that: (1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights."  *Moses v. Martin,* 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004) (internal quotation marks and citation omitted).  As to a claim of unjust enrichment, "[the] plaintiff must demonstrate 1) defendant was enriched; 2) defendant's enrichment came at plaintiff's expense; and 3) circumstances were such that in equity and good conscience defendant should compensate plaintiff."  *Shamrock Power Sales, LLC v. Scherer*, No.

12-CV-8959, 2015 WL 5730339, at *31 (S.D.N.Y. Sept. 30, 2015) (alterations and internal

quotation marks omitted).  At this stage, Plaintiff has adequately alleged the existence of unjust

enrichment, conversion, and money had and received claims, as it alleges that the funds withheld

by ACC were rightfully the property of the Condominium, and that ACC withheld and took that

money to the detriment of the Condominium, who was allegedly the rightful owner of those

funds.  (*See* Am. Compl. ¶¶ 225–28, 246–52.)  Accordingly, the Court denies ACC's motion to

dismiss these claims.

<u>ii.  Aiding and Abetting Breach of Fiduciary Duty</u>

With regard to Plaintiff's aiding and abetting claim, ACC argues that Plaintiff "fails to

allege how ACC (as opposed to Tobia) did anything to "aid and abet" Mr. Palazzolo's breach of

fiduciary duty."  (ACC Mem. 11.)  ACC does not appear to dispute that Plaintiff has adequately

pled that Mr. Palazzolo breached his fiduciary duty to Plaintiff, but rather that ACC did not aid

and abet Mr. Palazzolo in his breach.  "[T]o adequately plead a claim of aiding and abetting a

breach of fiduciary duty under New York law, a plaintiff must allege: (1) breach of a fiduciary

duty owed to the plaintiff; (2) defendant's knowing participation in the breach; and (3)

damages."  *Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 460 (S.D.N.Y.

2007); *see also Levy v. Young Adult Inst., Inc.*, 103 F. Supp. 3d 426, 441 (S.D.N.Y. 2015)

(same).  Here, Plaintiff alleges that ACC was not being charged for electricity use, and instead,

that cost was being borne by the Condominium and its unit owners.  (*See* Am. Compl. ¶ 178.)

Plaintiff further alleges that Mr. Palazzolo, a fiduciary of Plaintiff by virtue of his status as

treasurer, (*see id.* ¶¶ 6, 11), knew that ACC was not being charged as it should have been, and

thereafter crafted a plan in which he informed ACC's tenants that ACC was paying the

Condominium for the electrical charges, and thus the bill could be paid directly to Palazzolo as

opposed to the Condominium.  (*Id.* ¶ 179.)  Mr. Palazzolo and Tobia, the sole owners and

employees of ACC, then kept those funds in lieu of returning them to Plaintiff.  (*Id.* ¶ 180.)

ACC does not challenge that Mr. Palazzolo breached a fiduciary duty to Plaintiff and the Court

concludes that Plaintiff has plead sufficient facts to create a strong inference that ACC had actual

knowledge of this breach.  Indeed, Plaintiff has alleged that Mr. Palazzolo was one of only two

controlling members of ACC, (*id.* ¶ 177), and that ACC had knowledge of Mr. Palazzolo's

intentional diversion of funds owed by ACC to the Condominium, particularly because ACC has

refused to return the more than $300,000 allegedly withheld from the Condominium by ACC for

electrical charges,  (*see id.* ¶ 179).  Thus, at this stage, Plaintiff has adequately pled ACC's

knowing participation in Mr. Palazzolo's breach, and ACC's motion to dismiss Plaintiff's aiding

and abetting breach of fiduciary duty claims is denied.

### 2.  Palazzolo Counterclaims and Palazzolo Defendants' Affirmative Defenses

Plaintiff has moved to dismiss the unjust enrichment and promissory estoppel

counterclaims asserted by Mr. Palazzolo on numerous grounds, including waiver, timeliness, and

on the merits.  (*See* Pl.'s Mem. in Supp. of Mot. To Dismiss Counterclaims ("Pl.'s Mem.") 8–21

(Dkt No. 142).)  Plaintiff also seeks to strike the Palazzolo Defendants' affirmative defenses to

Plaintiff's Amended Complaint.  (*See id.* 21–22.)

### a.  Unjust Enrichment

As previously discussed, to state a claim for unjust enrichment, a party must demonstrate

"1) [the counterclaim] defendant was enriched; 2) [the counterclaim] defendant's enrichment

came at [the counterclaim] plaintiff's expense; and 3) circumstances were such that in equity and

good conscience [the counterclaim defendant] should compensate [the counterclaim plaintiff]."

*Shamrock Power Sales, LLC*, 2015 WL 5730339, at *31 (internal quotation marks omitted); *see*

*also Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (same).

Here, the fundamental question "is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." *Tasini v. AOL, Inc.*, 851 F. Supp. 2d 734, 740 (S.D.N.Y. 2012) (internal quotation marks omitted), *aff'd*, 505 F. App'x 45 (2d Cir. 2012); *see also St. John's Univ., New York v. Bolton*, 757 F. Supp. 2d 144, 182 (E.D.N.Y. 2010) ("The essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." (internal quotation marks omitted)).  Similarly to the plaintiffs in *Tasini*, Mr. Palazzolo alleges "he entered into [his] transactions with [and on behalf of] the [Board] with full knowledge of the facts and no expectation of compensation." *Tasini*, 851 F. Supp. 2d at 740.  Mr. Palazzolo alleges that he was elected to the Board in 2007 and elected treasurer of the Board in 2009. (Counterclaims ¶¶ 247–48.)  "Throughout his tenure . . . [Mr.] Palazzolo used his business acumen and experience to act *on behalf of the Board so as to benefit the Condominium.*"  (*Id.* ¶ 249 (emphasis added).)  Indeed, in reliance on representations made to the Board as to his "broad, unfettered discretion and authority to act on" *the Board's* behalf, (*id.* ¶ 250), Mr. Palazzolo "gave up the personal business opportunities" described in the counterclaims and forewent "the monetary benefit that would have been conferred upon himself personally and instead *acted so as to benefit the Board and the Condominium,*" (*id.* ¶ 251) (emphasis added). Mr. Palazzolo thus "consummate[d] the transactions as described below *so as to benefit the Board and its Condominium.*"  (*Id.* ¶ 252.) (emphasis added).

Notably missing from Mr. Palazzolo's counterclaims is *any* mention of *any* expectation that he would be compensated for the transactions he made *on behalf of the Board* and for the

benefit *of the Board and the Condominium*.  "Courts applying New York law require a plaintiff to allege some expectation of compensation that was denied in order to demonstrate that equity requires restitution."  *Tasini*, 851 F. Supp. 2d at 740.  By contrast, Mr. Palazzolo's Counterclaims repeatedly plead the exact opposite of such an expectation; instead, he affirmatively pleads that he entered into the transactions on behalf of, and for the benefit of, the Board and the Condominium with full knowledge that he would not be compensated. (Counterclaims ¶ 260 ("[Mr.] Palazzolo was authorized to use and did use the Reserve Account at his discretion so as to enhance its value and further the business of the Board and the Condominium."); *id.* ¶ 275 ("As of the date of the Purchase Money Mortgage and for purposes of benefitting the Board and the Condominium, F. Palazzolo *agreed not to collect the accrual of past interest* on the unit." (emphasis added)); *id.* ¶ 285 ("[Mr.] Palazzolo did not take advantage of this clear business opportunity . . . and advised the Board that it would be in the best interest of the Condominium to purchase the Rec Deck and Garage."); *id.* ¶ 298 ("[Mr.] Palazzolo used his personal contacts . . . to effect the emergency repairs, for the benefit of the Board and unit owners, without payment or commissions he otherwise could have obtained.").)  Simply put, Mr. Palazzolo claims he was "granted broad, unfettered discretion and authority" by the Board to act on behalf of the Board and Condominium.  Mr. Palazzolo then used that authority to effect transactions on behalf of the Board and Condominium that were designed to benefit the Board and Condominium, without any expectation that he would be compensated for the supposed lost opportunity to benefit himself.  Effectively, Mr. Palazzolo seeks to recover the profits for opportunities that he willingly gave to the Board and Condominium, and of which he had no expectation of profit.  "[T]hat is an effort to change the rules of the game after the game has been played, and equity and good conscience require no such result."  *Tasini*, 851 F. Supp. 2d at 741;

*see also Leibowitz v. Cornell Univ.*, 584 F.3d 487, 509 (2d Cir. 2009) ("[I]n the absence of any proof that plaintiff had a reasonable basis for believing she would receive compensation, . . . it cannot be said that principles of equity require any restitution."); *Borghese Trademarks Inc. v. Borghese*, No. 10-CV-5552, 2013 WL 143807, at *19 (S.D.N.Y. Jan. 14, 2013) (dismissing unjust enrichment counterclaim where the defendant "could not have had a reasonable expectation of compensation from [the plaintiff]"); *In re Jetblue Airways Corp. Privacy Litig.*, 379 F. Supp. 2d 299, 330 (E.D.N.Y. 2005) (dismissing unjust enrichment claim where the plaintiffs failed to "allege[] facts to suggest that JetBlue obtained any benefit that rightfully belonged to them or that they were otherwise subjected to any injustice by virtue of JetBlue's conveyance of their personal data").  Accordingly, Mr. Palazzolo's unjust enrichment counterclaim is dismissed.

### b.  Promissory Estoppel

"In New York, promissory estoppel has three elements: a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made[;] and an injury sustained by the party asserting the estoppel by reason of the reliance." *Darby Trading Inc. v. Shell Int'l Trading & Shipping Co.*, 568 F. Supp. 2d 329, 341 (S.D.N.Y. 2008) (quoting *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir. 1995)); *see also Baguer v. Spanish Broad. Sys., Inc.*, No. 04-CV-8393, 2007 WL 2780390, at *5 (S.D.N.Y. Sept. 20, 2007) (same).  "A promise that is too vague or too indefinite is not actionable under a theory of promissory estoppel; the alleged promise must be clear and unambiguous." *Kilgore v. Ocwen Loan Servicing, LLC*, 89 F. Supp. 3d 526, 534 (E.D.N.Y. 2015) (internal quotation marks omitted).  To invoke the doctrine of promissory estoppel to circumvent the Statute of Frauds, a "plaintiff must demonstrate unconscionable injury, i.e., injury beyond that which flows naturally

(expectation damages) from the non-performance of the unenforceable agreement." *Merex A.G.*

*v. Fairchild Weston Sys., Inc.,* 29 F.3d 821, 826 (2d Cir. 1994) (internal quotation marks

omitted); *see also Komlossy v. Faruqi & Faruqi, LLP*, No. 15-CV-9316, 2017 WL 722033, at *8

(S.D.N.Y. Feb. 23, 2017) (same), *aff'd*, 714 F. App'x 11 (2d Cir. 2017).[5]

   The Court finds it somewhat difficult to divine what "clear and unambiguous promise" is

at issue in Mr. Palazzolo's Counterclaims.  As pled, it is the decision by "the majority of the

members of the Board" to grant Mr. Palazzolo "full and complete control over the Reserve

Account and permission and authority to engage in transactions involving the Board, which in

[Mr.] Palazzolo's experience, were in the best interests of the Board and the Condominium,"

(*id.* ¶ 259).  This is a "vague and indefinite" promise that Mr. Palazzolo could essentially act in

---

[5] The Statute of Frauds clearly applies to the alleged oral promise made to Mr. Palazzolo. "[T]he Statute of Frauds renders unenforceable unwritten agreements that are impossible, by their own terms, to complete within one year of their creation." *Andrews v. Sony/ATV Music Publ'g, LLC*, No. 15-CV-7544, 2017 WL 770614, at *6 (S.D.N.Y. Feb. 24, 2017); *see also* N.Y. Gen. Oblig. Law § 5–701(a)(1).  "[C]ontracts of indefinite duration are deemed to be incapable of being performed within a year, and thus fall within the ambit of the Statute of Frauds."  *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 419 (S.D.N.Y. 2007) (internal quotation marks omitted).  The Counterclaims allege that "the majority of the members of the Board," granted Mr. Palazzolo "full and complete control over the Reserve Account and permission and authority to engage in transactions involving the Board, which in [Mr.] Palazzolo's experience, were in the best interests of the Board and the Condominium."  (*Id.* ¶ 259.)  By its pleaded terms, Mr. Palazzolo's alleged oral agreement with the Board is that he was granted "full and complete control over the Reserve Account and permission and authority to engage in transactions involving the Board" with no end date, no termination provisions, and is thus pled as an indefinite secession of power by the Board to Palazzolo.  (*Id.*)  Indeed, the whole basis for Mr. Palazzolo's promissory estoppel claim is that he was granted general authorization to act under this "broad mandate" that was abruptly terminated in 2015.  (*Id.* ¶¶ 359–369.)  Accordingly, the promise had no end date—as Mr. Palazzolo could have gone on with this grant of power forever under the terms of the agreement as pled.  *See Grayson v. Ressler & Ressler*, 271 F. Supp. 3d 501, 522 (S.D.N.Y. 2017) (finding an agreement to fall within the statute of frauds where the plaintiff's pleadings "suggest that [the] [d]efendants have an on-going contractual obligation to *forever*" perform under the terms of the agreement); *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d at 419 ("By its pleaded terms, this is a contract of indefinite duration.  No termination provision, express or implied, is alleged.").

the Board's best interest, but did not set the parameters of this relationship in any way.  *See*

*Ashland Inc. v. Morgan Stanley & Co.*, 700 F. Supp. 2d 453, 472 (S.D.N.Y. 2010) (holding that a

"promise to act was so vague and indefinite that reliance upon that promise . . . cannot be said to

be reasonable."), *aff'd*, 652 F.3d 333 (2d Cir. 2011).  Moreover, it is far from clear how the

promise was repudiated.  Plaintiff allegedly granted Mr. Palazzolo broad, unfettered discretion,

and, pursuant to that promise of discretion, Mr. Palazzolo entered into transactions on behalf of

the Board.  (Counterclaims ¶¶ 359–63.)  Then, the Board terminated Mr. Palazzolo as treasurer

and member of the Board in September 2015, and sought recovery from Mr. Palazzolo for

damages related to transactions he undertook.  (*Id.* ¶¶ 365–68.)  Yet, the pleadings indicate that

Mr. Palazzolo, while he was the Board treasurer and member of the Board, *did* have "full and

complete control over the Reserve Account and permission and authority to engage in

transactions involving the Board."  (*Id.* ¶ 259.)  *See Gas Nat., Inc. v. Iberdrola, S.A.*, 33 F. Supp.

3d 373, 386 (S.D.N.Y. 2014) ("Plaintiff . . . cannot plausibly allege that it suffered an actionable

'injury' as a result of reliance on Defendants' promise, because it has not plausibly alleged that

Defendants acted in a way inconsistent with that promise.").  To the extent that his termination

from the Board is a repudiation, the Court notes that the promise *is not* alleged to be that he may

maintain the position or that he would maintain this discretion outside of his presence on the

Board; rather, the pleadings are such that Mr. Palazzolo received this broad grant of "full and

complete control over the Reserve Account and permission and authority to engage in

transactions involving the Board" in conjunction with his role as Board member and treasurer.

(Counterclaims ¶ 259.)  Once his tenure on the Board was terminated, it would be logical that the

promise as to his discretion *as a Board member*, would no longer be enforceable.

   Nonetheless, even assuming that Mr. Palazzolo has satisfied the first two elements, he has

failed to plead an unconscionable injury.  To satisfy the "unconscionable injury" requirement,

Mr. Palazzolo "must demonstrate injuries beyond those that flow naturally from [Plaintiff's]

non-performance or from [his] continuing performance of the unenforceable agreement."  *Mobile*

*Data Shred, Inc. v. United Bank of Switz.,* No. 99–CV–10315, 2000 WL 351516, at *4 (S.D.N.Y.

Apr. 5, 2000); *see also Komlossy*, 2017 WL 722033, at *8 (same).  "Thus, in the absence of

'egregious' circumstances, courts have consistently rejected promissory estoppel claims when

the alleged injuries consisted of lost profits, lost fees, forgone business opportunities or damage

to business reputation."  *Komlossy, 2017 WL 722033, at *8.*  Here, as discussed above with

regard to Mr. Palazzolo's unjust enrichment claim, there is no injury pled *except* for foregone

business opportunities.  (*See, e.g.*, Counterclaims ¶ 363 ("As a result of the unfettered, broad

mandate and approval of the Board, together with . . . its general authorization for the manner in

which [Mr.] Palazzolo operated for its benefit, [Mr.] Palazzolo did not take or acquire the

numerous benefits and financial gains he otherwise would have obtained from the transactions

described above."); *id.* ¶ 364 ("The . . . lost financial benefit to [Mr.] Palazzolo . . . is measured

by the [Mr.] Palazzolo Loss."); *id.* ¶ 346 (defining the "Palazzolo Loss" as "[t]he value of the

business opportunities [Mr.] Palazzolo did not pursue").)  Such injuries related to Mr.

Palazzolo's lost opportunities—and, as previously discussed, Mr. Palazzolo had no expectation

to be paid for these services—would be insufficient grounds to state a promissory estoppel claim

for a promise subject to the Statute of Frauds even if Mr. Palazzolo had *any* expectation of

payment for his services.  *See Genna v. Sallie Mae, Inc.*, No. 11-CV-7371, 2012 WL 1339482, at

*6 (S.D.N.Y. Apr. 17, 2012) ("[W]here the injury is lost profits, lost fees, foregone business

opportunities, or damage to business reputation, courts in th[e] [Second] circuit have rejected as

not sufficiently unconscionable promissory estoppel claims." (internal quotation marks

omitted)); *Sugerman v. MCY Music World, Inc.*, 158 F. Supp. 2d 316, 326 (S.D.N.Y. 2001) ("Finder's fee damages represent expectation damages or the benefit of the oral contract, and do not qualify as unconscionable under the statute of frauds.") (internal quotation marks omitted); *Ellis v. Provident Life & Accident Ins. Co.,* 3 F. Supp. 2d 399, 411 (S.D.N.Y. 1998) ("[I]t is well established under New York law that injuries resulting in a[] . . . decision to forgo other career opportunities do not constitute unconscionable injuries."). Accordingly, Plaintiff's motion to dismiss the promissory estoppel counterclaim is granted.[6]

### c.  Motion To Strike Affirmative Defenses 10–29

Finally, Plaintiff moves to strike 20 of the Palazzolo Defendants' affirmative defenses, all of which relate to the legal sufficiency of the RICO claims asserted by Plaintiff. (*See* Counterclaims ¶¶ 386–425.)  "The standard that applies to a motion to strike is the 'mirror image' of the standard on a 12(b)(6) motion to dismiss for failure to state a claim." *Cohen v. Elephant Wireless, Inc.,* No. 03-CV-4058, 2004 WL 1872421, at *2 (S .D.N.Y. Aug. 19, 2004). Rule 12(f) of the Federal Rules of Civil Procedure permits a court to strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Motions to strike affirmative defenses under Rule 12(f) for legal insufficiency are generally disfavored and if there are questions of fact or disputed questions of law, the motion should be denied.  *See Landry v. Potter,* No. 04-CV-380, 2005 WL 293500, at *1 (D. Conn. Jan. 27, 2005) (citing *Salcer v. Envicon Equities Corp.,* 744 F.2d 935, 939 (2d Cir. 1984)), *vacated on other grounds,* 478 U.S. 1015 (1986)); *see also Smith v. Masterson,* No. 05-CV-2897, 2006 WL 2819591, at *1 (S.D.N.Y. Sept. 29, 2006) ("It is well-established in th[e] [Second]

---

[6] Because the Court has already dismissed Mr. Palazzolo's unjust enrichment and promissory estoppel claims on the merits, it need not address Plaintiff's argument that it should dismiss these claims as time-barred.

Circuit that a motion to strike an affirmative defense under Rule 12(f) . . . for legal insufficiency is not favored." (alteration and internal quotation marks omitted)); *Estee Lauder, Inc. v. Fragrance Counter, Inc.,* 189 F.R.D. 269, 271-72 (S.D.N.Y. 1999) (same).  To prevail on a motion to strike an affirmative defense, a plaintiff must establish three criteria: "(1) there is no question of fact which might allow the defense to succeed; (2) there is no question of law which might allow the defense to succeed; and (3) the plaintiff would be prejudiced by inclusion of the defense." *S.E.C. v. KPMG LLP,* No. 03-CV-671, 2003 WL 21976733, at *2 (S.D.N.Y. Aug. 20, 2003) (internal quotation marks omitted); *see also United Specialty Ins. Co. v. Fisk Fine Art Servs., LLC*, No. 15-CV-2802, 2016 WL 1268273, at *4 (S.D.N.Y. Mar. 31, 2016) (same). "Increased time and expense of trial may constitute sufficient prejudice to warrant granting plaintiff's Rule 12(f) motion." *Estee Lauder,* 189 F.R.D. at 272.  However, "'even when the facts are not disputed[,] . . . a motion to strike for insufficiency was never intended to furnish an opportunity for the determination of disputed and substantial questions of law[,] . . . particularly when there has been no significant discovery.'" *Id.* (quoting *Salcer,* 744 F.2d at 939).

Plaintiff argues that the Palazzolo Defendants' counterclaims "are not affirmative defenses—they are just argument . . . [and] are relevant argument only in support of a motion to dismiss that these Defendants cannot bring." (Pl.'s Mem. 23.)  In effect, the Palazzolo Defendants' affirmative defenses amount to a lengthy statement that Plaintiff has failed to state a RICO claim against the Palazzolo Defendants under § 1962(a)–(d).  (*See* Counterclaims ¶¶ 386–425.)  However, "it is well settled that the failure-to-state-a-claim defense is a perfectly appropriate affirmative defense to include in the answer." *McCaffery v. McCaffery*, No. 11-CV-703, 2012 WL 3260299, at *6 (E.D.N.Y. Aug. 8, 2012) (internal quotation marks omitted); *Erickson Beamon Ltd. v. CMG Worldwide, Inc.,* No. 12-CV-5105, 2014 WL 3950897, *4

(S.D.N.Y. Aug.13, 2014) (same); *Aros v. United Rentals*, No. 10-CV-73, 2011 WL 5238829, at

*4 (D.Conn. Oct. 31, 2011) ("It is well settled . . . that a party may include failure to state a claim

as an affirmative defense in its answer, and that such a defense is invulnerable as against [a

motion to strike]." (internal quotation marks omitted)). "Although the defense is arguably

redundant in that it is essentially a general denial, there is no prejudicial harm to plaintiff and the

defense need not be stricken." *Erickson Beamon Ltd.*, 2014 WL 3950897, at *4 (internal

quotation marks omitted); *see also Simon v. Mfrs Hanover Trust Co.,* 849 F. Supp. 880, 882

(S.D.N.Y. 1994) (same).  That the Palazzolo Defendants spend 40 paragraphs dissecting the

individual elements of the RICO claims is irrelevant, as the sum total of the affirmative defenses

is that Plaintiff has failed to state a claim upon which relief may be granted.  Accordingly, while

the affirmative defenses are not a model of efficiency, they present no prejudicial harm to

Plaintiff as they are merely a general denial of the claims asserted against the Palazzolo

Defendants.  Thus, Plaintiff's motion to strike affirmative defenses 10–29 is denied.

### III.  Conclusion

For the reasons stated herein, the Court denies the Tobia Defendants' Motion To Dismiss

and ACC's Motion To Dismiss.  The Court grants Plaintiff's Motion To Dismiss Mr. Palazzolo's

unjust enrichment and promissory estoppel counterclaims with prejudice, but denies Plaintiff's

Motion To Strike the affirmative defenses.  The Clerk of Court is respectfully requested to

terminate the pending Motions.  (Dkt. Nos. 138, 140, 144 and 150.)

SO ORDERED.

DATED:      September 28, 2018
            White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE